**2016-2323**

# United States Court of Appeals for the Federal Circuit

PAPST LICENSING GMBH & CO. KG,

*Plaintiff-Appellant,*

v.

XILINX, INC.,

*Defendant-Appellee.*

*Appeal from the United States District Court for the Northern District of California in No. 5:16-cv-00925-LHK, Judge Lucy Koh*

## CORRECTED BRIEF FOR PLAINTIFF-APPELLANT

ANDREW G. DINOVO
JAY D. ELLWANGER
NICOLE E. GLAUSER
DINOVO PRICE ELLWANGER & HARDY LLP
7000 N. MoPac Expressway, Suite 350
Austin, Texas 78731
Telephone: (512) 539-2626
Facsimile: (512) 539-2627

*Counsel for Plaintiff-Appellant*
*Papst Licensing GmbH & Co. KG*

OCTOBER 4, 2016

COUNSEL PRESS, LLC (888) 277-3259 * (202) 783-7288

**CERTIFICATE OF INTEREST**

Counsel for Plaintiff-Appellant Papst Licensing GmbH & Co. KG certify the following:

1. The full name of every party or amicus represented by me is:

Papst Licensing GmbH & Co. KG

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Attorneys who appeared in the trial court: DiNovo Price Ellwanger & Hardy LLP: Andrew G. DiNovo, Jay D. Ellwanger, Nicole E. Glauser, Daniel L. Schmid; Bartko Zankel Bunzel & Miller: William P. Schuck

Attorneys expected to appear in this Court: DiNovo Price Ellwanger & Hardy LLP: Andrew G. DiNovo, Jay D. Ellwanger, Nicole E. Glauser

# TABLE OF CONTENTS

***Page***


CERTIFICATE OF INTEREST ........ i

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iv

TABLE OF ABBREVIATIONS ........ vii

STATEMENT OF RELATED CASES ........ 1

JURISDICTIONAL STATEMENT ........ 2

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 2

STATEMENT OF FACTS ........ 4

I. THE PATENTS-IN-SUIT ........ 4

A. Background Principles of Memory Device Testing ........ 5

B. The Prior Art Method of Generating Tests for Memory Devices ........ 8

C. The Patented Method of Generating Verified and Run-Time Optimized Tests for Memory Devices ........ 9

D. The Asserted Claims ........ 16

II. THE DISTRICT COURT'S § 101 RULING ........ 18

SUMMARY OF ARGUMENT ........ 21

STANDARD OF REVIEW ........ 23

ARGUMENT ........ 24

I. PATENTABILITY UNDER § 101 ........ 24

A. *Alice* Step One: The "Directed to" Analysis ........ 25

B. *Alice* Step Two: The "Inventive Concept" Analysis ......................... 26

II. THE SPECIFIC LIMITATIONS OF THE ASSERTED CLAIMS ............ 27

III. THE ASSERTED CLAIMS ARE PATENT ELIGIBLE UNDER *ALICE* STEP ONE OR TWO BECAUSE THEY ARE DIRECTED TO A SPECIFIC METHOD OF IMPROVING AN EXISTING TECHNOLOGICAL PROCESS. ................................................................ 31

IV. THE ASSERTED CLAIMS RECITE AN INVENTIVE CONCEPT AND THUS ARE ELIGIBLE UNDER STEP TWO OF *ALICE* ............... 38

V. THE ASSERTED CLAIMS DO NOT PREEMPT EVERY APPLICATION OF AN ABSTRACT IDEA............................................. 42

VI. THE DISTRICT COURT'S DECISION CONFLICTS WITH APPLICABLE PRECEDENT ................................................................... 45

A. The District Court Erroneously Concluded that the Asserted Claims Were Unpatentable Because They Do Not Recite an Algorithm or Provide Detailed Implementation Instructions. .......... 46

B. The District Court Erroneously Concluded that the Asserted Claims Are Not Directed to Patentable Improvements to a Technological Process. ..................................................................... 52

C. The District Court Erroneously Concluded that the Asserted Claims Lack an Inventive Concept Because They Incorporate Allegedly Conventional, Routine Software Components. ................ 59

CONCLUSION ......................................................................................... 60

ADDENDUM ........................................................................................... 61

CERTIFICATE OF SERVICE ..................................................................... 62

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS ......... 64

# TABLE OF AUTHORITIES

***Page(s)***

**Cases**

*Adang v. Fischhoff*,
286 F.3d 1346 (Fed. Cir. 2002) .......... 51

*Affinity Labs of Texas, LLC v. Directv, LLC, et al.*,
Appeal No. 2015-1845 (Fed. Cir. Sept. 23, 2016) .......... 38

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014) .......... passim

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
788 F.3d 1371 (Fed. Cir. 2015) .......... 42

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (USA)*,
687 F.3d 1266 (Fed. Cir. 2012) .......... 58

*BASCOM Global Internet Servs., Inv. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) .......... passim

*Bilski v. Kappos*,
561 U.S. 593 (2010) .......... 42, 57

*buySAFE, Inc. v. Google, Inc.*,
765 F.3d 1350 (Fed. Cir. 2014) .......... 58

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.*,
717 F.3d 1269 (Fed. Cir. 2013) .......... 24

*CyberSource, Corp. v. Retail Decisions, Inc.*,
654 F.3d 1366 (Fed. Cir. 2011) .......... 58

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) .......... passim

*Dealertrack, Inc. v. Huber*,
674 F.3d 1315 (Fed. Cir. 2012) .......... 58

*Diamond v. Diehr*,
450 U.S. 175 (1981) .......... passim

*Elec. Power Grp., LLC v. Alston S.A.*,
--- F.3d ---, 2016 WL 4073318 (Fed. Cir. 2016)....................................................31

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016)................................................................ passim

*Genetic Techs. Ltd. v. Merial L.L.C.*,
818 F.3d 1369 (Fed. Cir. 2016).......................................................................31

*In re TLI Commc'ns LLC Patent Litig.*,
823 F.3d 607 (Fed. Cir. 2016)................................................................ 27, 31, 38

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015).......................................................................58

*Internet Patents Corp. v. Active Networks, Inc.*,
790 F.3d 1343 (Fed. Cir. 2015)................................................................ 26, 51

*Kotrous v. Goss-Jewett Co.*,
523 F.3d 924 (9th Cir. 2008).........................................................................23

*Le Roy v. Tatham*,
55 U.S. 156 (1853) ........................................................................................43

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008)................................................................ 23, 40

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
132 S. Ct. 1289 (2012) .......................................................... 25, 26, 41, 42

*McRO, Inc. v. Bandai Namco Games America*,
--- F.3d ---, 2016 WL 4896481 (Fed. Cir. 2016)...................................... passim

*Microsoft Corp. v. i4i Ltd. P'Ship.*,
564 U.S. 91 (2011) .........................................................................................23

*Mortgage Grader, Inc. v. First Choice Loan Servs., Inc.*,
811 F.3d 1314 (Fed. Cir. 2016).......................................................................57

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
134 S. Ct. 2120 (2014) ..................................................................................51

*O'Reilly v. Morse*,
56 U.S. 62 (1854) ....................42

*OIP Techs., Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015) .................... 23, 58

*Parker v. Flook*,
437 U.S. 584 (1978) .................... 25, 56

*Planet Bingo, LLC v. VKGS, LLC*,
576 Fed. App'x 1005 (Fed. Cir. 2014) ....................58

*Rapid Litig. Mgmt. Ltd. v. Cellzdirect, Inc.*,
827 F.3d 1042 (Fed. Cir. 2016) .................... 18, 25, 31

*Research Corp. Techs., Inc. v. Microsoft Corp.*,
627 F.3d 859 (Fed. Cir. 2010) .................... 32, 43, 51

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709 (Fed. Cir. 2014) .................... 24, 39, 48

*Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*,
635 F. App'x 914 (Fec. Cir. 2015) .................... 19, 47

**Statutes**

28 U.S.C. § 1295 ....................2

28 U.S.C. § 1331 ....................2

28 U.S.C. §1338 ....................2

35 U.S.C. § 101 ....................25

35 U.S.C. § 112 ....................47

35 U.S.C. § 282(a) ....................23

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| **Parties** | |
| Papst | Plaintiff-Appellant Papst Licensing GmbH & Co. KG |
| Xilinx | Defendant-Appellee Xilinx, Inc. |
| **Defined Terms** | |
| ’759 Patent | U.S. Patent No. 6,574,759 |
| ’891 Patent | U.S. Patent No. 6,704,891 |
| Asserted Claims | Claims 1, 4, 5, and 14 of the ’759 Patent and claims 1, 2, 5, and 6 of the ’891 Patent |
| court *or* district court | United States District Court for the Northern District of California, Honorable Lucy Koh presiding |
| PTAB | United States Patent and Trademark Office’s Patent Trial and Appeal Board |
| Lattice | Lattice Semiconductor, Inc. |
| Altera | Altera Corporation |

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5 of the Federal Circuit Rules, Papst states that no other appeal in or from the same civil action or proceeding in the lower court has been before this or any other appellate court.

Xilinx filed a declaratory judgment action against Papst in the district court, seeking a judgment of noninfringement and invalidity of the same patents at issue in this appeal—the ’759 and ’891 Patents. *See Papst Licensing GmbH & Co. KG v. Xilinx, Inc.*, Civil Action No. 5:14-cv-04936-LHK (N.D. Cal.). The district court dismissed Xilinx’s declaratory judgment action for lack of personal jurisdiction over Papst. Thereafter, Xilinx (1) petitioned for *inter partes* review of all claims of the ’759 and ’891 Patent (which has been instituted with regard to all Asserted Claims except claim 14 of the ’759 Patent) (Appx213); and (2) appealed the district court’s dismissal for lack of personal jurisdiction (Appeal No. 2015-1919), which has been fully briefed and was argued on September 7, 2016.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 & 1338. The district court entered a Final Judgment disposing of all claims on June 9, 2016. Papst timely filed a notice of appeal on July 8, 2016. This Court has jurisdiction pursuant to 28 U.S.C. § 1295.

## STATEMENT OF THE ISSUES

Papst's appeal presents a single issue: Whether the district court erred in finding that the Asserted Claims of the patents-in-suit recite ineligible subject matter under 35 U.S.C. § 101.

## STATEMENT OF THE CASE

Papst filed patent infringement actions in the District of Delaware against Xilinx and Lattice in November 2014 and Altera in February 2015. In October 2015, Papst and Lattice stipulated to dismissal after Lattice took a license to the patents-in-suit. *See* Dkt. 55, *Papst Licensing GmbH & Co. KG v. Lattice Semiconductor Corp.*, Case No. 14-1375-LPS (D. Del. Oct. 21, 2015). The District of Delaware subsequently granted Xilinx's and Altera's 28 U.S.C. § 1404(a) motions, and the cases were transferred to the Northern District of California on February 24, 2016. Appx40. The Northern District of California subsequently related the two cases, which were reassigned to the same district court judge. Appx40.

Xilinx filed an answer, and Altera filed an answer and asserted counterclaims. Appx76 at Dkt. 10; Appx33 at n.2. Then, on May 11, 2016, Xilinx and Altera filed

a joint Rule 12(c) motion for judgment on the pleadings, asserting that all of the Asserted Claims of the patents-in-suit recite ineligible subject matter under § 101. Papst filed its opposition on May 25, 2016. Xilinx and Altera filed a joint reply on May 30, 2016. On June 9, 2016, the district court issued a single Order Granting Motion for Judgment on the Pleadings, which was filed in both the Xilinx and Altera actions. Appx32-68. Because Xilinx had not asserted any counterclaims, the district court also entered Final Judgment in the action against Xilinx on June 9, 2016. Appx69. Papst filed a timely notice of appeal. Altera and Papst subsequently settled their dispute and jointly filed a stipulation of dismissal of Papst's claims and Altera's counterclaims. *See* Dkt. 94, *Papst Licensing GmbH & Co. KG v. Altera Corporation, et al.*, Case No. 16-0926-LHK (N.D. Cal. Aug. 5, 2016).

On June 23, 2016, Xilinx moved for attorneys' fees under 35 U.S.C. § 285, primarily arguing that Papst's assertion of the Asserted Claims and defense against Xilinx's § 101 challenge was exceptional. Appx89 at Dkt. 102. Papst filed its opposition on July 7, 2016; and Xilinx filed its reply on July 14, 2016. Appx90-91 at Dkt. 106 & 113. On August 18, 2016, the district court denied Xilinx's fees motion. Appx91 at Dkt. 116.

## STATEMENT OF FACTS

### I. THE PATENTS-IN-SUIT

Papst has a longstanding history in the field of intellectual property development and enforcement, having been in existence for over seventy years. Hermann Papst was an engineer and inventor, who was responsible for over four hundred patents in a variety of technical fields. Mr. Hermann Papst's licensure of a patent pertaining to loudspeakers enabled him to launch Papst-Motoren GmbH & Co. KG—a business that generated over six hundred patents on in-house products such as small electric motors and cooling fans. In 1992, Papst-Motoren's patent portfolio was sold to Papst, a German company founded by Mr. Hermann Papst's son, Mr. Georg Papst, that protects its own and others' intellectual property rights. After Hermann Papst's death in 1981 and the passing of Georg Papst in 2012, the family business is now run by the third generation of Papsts. Appx112-113.

Papst acquired the patents at issue here in October 2012. The original assignee of the patents is Rambus, Inc. ("Rambus"). Rambus is a world leader in the area of semiconductors and memory design and testing. The named inventors of the patents were all employees of Rambus. Appx113.

The '759 and '891 Patents are each titled "Method for Verifying and Improving Run-Time of a Memory Test." The '891 Patent is a continuation of the

patent application that lead to the ’759 Patent. The ’759 and ’891 Patents thus share nearly identical specifications.[1]

### A. Background Principles of Memory Device Testing

As described in the background section of the specification, “[m]emory devices . . . are implemented as integrated circuits (ICs)”—*i.e.*, they are hardware devices that utilize integrated circuits to store and process electronic data. Appx96 at 1:7-9. The intended operation of a memory device is governed by “operating constraints.” These “[o]perating constraints take many forms including state-based and timing-based constraints, as well as other constraints . . . .” Appx96 at 1:61-64. One example of a state-based constraint is the requirement that a bank of memory cannot be “CASed” before it has been properly “RASed.” One example of a timing-based constraint is that a memory bank may not be “CASed” too soon after it was “RASed.” Appx96 at 1:64-2:1. Essentially, in order for memory devices to operate correctly, the various read and write commands sent to a memory device must occur in a certain order and must not exceed the speed at which the memory device is capable of operating. *See* Appx96 at 1:61-2:1; *see also id*. at 2:63-66.

Given that the operation of memory devices “must be reliable,” they “have been tested since their first manufacture” to ensure that they perform as designed.

[1] Citations to the text and figures of the patents refer to the ’759 Patent specification, unless otherwise noted.

Appx96 at 1:17-18. "Very early in the history of memory device testing, specialized equipment and automated test routines were developed to improve testing efficiency." Appx96 at 1:17-21. "As the capacity and capabilities of memory devices increased, a broad range of tests were automated." Appx96 at 1:21-22.

The specification states that "[t]he expression 'memory device test(s)' . . . denote[s] a test which exercises not only the internal functionality and storage capabilities of a memory device or a collection of memory devices (such as a module), but also the ability of the memory device or module to communicate with an external memory controller." Appx97 at 4:62-67. A memory device's internal functionality, storage capabilities, and ability to communicate with an external memory controller are all governed by the memory device's "operating constraints." Appx96 at 1:58-61. To create a test, the test writer must, *inter alia*, "define a sequence of operations which store and retrieve data to/from the memory device in accordance with [the memory device's] 'operating constraints.'" Appx96 at 1:58-61. The test design process is "lengthy," and "each new test must be verified against a number of different conditions, such as temperature, data state power level, etc." Appx96 at 2:57-60.

The first memory devices were "simple and characterized by relatively few constraints. However, before the time of the invention, recent memory devices had "decreased [in] size, increased [in] storage capacity, increased [in] operating speed,

and expanded [in] capabilities." Appx96 at 1:9-10. These attributes had "revolutionized computer systems, telecommunications equipment and consumer electronics." Appx96 at 1:10-13. Yet "these attributes [had] also created a number of technical challenges," including challenges relating to the generation of tests to confirm the proper operation of the memory devices. Appx96 at 1:9-15.

In particular, more modern memory devices "ha[d] an increased number of operating constraints," which test writers had to "observe[] and account[] for during the definition and creation of a test." Appx96 at 2:5-6; *see also* Appx96 at 1:58-64. Additionally, "the use of packets to exchange control/address information and data [had] greatly expand[ed] the number of constraints which must be obeyed during the definition of a memory device test protocol." Appx96 at 2:12-15. Further, contemporary devices at the time of the invention now allowed "multiple transactions to be handled simultaneously." Appx96 at 2:7-9, 18-19. As a result, the number of operating constraints and the resultant number of interactions between these various individual constraints, which memory test writers and the memory tests themselves must account for, increased substantially. Appx96 at 2:7-20.

Under the prior art method, test writers sought "to writ[e] a test which adhere[d] to the increasing multiplicity of memory device constraints." Appx97 at 3:38-41. Test writers were also "motivated to write efficient tests." Appx97 at 3:39-40; *see also* Appx96 at 1:17-21. However, these goals were often at "odds" because

"[t]he time required to perform a test typically rises as memory devices increase in capacity and complexity." Appx97 at 3:40-44.

### B. The Prior Art Method of Generating Tests for Memory Devices

The admitted prior art method for generating memory device tests is illustrated in Figure 1 of the patents (Appx93) and set forth below.




(Prior Art)
FIG. 1

The prior art method used "interpretations of memory device constraints" to create a test at step **2** and run it at step **3** on a memory device. Appx96 at 2:42-43. When a memory device passed the test (*i.e.*, step **4**=yes), then both the test and the memory device "were ***assumed*** to be good" at step **5,** in order to reach a stopping

point and complete the conventional test generation process. Appx96 at 2:42-45 (emphasis added); Appx93. On the other hand, when the memory device failed the test (*i.e.*, step **4**=no), then at step **6** the test writer was left to guess "whether the device failed on its own accord or whether the test [was] bad." Appx96 at 2:48-50. If the test writer ***suspected*** or ***assumed*** that the test had violated one or more memory device constraints (*i.e.*, step 7=yes), then the test was changed at step **9** and the new test was run at step **3.** Appx96 at 2:49-52; Appx93. Alternatively, if the test writer did not ***suspect*** the test was bad or had ***confidence*** in the test (*i.e.*, step **7**=no), then the memory device was replaced at step **8** and the same test was run on the new memory device at step **3**. Appx96 at 2:52-54.

### C. The Patented Method of Generating Verified and Run-Time Optimized Tests for Memory Devices

As set forth in the patents, the Rambus inventors recognized several disadvantages and problems with the conventional process of test generation and verification. Mainly, the conventional process "[did] not include a mechanism for verifying compliance with actual memory device constraints." Appx97 at 3:15-17. Conventional test generation was done "without benefit of a tool which provide[d] feedback as to whether or not a test step or a test routine violate[d] one or more memory device constraints." Appx96 at 2:23-27. As a result, "when a memory device fail[ed] a test," the test writer had to "rel[y] on assumptions" regarding

whether the memory device was defective or the test had been improperly constructed. Appx96 at 2:29-31; 2:55-57.

One way the prior art method attempted to address this problem was by running the test on a number of "known-to-be-good" memory devices. Appx96 at 2:37, 55-57; *see also* Appx97 at 3:21-22; Appx96 at 2:36-37, 44-47. The Rambus inventors criticized this approach because it "involve[d] a 'chicken and egg' problem." Appx97 at 3:19-21. That is, verifying a test under the conventional process required "known-good" memory devices to generate a valid test. Appx97 at 3:21-22. "However, known-good memory devices [could not] be identified until a valid set of tests ha[d] been run" on the memory device. Appx97 at 3:22-24; *see also* Appx97 at 3:24-26 (describing how the "mother-of-all-vectors" approach to attempting to identify known-good memory devices was insufficient).

The Rambus inventors further criticized the prior art method of generating a test because it relied on "assumption" and "'trial-and-error' tactics to arrive at a test ***presumed*** to be good." Appx96 at 2:55-57 (emphasis added). The inventors recognized that such a presumption could be faulty, as reflected in the following example:

> [A] timing constraint, such as the minimum period between RAS-to-CAS (tRCD), might be violated by a test which defines a slightly shorter period than that prescribed by the memory device specification. Using this constraint as an example, one batch of memory devices might pass the test even though the test violates the specification for the devices. As a result, the test and the batch of memory devices are

> assumed to be good. . . . As it turns out, the test violates the minimum tRCD period for the memory device, but the first batch of memory devices were able to tolerate the shorter than specified period for tRCD. Unfortunately, a subsequent batch of memory devices, while in actuality meeting specification, are not able to tolerate the shorter tRCD period defined by the test. Because the test has been assumed "good," the later batch of memory devices will be considered out-of-specification and may be thrown out. Such an error in the test protocol may not be caught until many good parts have been discarded as bad.

Appx96-97 at 2:63-3:14. Consequently, "errors may enter the test design process during any one of steps **2, 5, 6, 7** and **9**" of the prior art method shown in Figure 1 above. Appx96 at 2:60-62.

The Rambus inventors invented a new method of test generation that resolves these problems of the prior art method. Unlike the prior art process, their invention "provides a method by which a test writer may determine whether a proposed test violates any operating constraints for the memory device being tested." Appx97 at 3:55-58. A flowchart of operations for one embodiment of the invention is set forth in Figure 2 (Appx94), reproduced below:



FIG. 2

In general, the invention provides a method for developing and utilizing a "simulator" that is customized to directly model a targeted memory device(s). Appx98 at 5:5-14. The simulator is implemented in software. Appx98 at 6:55-65. It "is developed using a parameter list covering all relevant constraints" of the targeted memory device, such that the simulator reliably and accurately replicates the actual behavior of the memory device. Appx97 at 3:58-60; Appx98 at 5:7-9. Additionally, the simulator is capable of detecting violations of the constraints used

in generating the simulator and outputting error messages regarding the detected violation. *See, e.g.*, Appx98 at 5:25-28; Appx100 at 9:26-28; Appx98 at 5:25-35; Appx100 at 9:30-34.

According to the claimed method, at step **10** a test writer creates a proposed test for a memory device, which is a set of time-ordered memory device operations. Appx99 at 7:41-49; Appx94 at Fig. 2. At step **12**, the test is run through the simulator against the list of memory device constraints defined by the parameter file. Appx99 at 7:49-55. If the simulator detects that a test operation violates a constraint, then the simulator provides an "error message" at step **14**. The test writer then uses the feedback from the error messages output by the simulator in an iterative process to alter the test until the simulation completes with no reports of constraint violations, *i.e.*, the test "passes" at step **13**. Different embodiments of the claimed invention identify violations of state-based or time-based constraints; some embodiments are capable of outputting error messages that provide information regarding how to resolve detected operating constraint violations. Appx98 at 5:43-52.

In comparison to the prior art method, the patented method provides a new approach that does not rely on a presumed good physical memory device(s) or a test writer's assumptions or guesses to generate and verify memory tests. The patented method instead relies on a distinct use of a special-purpose software tool—the customized simulator—with particular characteristics that consistently and

accurately replicates the anticipated behavior of a targeted memory device. This customized simulator, when as directed by with the patented method, provides test writers with reliable diagnostic feedback that allows test writers to immediately and confidently ascertain the source of a test failure. For instance, the claimed method ensures that "[o]perating constraints are observed and automatically checked during test generation." Appx99 at 8:34-36. It then directs that the claimed simulator output error messages, which definitively reflect that the test is the source of the error and thus is improperly constructed. *See, e.g.*, Appx100 at 9:30-34. These error messages automatically identify the type of constraint being violated and its sequential occurrence, as well as suggested adjustments to resolve a detected violation. *See, e.g.*, Appx100 at 9:30-34, 56-59; Appx110 at 9:38-40, 10:4-9; Appx98 at 5:30-34, 42-51. As such, tests generated according to the claimed method are known to be "good" in relation to actual constraints specified for the memory device (rather than constraints of a presumed good memory device). Therefore, they are objectively more reliable than the tests previously generated by the conventional process based on assumption and guesswork. Appx99 at 8:31-43; *see also* Appx96 at 2:55-57; Appx96-97 at 2:63-3:15.

The Rambus inventors recognized another problem with the prior art method. The conventional process of test generation increasingly failed to address the test writers' conflicting "goals of writing a complete, constraint compliant test and

writing a run-time efficient test." Appx97 at 3:42-44. The critical insight of the inventors was that test time could be minimized if a software tool could be developed that "temporally 'packs'" the test operations "as tightly as possible" relative to the memory device's operating constraints. Appx98 at 5:59-62; Appx97 at 4:1-4.

The inventors invented a method that achieves that goal by "provid[ing] a 'packer' function" as part of the new test generation method. Appx97 at 4:1-2. As described in the specification, the "packer" is implemented in software. Appx98 at 6:63-65. Under the claimed method, once a test passes through the simulator without error, the verified test may be time-optimized by running the test and its corresponding parameter list of memory device constraints through a "packer," as shown in step **14** of Figure 2 above. The "packer" reduces the run time of a test by iteratively calling the simulator and making or suggesting changes to the sequence of operations, including by temporally packing the operations as closely together as possible or by re-ordering the sequence of operations while avoiding constraint violations. Appx98 at 5:60-6:2. The "packer" is thus able to optimize the run time of the verified test while also simultaneously ensuring the time-optimized test obeys the operating constraints of the targeted memory device. Appx98 at 6:8-9. Additionally, the "packer" is capable of maintaining write buffer side effects between the packed and unpacked versions of the test. Appx98 at 6:2-4. Once the proposed test is time-optimized by the packer, the test is accepted as good at step **19**,

and the test is ready to be used in the testing of actual memory devices. Appx99 at 7:61-62, 66-67; Appx94.

### D. The Asserted Claims

The Asserted Claims recite the following:

| **’759 Patent (Appx100-101)** | |
|---|---|
| Claim 1 | A method of generating a test for a memory having defined operating constraints, the method comprising:<br><br>developing a set of operations defining the test, where the set of operations is ordered in time;<br><br>passing the set of operations through a simulator capable of determining whether the set of operations violates anyone of the operating constraints; and<br><br>upon determining that the set of operations violates any one of the operating constraints, outputting an error message, wherein the error message comprises an adjustment to the set of operations which will resolve the operating constraint violation. |
| Claim 4 | A method of generating a test for a memory having defined operating constraints, the method comprising:<br><br>developing a set of operations defining the test, where the set of operations is ordered in time;<br><br>passing the set of operations through a simulator capable of determining whether the set of operations violates anyone of the operating constraints; and<br><br>upon determining that the set of operations violates any one of the operating constraints, outputting an error message, wherein the error message identifies a violated time-based constraint. |
| Claim 5 | The method of claim 4, wherein the error message further identifies a timing adjustment to the set of operations which will resolve the time-based constraint violation. |

| | |
|---|---|
| Claim 14 | A method of generating and verifying a test for a memory having defined operating constraints, the method comprising:<br><br>defining one or more commands, wherein each one of the commands comprises a group of operations;<br><br>forming a time ordered sequence of commands defining the test;<br><br>verifying the test by passing the time ordered sequence of commands through a simulator capable of determining whether the time order sequence of commands violates anyone of the operating constraints;<br><br>passing the verified test through a packer to minimize run time of the test in relation to the operating constraints. |

| **’891Patent (Appx110)** | |
|---|---|
| Claim 1 | A method of simulating the behavior of a memory device, the method comprising:<br><br>defining a set of operating constraints based on the characteristics of the memory device;<br><br>providing a set of memory device operations, wherein the set of memory device operations is ordered in time;<br><br>passing the set of operations through a simulator capable of determining whether the set of memory device operation violates anyone of the operating constraints; and<br><br>outputting an error message upon determining that the set of operations violates anyone of the operating constraints. |
| Claim 2 | The method of claim 1, wherein the error message comprises an adjustment to the set of operations which will resolve the operation constraint violation. |
| Claim 5 | The method of claim 1, wherein the error message identifies a violated time-based constraint. |

| | |
|---|---|
| Claim 6 | The method of claim 5, wherein the error message further identifies a timing adjustment to the set of operations which will resolve the time-based constraint violation. |

## II. THE DISTRICT COURT'S § 101 RULING

The district court granted Xilinx's motion for judgment on the pleadings. The district court's analysis purports to follow the Supreme Court's two step framework as set forth in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014). However, the district court issued its patentability decision before this Court issued its decisions in, *inter alia*, *BASCOM Global Internet Servs., Inv. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016); *Rapid Litig. Mgmt. Ltd. v. Cellzdirect, Inc.*, 827 F.3d 1042 (Fed. Cir. 2016); or *McRO, Inc. v. Bandai Namco Games America*, --- F.3d ---, 2016 WL 4896481 (Fed. Cir. 2016).

In its patentability order, the district court first discussed the claims generally "to understand the idea at the 'heart' of the claimed invention." Appx51. Ultimately, it concluded that "each of the asserted claims, at its heart, is directed to the use of a simulator to determine whether a memory test violates a set of rules." Appx51. It then concluded that claim 14, in addition to that basic concept, is directed to "using a packer to optimize the memory test." Appx53. Finally, the district court concluded that claim 1 and claim 14 of the '759 patent were "plainly representative of the remaining asserted claims," which varied only by "minor rephrasing or the addition

of minor limitations varying the content of the error message output by the simulator." Appx52.

Next, the district court found that, under *Alice* step one, "each of the asserted claims is directed to a patent-ineligible abstract idea." Appx64. Its abstract idea finding was based on the following: **First**, the district court concluded that the patent specification and the Asserted Claims lacked "any meaningful explanation of ***how*** the claimed simulator determines whether operating constraints are violated" and "any explanation of how the claimed packer optimizes the memory test." Appx55 (emphasis in original). In particular, the district court viewed the patents as lacking any recital or description of a "specific algorithm for simulator or packer operation . . . , or other implementation details that might narrow the scope of the abstract idea of creating and using a generic simulator or packer." Appx56. Based on these findings and relying on *Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*, 635 F. App'x 914 (Fec. Cir. 2015) (non-prec.), *cert denied*, No. 15-1201, 2016 WL 1171121 (U.S. May 31, 2016), the district court found the claims "drawn to a patent-ineligible abstract idea." Appx56.

**Second**, the district court concluded that, unlike the claims in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016), or *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014), the patents here "do not purport to improve the underlying technology of memory devices or particular techniques of

testing memory devices." Appx59. **Third**, the district court concluded that the claimed "simulator" and "packer" were "generic" software components performing "conventional functions." Appx57; *see also* Appx63-64. It further concluded that the claimed methods reflected a "generic, and conventional, computerization of processes previously performed by humans without computers." Appx63; *see also* Appx60-64. The district court viewed these conclusions as "confirm[ing]" its finding that "the asserted claims are directed to patent-ineligible abstract ideas." Appx63.

Finally, the district court found that, under *Alice* step two, the Asserted Claims lacked an "inventive concept." In doing so, the court first stated that the Asserted Claims, "as an ordered combination . . . consist of little more than reciting the [abstract] idea followed by 'apply it'" on a computer or conventional computer components. Appx64 (quoting *Alice*, 134 S. Ct. at 2357). It then reiterated its view that the "simulator" and "packer" limitations, as well as the "error message" and "adjustment" limitations, merely acted conventionally and do not "do anything other than operate in their expected manner." Appx65-66. Finally, the court stated that the patents "describe and claim the simulator at a level of generality that makes it a generic computer element, rather than a particular device sufficient to save an otherwise abstract claim" under the "machine or transformation" analysis. Appx66.

After finding the Asserted Claims patent ineligible, the district court concluded that any fact-related dispute or claim construction issues "would not alter the generic nature of the simulator as claimed in the asserted claims." Appx67. Therefore, it denied Papst's alternative request that, before invalidating the patents, Xilinx's motion should be denied without prejudice to allow Papst to present the Court with relevant evidence, including expert testimony. Appx67; Appx192-193. The district court entered judgment against Papst in June 2016. Appx69.

## SUMMARY OF ARGUMENT

The Asserted Claims are not directed to an "abstract idea" under *Alice* step one or they each contain a sufficiently "inventive concept" under *Alice* step two to make any putative abstract idea patentable. The patents are not directed to a mathematical formula or fundamental business or economic practices comprising ideas about organizing human activity. Instead, when considered as a whole, each of the Asserted Claims is directed to a patentable, technological improvement over the conventional industry practice for generating and verifying memory device tests. Specifically, each of the Asserted Claims focuses on a distinct process that requires the use of either (1) a "simulator," developed from a targeted memory device's operating constraints, that is provided particular inputs and provides particular outputs; or (2) that "simulator" plus a "packer" to generate a verified, run-time optimized memory device test. The claimed methods are not carried out in the same

way as the conventional process. And it is the distinct use of the claimed special-purpose simulator and packer with specific characteristics and functionality, not the use of the computer, that improves the conventional process.

The Asserted Claims are also independently patent eligible under *Alice* step two because they each contain an inventive concept that transforms the claimed inventions into patent-eligible methods for generating a verified, run-time optimized test that is clearly rooted in technology. The use of the packer with its particular functionality is an individually inventive concept based on the record evidence. Additionally, the Asserted Claims recite a combination of elements that claim a non-conventional process of test generation.

That the Asserted Claims do not implicate the fundamental preemption concern that underlies the abstract-ideas exception to § 101 further confirms their eligibility. The claims recite a specific process of generating a verified, run-time optimized memory device test using customized software tools with particular requirements tailored towards test generation and verification in a distinct processes to improve the conventional process. Consequently, the Asserted Claims are directed to and claim a specific method or means of improving the generation of memory device tests; they are not directed to and do not claim the result of that process.

The district court's judgment should be reversed.

## STANDARD OF REVIEW

The law of the regional circuit—here, the Ninth Circuit—applies to the procedural aspects of the grant of judgment on the pleadings. *McRO*, 2016 WL 4896481, at *6. "The Ninth Circuit reviews the grant or denial of judgment on the pleadings under Rule 12(c) de novo." *Id.* (citing *Kotrous v. Goss-Jewett Co.*, 523 F.3d 924, 929 (9th Cir. 2008)). The Ninth Circuit accepts all well-pleaded facts as true and draws all reasonable inferences in a light most favorable to Papst, the non-movant. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

Section 101 eligibility is a question of law. *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015) *cert. denied*, 136 S. Ct. 701 (2015). Therefore, this Court reviews § 101 *de novo*. *Id.*

By statute, issued patents—such as the patents here—are presumed valid, and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282(a). In the context of other invalidity challenges, a party asserting invalidity must prove its defense by clear and convincing evidence to overcome presumptive validity. *See, e.g.*, *Microsoft Corp. v. i4i Ltd. P'Ship.*, 564 U.S. 91, 96 (2011). This Court has described that § 101 "is independent of—and on equal footing with—any other statutory provision." *BASCOM*, 827 F.3d at 1347. That "equal footing" description suggests that the

challenger should bear the burden of proving patent-ineligible subject matter under § 101 by clear and convincing evidence. *See CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1284 (Fed. Cir. 2013), *aff'd* 134 S. Ct. 2347 (2014) (Lourie, J., concurring, joined by Dyk, Prost, Reyna, Wallach, JJ.) ("[A]s with obviousness and enablement, that presumption [of validity] applies when § 101 is raised as a basis for invalidity in district court proceedings."); *id*. at 1304-05 (Rader, J., concurring-in-part and dissenting-in-part, joined by Linn, Moore, O'Malley, JJ.) ("Because we believe the presumption of validity applies to all challenges to patentability, including those under Section 101 and the exceptions thereto, we find that any attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear and convincing evidence."). *But see Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 720-21 (Fed. Cir. 2014) (Mayer, J., concurring) (noting that, "[a]lthough the Supreme Court has taken up several section 101 cases in recent years, it has never mentioned—much less applied—any presumption of eligibility"). Whether or not a heightened burden applies, Xilinx has not demonstrated that the Asserted Claims here are patent ineligible.

## ARGUMENT

### I. PATENTABILITY UNDER § 101

Section 101 defines patentable-eligible subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful

improvement thereof," subject to the other limitations of the Patent Act. 35 U.S.C. § 101. But, under the judicial exceptions to the literal scope of § 101, "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 134 S. Ct. at 2354. This appeal involves the abstract idea exception. In *Alice*, the Supreme Court applied a two-step analysis to determine whether claims are patent eligible.

### A. *Alice* Step One: The "Directed to" Analysis

*Alice* step one is "a meaningful one," such that "a substantial class of claims are not directed to a patent-ineligible concept." *Enfish*, 822 F.3d at 1335. This step requires "determin[ing] whether the claim at issue is 'directed to' a judicial exception, such as an abstract idea." *McRO*, 2016 WL 4896481, at *6 (quoting *Alice*, 134 S. Ct. at 2355). A claim is not "directed to" excluded subject matter simply because it, for example, contains an abstract idea. *See id.* ("We do not assume that such claims are directed to patent ineligible subject matter because 'all inventions at some level embody, use, reflect, rest upon or apply . . . abstract ideas.'") (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012)); *see Rapid*, 827 F.3d at 1050 (clarifying that just because a claim "touches on" an excluded subject matter at some level, the claim is not necessarily "directed to" that subject matter under *Alice* step one); *Diamond v. Diehr*, 450 U.S. 175, 187 (1981) ("[A] process is not unpatentable simply because it contains a law of nature or a mathematical algorithm.") (quoting *Parker v. Flook*, 437 U.S. 584, 590 (1978)).

"Instead, 'the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter.'" *McRO*, 2016 WL 4896481, at *6 (quoting *Internet Patents Corp. v. Active Networks, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)); *see also id.* at *7 ("Whether at step one or step two of the *Alice* test, in determining the patentability of a method, a court must look to the claims as an ordered combination, without ignoring the requirements of the individual steps."). The *Alice* inquiry ends if the claims, as a whole, are not "directed to" an abstract idea. *McRO*, 2016 WL 4896481, at *6; *see also Alice*, 134 S. Ct. at 2355.

### B. *Alice* Step Two: The "Inventive Concept" Analysis

If the claims are "directed to" an abstract idea, then *Alice* step two considers whether the claims contain an "an 'inventive concept.'" *Alice*, 134 S. Ct. at 2355; *see also BASCOM*, 827 F.3d at 1349. An "inventive concept" is "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1294) (alteration in original); *see also BASCOM*, 827 F.3d at 1349. The "inventive concept" inquiry thus "requires more than recognizing that each claim element, by itself, was known in the art." *Id.* at 1350. Instead, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Id.*

## II. THE SPECIFIC LIMITATIONS OF THE ASSERTED CLAIMS

This Court has repeatedly cautioned against "'oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims.'" *McRO*, 2016 WL 4896481, at *7 (quoting *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)); *see also Enfish*, 822 F.3d at 1377 (warning that describing claims at "a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule"); *see also Alice*, 134 S. Ct. at 2354 (noting that "we tread carefully in construing this exclusionary principle [of laws of nature, natural phenomena, and abstract ideas] lest it swallow all of patent law"); *cf. Diehr*, 450 U.S. at 189 n. 12 (cautioning that overgeneralizing claims, "if carried to its extreme, make[s] all inventions unpatentable because all inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious").

On at least two recent occasions, this Court has specifically rejected a district court's description of the claims at issue as impermissibly oversimplified. *See McRO*, 2016 WL 4896481, at *7; *Enfish*, 822 F.3d at 1337-38. In *Enfish*, "the district court concluded that the claims were directed to the abstract idea of 'storing, organizing, and retrieving memory in a logical table' or, more simply, 'the concept of organizing information using tabular formats.'" *Enfish*, 822 F.3d at 1337 (internal citations omitted). This Court disagreed, explaining that "the claims are not simply

directed to *any* form of storing tabular data, but instead are specifically directed to a *self-referential* table for a computer database," as reflected in the claim language and the specification. *Id.* (emphasis in original). It then held that "the district court oversimplified the self-referential component of the claims and downplayed the invention's benefits." *Id.* at 1338.

In *McRO*, the district court concluded that the representative claim at issue "is 'drawn to the [abstract] idea of automated rules-based use of morph targets and delta sets for lip-synchronized three-dimensional animation.'" *McRO*, 2016 WL 4896481, at *7 (internal citations omitted) (alteration in original). This Court disagreed, holding that, when considered as a whole, "the claims are limited to rules with specific characteristics," which "the claims themselves set out." *Id.* It then held that "[t]he specific, claimed features of these rules allow for the improvement realized by the invention"—*i.e.*, "allowing computers to produce 'accurate and realistic lip synchronization and facial expression in animated characters' that previously could only be produced by human animators." *Id.* at *8 (internal citations omitted).

Here, the district court's description of the Asserted Claims runs afoul of this Court's requirement that the claims be considered as a whole and its prohibition against oversimplification. Specifically, the district court concluded that all of the Asserted Claims were directed to the abstract idea of "using a simulator to determine

whether a memory test violates a set of rules." Appx53; *see also* Appx51-52. It further concluded that claim 14 is also directed to the abstract idea of "using a packer to optimize the memory test." Appx53.

Similar to *Enfish* and *McRO*, however, the Asserted Claims considered as a whole, and in light of the specification, set out meaningful requirements for the simulator. The specification explains that the simulator is specifically developed to mimic a targeted memory device by using a parameter list covering all relevant constraints of the targeted memory device. *See* Appx98 5:5-9. Each of the Asserted Claims requires that the simulator input be a set (or group) of time-ordered operations. Appx100 at 9:24-26, 37-39, 51-54; Appx101 at 11:25-28; Appx110 at 9:26-30. The Asserted Claims further require that the simulator be capable of determining whether the set of inputted operations violates any one of the operating constraints. Appx100 at 9:26-28, 9:53-56; Appx101 at 11:9-13; Appx110 at 9:31-34. And each of the Asserted Claims (except claim 14 of the '759 Patent) requires that the simulator output an error message providing feedback that the set of operations violates any one of the operating constraints. Appx100 at 9:30-34, 57-60; Appx110 at 9:35-37. Additionally, claims 1, 4, and 5 of the '759 Patent and claims 2, 5, and 6 of the '891 Patent each require that the error message outputted by the simulator either identify the violated time-based constraints (Appx100 at 9:59-60; Appx110 at 10:4-5) or include an adjustment that will correct identified

operating-constraint violations (Appx100 at 9:32-34, 61-63; Appx110 at 9:38-40, 10:6-8).

Further, claim 14 requires optimizing the memory test with a packer. The claimed packer, working in conjunction with the customized simulator, reduces the run time of the verified test generated with the simulator. *See* Appx98 at 5:60-62. Specifically, the packer accepts, as inputs, the verified test developed with the simulator and the parameter list used to develop the simulator. *Id.* at 5:62-63. The packer then iteratively calls the developed simulator in order to reduce the run time of the verified test. *Id.* at 5:63-66. The packer achieves the reduction in run time (1) by temporally packing the sequence of operations as closely together in time as possible; or (2) by re-ordering the sequence of operations, while ensuring that either technique does not generate a test that violates the operating constraints of the targeted memory device. *Id.* at 5:60-6:9, 6:13-17.

The Asserted Claims are thus limited to a means of determining whether a memory test violates a specific set of rules using (1) developed special-purpose simulators with specific inputs and outputs ('759 Patent claims 1, 4, & 5; '891 Patent claims 1, 2, 5, & 6); or (2) using developed simulators with specific inputs and outputs plus a special-purpose packer ('759 Patent claim 14). The district court's characterization fails to account for these additional and important limitations. Yet it is these specific, claimed features that allow for the technological improvement

realized by the invention and that avoid "monopoliz[ing] [an] abstract idea itself." *See Alice*, 134 S. Ct. at 2358.

## III. THE ASSERTED CLAIMS ARE PATENT ELIGIBLE UNDER *ALICE* STEP ONE OR TWO BECAUSE THEY ARE DIRECTED TO A SPECIFIC METHOD OF IMPROVING AN EXISTING TECHNOLOGICAL PROCESS.[2]

The Supreme Court has stated that "many computer-implemented claims are formally addressed to patent-eligible subject matter." *Alice*, 134 S. Ct. at 2359. For instance, the Supreme Court has described that claims that are "directed to" eligible subject matter may include those that ***either*** "improve the function of the computer itself" ***or*** "improve[] an existing technological process." *Alice*, 134 S. Ct. at 2358-59. Following the Supreme Court's guidance, this Court has likewise emphasized that claims may be patent eligible, under *Alice* step one or step two, if they represent an improvement to technology or a technological process. *See McRO*, 2016 WL 4896481, at *8 ("[W]e therefore look to whether the claims in these patents focus on a specific means or method that improves the relevant technology or are instead

[2] This Court has observed that the relatedness between *Alice* step one and step two may involve "overlapping scrutiny of the content of the claims" and "close questions about when the inquiry should proceed from the first [step] to the second" such that at times a claim determined to be patent eligible under step two could also have be determined to be so under step one alone. *Elec. Power Grp., LLC v. Alston S.A.*, --- F.3d ---, 2016 WL 4073318, at *3 (Fed. Cir. 2016) (citing *TLI*, 823 F.3d at 611-15; *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1375 (Fed. Cir. 2016); *Enfish*, 822 F.3d at 1339; *Rapid*, 827 F.3d at 1050; and *BASCOM*, 827 F.3d 1341 at 1349).

directed to a result or effect that itself is the abstract idea . . . .”); *BASCOM*, 827 F.3d at 1050 (finding patentable claims directed to a “technical solution to a problem unique to the Internet”); *Enfish*, 822 F.3d at 1337 (holding that “the claims at issue in this appeal are not directed to an abstract idea within the meaning of *Alice*. Rather, they are directed to a specific improvement to the way computers operate, embodied in the self-referential table”); *DDR*, 773 F.3d at 1245 (finding claims that improve the generation of web pages to be patentable); *Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010) (noting that “inventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act”).

Furthermore, those patent-eligible improvements can be software improvements. *See Diamond v. Diehr*, 450 U.S. 175,187 (1981) (“[A] claim drawn to subject matter otherwise statutory does not become non-statutory simply because it uses a mathematical formula, computer program, or digital computer.”); *see also Enfish*, 2016 WL 2756255, at *4. This Court has also recently made clear that software claims may be eligible even if they produce information rather than a physical product or result because preemption—“not tangibility”—undergirds the abstract idea exception. *McRO*, 2016 WL 4896481, at *2.

The Asserted Claims here are patent eligible because, as a whole, they are directed to a specific method of overcoming problems with, or improving upon, the conventional process of generating and verifying tests for memory devices. *See McRO*, 2016 WL 4896481, at *10; *BASCOM*, 827 F.3d at 1350-52; *Enfish*, 822 F.3d at 1336-37; *DDR*, 773 F.3d at 1257-58. Under the prior art method, memory device test writers lacked a mechanism for reliably and definitively determining whether a test violated a particular memory device's constraints. Appx97 at 3:15-17; Appx99 at 8:31-42; *see also* Appx96 at 2:23-27 (lack of a feedback tool); 2:55-57 (reliance "on assumption and 'trial-and-error' tactics"); Appx97 at 3:15-24 ("chicken and egg" problem).

The claimed methods improved the conventional process in at least the following ways: First, they provided a specific mechanism for verifying a memory test's compliance with actual memory device constraints without the use of a physical memory device and without relying on a human test writer's assumptions. Appx98 at 5:5-9; Appx98 at 5:7-15; Appx97 at 3:58-60. Using the patented method, a test writer could generate verified memory tests that "were known to be 'good.'" Appx99 at 8:31-42. Second, the patented methods provide feedback to test writers or users of the method, including suggested adjustments to resolve detected errors or violations of operating constraints. Appx96 at 2:23-27, 2:55-57; Appx97 at 3:64-67. Third, the patented methods reduce the run time of generated memory tests while

simultaneously and automatically ensuring the test complies with the relevant operating constraints. *See* Appx98 at 5:59-66, 6:8-18.

The Asserted Claims achieve these improvements through a distinct test generation and verification process that uses, in a particular way, special-purpose software tools with specific characteristic and functionality—*i.e.*, (1) a unique "simulator" that is given particular inputs and that provides particular outputs; and (2) a "packer" with specific functionality. The Asserted Claims are thus like other claims that pass § 101 muster because they are directed to a specific way of "improving a technological process," not to "economic or other tasks for which a computer is used in its ordinary capacity." *Enfish*, 2016 822 F.3d at 1336-1337.

In *DDR*, this Court analyzed system and method that allowed a host website to link to a composite webpage that combined selected visual elements of a host website with content of a third-party merchant. *See DDR*, 773 F.3d at 1248-49. As this Court described, the *DDR* claims addressed the problem of retaining website visitors after "clicking" a hyperlink by "overrid[ing] the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." *Id.* at 1257-58. Despite involving "both a computer and the Internet," the Court found the claims patentable because they "do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer

technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* at 1257.

Then in *Enfish*, the Federal Circuit analyzed whether a "self-referential model" for computer databases was patentable. *Enfish*, 822 F.3d at 1329. Unlike conventional databases that followed the "relational model," the *Enfish* invention could "store all entity types in a single table and . . . define the table's columns by rows in that same table." *Id.* at 1332. The specification of the *Enfish* patents taught that this database design resulted in a number of benefits over the conventional database design, including "faster searching of data," "more effective storage of data," and "more flexibility in configuring the database." *Id.* The Federal Circuit rejected the district court's finding that the claims were "directed to" the abstract idea of "organizing data into a logical table with identified columns and rows where one or more rows are used to store an index of information defining columns" because that finding "downplayed the invention's benefits." *Id.* at 1337. The Court then held that the *Enfish* claims were not directed to an abstract idea because the claims focused "on an improvement to computer functionality itself" rather than "economic or other tasks for which a computer is used in its ordinary capacity." *Id.* at 1336-1337 ("[T]he claims are not simply directed to any form of storing tabular data, but instead are specifically directed to a self-referential table for a computer

database. . . . [T]he self-referential table functions differently than conventional database structures.”).

Next, in *BASCOM*, the Federal Circuit reviewed claims relating to “filtering content on the Internet.” *BASCOM*, 827 F.3d at 1343. The Court found the claims presented a “close call” under *Alice* step one because the specification did not clearly demonstrate that the claims made specific technological improvements over the prior art. *Id.* at 1349. Instead, the only evidence of the *BASCOM* claims’ improvement over the prior art came from the claim language itself. *Id.* However, under its *Alice* step two analysis, this Court concluded that, given the claim limitations, the claimed filtering system was “more dynamic and efficient” and recited “a technology-based solution (not an abstract-idea based solution implemented with generic technical components in a conventional way) to filter content on the Internet that overcomes existing problems with other Internet filtering systems.” *Id.* at 1351. Accordingly, the Court held the claims patent eligible. *Id.* at 1351-1352.

Most recently, in *McRO*, this Court considered whether a method for automating 3-D animation using rules of a particular type was patentable. *McRO*, 2016 WL 4896481, at *1. The *McRO* opinion explained that, under the prior art animation system, “an animator would have to subjectively identify the problematic sequence and manually fix it by adding an appropriate keyframe.” *Id.* at *3. In contrast, the patented invention in *McRO* “uses rules to automatically set a keyframe

at the correct point to depict more realistic speech, achieving results similar to those previously achieved manually by animators." *Id.* This Court found the representative claim was directed to "a patentable, technological improvement over the existing, manual 3-D animation techniques" because the "claim uses the [claimed] limited rules in a process specifically designed to achieve an improved technological result in conventional industry practice." *Id.* at *10 (citing *Alice*, 134 S. Ct. at 2358; *Diehr*, 450 U.S. at 177).

In short, *Alice* step one was satisfied by (1) the *McRO* patents, which were directed to an improved, automated method of 3-D animation using rules with specific characteristics that replaced an inferior method that could only be performed by human animators; and (2) the *Enfish* patents, which were directed to an improved, self-referential computer database design that offered features and functionality not found in the prior art relational database designs. *Alice* step two was satisfied by (1) the *DDR* patent, which claimed a particular solution to the Internet problem of retaining website visitors that deviated from the normal, expected operation of computer networks; and (2) the *BASCOM* patent, which claimed a specific technological system for filtering content that overcame problems with conventional Internet filtering systems. Here, the patents claim a specific, improved method of generating memory device tests by using specialized software tools with particular characteristics and functionality that, unlike the conventional process, allow the test

writer to automatically generate a time-optimized and/or verified test.[3] As such, they satisfy the *Alice* framework under step one or step two.

## IV. THE ASSERTED CLAIMS RECITE AN INVENTIVE CONCEPT AND THUS ARE ELIGIBLE UNDER STEP TWO OF *ALICE*

Even putting aside that the Asserted Claims here should be patent eligible under the Supreme Court's and this Court's specific "technological improvement" standard (addressed above), the Asserted Claims are independently patent eligible under *Alice* step two because they embody an inventive concept that transforms the claimed invention into patent-eligible methods.

Here, claim 14 includes the individually inventive step of "passing the verified test through a packer to minimize run time of the test in relation to the operating constraints." Appx101 at 11:31-32. There is no evidence in the record that such a step was conventional or routine. Rather, the record confirms that claim 14's

[3] Because the patents here claim a specific means of improving a technical problem with then-existing methods of generating a memory device test, they are unlike the patents in *Affinity Labs of Texas, LLC v. Directv, LLC, et al.*, Appeal No. 2015-1845, at *8-9, 14 (Fed. Cir. Sept. 23, 2016) (holding that the at-issue patent claims were "not directed to the solution of a 'technological problem,'" but rather "claims the general concept of out-of-region delivery of broadcast content [*i.e.*, "a broad and familiar concept . . . employed by nearly every form of media that has a local distribution"] through the use of conventional devices, without offering any technological means of effecting that concept"); *TLI*, 823 F.3d at 611-613 (Fed. Cir. May 17, 2016) (holding that the *TLI* patent claims were directed to "the abstract idea of classifying and storing digital images in an organized manner" and were "not directed to a solution to a technological problem") (internal quotations omitted).

recitation of the use of a "packer" cannot be deemed a "purely conventional" activity. *Alice*, 134 S. Ct. at 2358.

Xilinx petitioned the PTAB to institute an *inter partes* review of, *inter alia*, claim 14, asserting it was obvious. *See* Appx212. The PTAB denied institution as to claim 14. Appx246. In denying review, the PTAB found that Xilinx failed to show that the cited reference teaches the "packer." Appx245-246. In particular, the PTAB concluded that the technique of minimizing test time in the reference cited by Xilinx taught "only removing test sequences (i.e., operations)" whereas claim 14 teaches minimizing test time by "temporally packing operations more closely together." Appx246.

Evidence that claim elements were not used in the prior art should weigh against a finding that those elements were conventional, particularly at the pleadings stage. Likewise, something that is or may be novel should not be deemed generic or conventional. If the "packer" limitation is potentially dispositive regarding validity, then it should provide the necessary "practical assurance" that the claimed method is more than the abstract idea. *Alice*, 134 S. Ct. at 2358; *see also Ultramercial*, 772 F.3d at 715 (stating that "any novelty in implementation of the idea is a factor to be considered only in the second step of the *Alice* analysis"). Here, the PTAB found the "packer" element lacking from the only prior art Xilinx alleged disclosed the limitation. Construed in a light most favorable to Papst (*see Manzarek*, 519 F.3d at

1031), the record indicates that the "packer" limitation is not conventional and constitutes an inventive concept.[4]

Papst does not deny that a simulator was a well-known software component. *See* Appx184. However, the patented methods do not merely use a conventional, routine simulator in a conventional, routine way. Instead, each of the Asserted Claims (except claim 14) requires ***both*** inputting a proposed test into a simulator, developed from a targeted memory device's operating constraints, ***and*** outputting specific error messages relevant to test verification. Additionally, claims 1 and 5 of '759 Patent and claims 2 and 6 of the '891 Patent include the additional inventive steps of outputting an error message that either identifies the operating constraint violated or identifies an adjustment that will correct detected errors. Appx100 at 9:33, 62; Appx110 at 9:39, 10:7. There is no record evidence that this combination of steps was routine or conventional. To the contrary, as the specification reflects, it is this particular use—or ordered combination of steps—that allowed the patented

[4] The PTAB's decision to review the other Asserted Claims, which is only a preliminary decision, does not indicate that those claims are generic or conventional. Appx213. Likewise, although Papst expects that the PTAB will ultimately find the instituted claims valid, a final decision that the Asserted Claims are anticipated or obvious does not mean that those claims fail to recite patent-eligible subject matter under § 101. *See* Diehr, 450 U.S. at 191 (noting that potential inability to satisfy novelty or nonobviousness requirements "does not affect the determination that respondents' claims recited subject matter which was eligible for patent protection under § 101").

methods to overcome the problems of the conventional process. This ordered combination of steps thus constitutes an inventive concept. *See Alice*, 134 S. Ct. at 2355 (directing that § 101 analysis requires consideration of "the elements of the claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application") (quoting *Mayo*, 132 S. Ct. at 1298, 1297); *Diehr*, 450 U.S. at 158 ("It is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis. This is particularly true in a process claim because a new combination of steps may be patentable even though all of the constituents of the combination were well-known and in common use before the combination was made."); *BASCOM*, 827 F.3d at 1350 ("[A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces.").

Beyond the packer constituting an individually inventive concept in claim 14, that claim includes the inventive steps of ***both*** verifying a test by using a simulator with particular characteristics and functionality ***and*** then passing the verified test through a packer with particular functionality. Appx101 at 11:20-31. The specification describes that the specialized packer functions in conjunction with the simulator to minimize run-time time. *See* Appx98 at 5:62-66. This ordered combination of steps in claim 14 is an additional inventive concept that transforms

any putative abstract concept into patentable subject matter. *See Alice*, 134 S. Ct. at 2355; *Diehr*, 450 U.S. at 158; *BASCOM*, 827 F.3d at 1350.

## V. THE ASSERTED CLAIMS DO NOT PREEMPT EVERY APPLICATION OF AN ABSTRACT IDEA

The Supreme Court has repeatedly and clearly stated that the basis for the judicial exceptions to patentability is preemption. *See, e.g., Alice*, 134 S. Ct. at 2354-55; *Mayo*, 132 S. Ct. at 1293; *Bilski v. Kappos*, 561 U.S. 593, 611-12 (2010). That is, "the concern that patent law not inhibit further discovery by improperly tying up the future use of the[] building blocks of humanity." *Alice*, 134 S. Ct. at 2354 (quoting *Mayo*, 132 S. Ct. at 1301). This Court's recent decision in *McRO* reflects that, although preemption is not the test for patentability, it indisputably plays a significant role in a § 101 analysis. *See McRO*, 2016 WL 4896481, at 8-10; *see also Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015) (recognizing that "the absence of complete preemption does not demonstrate patent eligibility").

In *McRO*, this Court described the preemption concern as follows: "The abstract idea exception prevents patenting a result where 'it matters not by what process or machinery the result is accomplished.'" *McRO*, 2016 WL 4896481, at *6 (quoting *O'Reilly v. Morse*, 56 U.S. 62, 113 (1854)). "A patent is not good for an effect, or the result of a certain process' because such patents 'would prohibit all other persons from making the same thing by any means whatsoever." *Id.* at *8

(quoting *Le Roy v. Tatham*, 55 U.S. 156, 175 (1853)). Instead, "[a] patent may issue 'for the means or method of producing a certain result, or effect, and not for the result or effect produced.'" *Id.* (quoting *Diehr*, 450 U.S. at 182 n.7). Accordingly, in the context of method claims such as the Asserted Claims here, the proper focus of a preemption analysis is on "whether the claims in [the challenged] patents focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *Id.*

The Asserted Claims here do not seek to patent a mathematical formula. They do not seek to patent memory test verification or run-time optimization itself (the result). And they do not seek to patent all means of generating a verified, run-time optimized test using a computer or software. Instead, the Asserted Claims seek patent protection for a distinct process of generating a verified, run-time optimized memory device test (the method) using special-purpose software—*i.e.*, a simulator alone or in conjunction with a packer. *See McRO*, 2016 WL 4896481, at *8; *see also Diehr*, 450 U.S. at 187 (finding patentable claims that sought not for "a mathematical formula [but] [i]nstead . . . for a process of curing synthetic rubber" that solved a conventional industry problem of "undercure" and "overcure"); *Research*, 627 F.3d at 869 (finding patentable claims that "'[did] not seek to patent

a mathematical formula'" but rather "'seek patent protection for a process of' halftoning in computer applications") (quoting *Diehr*, 450 U.S. at 187).

Additionally, the claimed methods are limited to a particular use of a simulator with specific characteristics, in that the simulator must (1) accept particular inputs with specific characteristics (*i.e.*, time-ordered operations); (2) be capable of determining whether the set of input operations violate the memory device's operating constraints; and (3) either (a) output certain error messages (all Asserted Claims, except claim 14) or (b) output a test in a format acceptable to the packer to assist the packer function in run-time optimization (claim 14 of the '759 Patent). Appx100 at 9:22-34; 49-63; Appx101 at 11:20-31; Appx110 at 9:24-40; 10:4-8; *see also* Appx97 at 3:58-60, 4:1-4; Appx98 at 5:7-15, 42-51, 53-66. The method of claim 14 is further limited because, even under the broadest reasonable construction, it is limited to the particular technique of "temporally pack[ing] the operations in a set of operations." *See* Appx221 (PTAB *Inter Partes* Review Institution Decision). Therefore, borrowing from *McRO*, the Asserted Claims "are limited to a specific process for automatically [generating verified, run-time optimized memory device tests] using particular information and techniques and do[] not preempt approaches that use [simulators or other special-purpose software with] different structure [or

characteristics] or different techniques."[5] *McRO*, 2016 WL 4896481, at *10 (holding that claims directed to a "specific asserted improvement in computer animation" were patent eligible where claims used "limited rules in a process specifically designed to achieve an improved technological result in conventional industry practice").

That the patented methods here do not implicate the fundamental preemption concern that underlies the § 101 analysis further reflects that the Asserted Claims are directed to patent-eligible subject matter.

## VI. THE DISTRICT COURT'S DECISION CONFLICTS WITH APPLICABLE PRECEDENT

*BASCOM* and *McRO* were decided after the district court issued its patentability order, and thus the district court did not address or apply those decisions. However, the district court concluded that, unlike *Enfish* and *DDR*, the Asserted Claims here "are not directed to any improvement of the computer or technology itself." Appx58. The district court concluded that the patented methods are instead directed to an abstract idea and lack any inventive concept. Appx68. By finding the Asserted Claims unpatentable, the district court mistook the applicable §

[5] Indeed, the record here evidences an alternative process for minimizing run time that is different than the claimed method. *See* Appx245-246 (the PTAB's conclusion that Xilinx's cited prior art reference used a technique of minimizing test time that is different than the technique taught by claim 14 of the '759 Patent).

101 precedent in a manner that threatens any software-based patent that does not disclose a specific algorithm or other detailed implementation instructions. The district court's faulty approach should not stand.

### A. The District Court Erroneously Concluded that the Asserted Claims Were Unpatentable Because They Do Not Recite an Algorithm or Provide Detailed Implementation Instructions.

The district court invalidated the Asserted Claims on the theory that the patents lacked "any specific algorithm . . . or other implementation details." *See* Appx56. However, patent eligibility does not require the type of disclosure the district court effectively demanded here. As set forth above, the specific characteristics and functionality of the special-purpose software tools reflect a distinct implementation that does not implicate § 101's preemption concerns. That should be enough for eligibility purposes.

The district court rejected Papst's argument that the Asserted Claims are directed to an improvement of technology rather than an unpatentably abstract idea based, in part, on the fact that the patents here do not recite a particular algorithm for the simulator or packer. Appx56. That conclusion is unjustified. While a recited algorithm may support a determination that patent claims are not directed to an abstract idea (*see Enfish*, 822 F.3d at 1326-28),[6] the lack of an algorithm should not

[6] In *Enfish*, the detailed implementation instructions were due, in part, to the district court's prior construction of a means-plus-function claim pursuant to 35 U.S.C. § 112 ¶ 6 as requiring a four-step algorithm. *See Enfish*, 822 F.3d at 1336-1337

*per se* mean the claims are unpatentably abstract. Nor does this Court's precedent direct such a conclusion.

In support of its decision, the district court stated that the patents here suffer from the same deficiencies as the patents in *Vehicle Intelligence*. Appx54-58. Specifically, the court concluded that the patents here lack "any meaningful explanation of ***how*** the claimed simulator determines whether operating constraints are violated" or "how the claimed packer optimizes the memory test." Appx55 (emphasis in original). The district court's reliance on *Vehicle Intelligence* is misplaced.

The *Vehicle Intelligence* claims cannot be aptly analogized to the Asserted Claims here. First, there is no suggestion in *Vehicle Intelligence* that the claims were directed to a specific improvement to a technological process. Instead, the invalidated claims at issue in *Vehicle Intelligence* were directed to the "abstract idea of testing operators of any kind of moving equipment for any kind of physical or mental impairment." *Vehicle Intelligence*, 635 Fed. App'x at 917. Second, the claims failed under *Alice* step one (and *Alice* step two) because "[n]one of the claims

---

(looking to the district court's claim construction in analyzing patent eligibility). But here, the district court issued its patent-ineligibility order and judgment before it engaged in claim construction and without Papst having an opportunity to present the Court with evidence, including expert testimony as to how one of ordinary skill in the art would interpret the claims' special-purpose software tools.

at issue [were] limited to a particular kind of impairment, explain[ed] how to perform either screening or testing for any impairment, specif[ied] how to program [the system] to perform any screening or testing, or explain[ed] the nature of control to be exercised on the vehicle in response to the test results." *Id*.

The claims here, however, are more appropriately analogized to the claims in, for example, *DDR, BASCOM*, and *McRO*. In *DDR*, the claims were directed to the problem of retaining website visitors. *DDR*, 773 F.3d at 1248-49. The Federal Circuit found that the "claims are different enough in substance from those in *Ultramercial* because they do not broadly and generically claim 'use of the Internet' to perform an abstract business practice (with insignificant added activity)." *Id.* at 1258. Specifically, it explained: "Unlike the claims in *Ultramercial*, the claims at issue [in *DDR*] specify how interactions with the Internet are manipulated to yield a desired result. Instead of the computer network operating in its normal, expected manner by sending the website visitor to the third-party website that appears to be connected with the clicked advertisement, the claimed system generates and directs the visitor to the above-described hybrid web page that presents product information from the third-party and visual 'look and feel' elements from the host website." *Id.* at 1258-59; *see Ultramercial*, 772 F.3d at 715-16 (finding unpatentable claims that merely recited the abstract idea of using advertising as a currency as applied to the particular technological environment of the Internet"). This Court did not require

any more particular implementation details for the claims to be patentable. For example, unlike the district court here, the Federal Circuit did not require detailed implementation instructions regarding how the claimed system generated or directed the visitor to the hybrid web page or how the hybrid web page presented the third-party product information or the host website's "look and feel" elements. *See id.*

The Asserted Claims here are directed to the problem of generating a memory device test that is automatically and reliably verified, rather than "presumed" good by a human test writer, and that minimizes testing time. Appx96 at 2:55-57; Appx99 at 8:31-42, 51-54. The Asserted Claims "do not broadly and generically claim" use of a computer or software components "to perform an abstract business practice." *DDR*, 773 F.3d at 1258. Instead, similar to *DDR* and unlike *Ultramercial*, the Asserted Claims here specify how defined, special-purpose software components are used in a particular process to yield the desired result: First, a test writer verifies a proposed test by passing it through a custom simulator, which is developed based on the operating constraints of a targeted memory device, that outputs a certain error message if the simulator detects a violation of one or more operating constraints. Appx98 at 5:5-14, 30-34, 42-50. Second, the invention run-time optimizes a verified test by passing it through a packer that temporally arranges or packs the operations as tightly as possible or re-orders the sequence of operations. Appx98 at 5:60-6:9, 6:13-17. As in *DDR*, no more particular implementation details should be required

for the Asserted Claims to be patentable. *See DDR*, 773 F.3d at 1258-59; *cf. McRO*, 2016 WL 4896481, at *8, 10 (rejecting the district court's conclusion that the claims were invalid where the claims did not specify what the rules should be, which is directed to 35 U.S.C. § 112, and finding the claims eligible because the claimed method uses "limited rules [with specific characteristics] in a process specifically designed to achieve an improved technological result in conventional industry practice").

Likewise, the patents at issue in *BASCOM* did not claim, nor did the specification describe, an algorithm or detailed implementation instructions. *See BASCOM*, 827 F.3d at 1345-46. This Court found the claims directed to patent-eligible subject matter because they were directed to a technology-based solution to a technological problem with the conventional system and "did not preempt the use of the abstract idea of filtering content on the Internet" because "the claims carve out a specific location for the filtering system (a remote ISP server) and require the filtering system to give users the ability to customize filtering for their individual network accounts." *BASCOM*, 827 F.3d at 1351-52. Yet the claims in *BASCOM* would have been invalidated under the district court's analysis.

This is not to say that specificity or generality is wholly irrelevant to patent eligibility. This Court's precedent reflects that a claimed solution to a technological problem must be specific enough to preclude the risk of preemption. *McRO*, 2016

WL 4896481, at *8; *DDR*, 773 F.3d at 1258-59; *see also Internet Patents*, 790 F.3d at 1348 (stating that a patent claim that "describes the effect or result [of an abstract idea] dissociated from any method by which [that result] is accomplished" is not directed to patent-eligible subject matter"). As set forth above, the Asserted Claims here overcome that hurdle by claiming a distinct means of using special-purpose software tools with specific characteristics and functionality to generate a verified, run-time optimized memory device test that overcomes problems with conventional industry practice. *See supra* part II, III, V.

The district court's specificity analysis here looks more akin to a § 112 indefiniteness or enablement inquiry (albeit, a critically deficient one)[7] than a proper preemption analysis. The § 101 inquiry is not co-extensive with a § 112 or enablement analysis. *Cf. McRO*, 2016 WL 4896481, at *8, 10; *Research,* 627 F.3d at 869. Here, the district court had no evidence before it regarding a person of ordinary skill in the art or whether such a person would be able to make and use the claimed invention without undue experimentation. Nor did it undertake any review

[7] *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014) (stating that "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention"); *Adang v. Fischhoff,* 286 F.3d 1346, 1355 (Fed. Cir. 2002) ("The legal question of enablement involves an assessment of whether a patent disclosure would have enabled one of skill in the art at the time the application was filed to make and use the claimed invention without undue experimentation.").

or analysis of the patents' prosecution history or construe any of the claims. This Court has previously rejected a district court's conflation of § 101 with an aborted analysis of other requirements for patent protection. *See BASCOM*, 827 F.3d at 1350 (rejecting the district court's analysis, which "look[ed] similar" to a 35 U.S.C. § 103 obviousness analysis, while lacking the critical explanation regarding the reason to combine the claim limitations). Accordingly, the district court should not have invalidated the Asserted Claims in this case for insufficient implementation details based on the limited record before it or at this procedural stage, particularly where those Asserted Claims, in light of the specification, are specific enough to preclude the risk of preemption.

### B. The District Court Erroneously Concluded that the Asserted Claims Are Not Directed to Patentable Improvements to a Technological Process.

The district court's patentability opinion is based on an incorrect identification of the relevant technology and an overly narrow interpretation of *Enfish* (and *DDR*) that conflicts with *McRO* (as well as *Alice*).

**1.** The district court found that the patents "do not purport to improve the underlying technology of memory devices or particular techniques of testing memory devices." Appx59. That finding reflects that the district court failed to analyze the "***relevant technology***." *McRO*, 2016 WL 4896481, at *8 (emphasis added). Here, the relevant technology is not the computer or the memory devices or

even techniques of testing memory devices; rather, the relevant technology is the process of generating a test for a memory device,[8] which the patents indisputably purport to improve. Appx99 at 8:31-42 (stating that "the present invention solves the problems inherent in the conventional method for generating memory device tests.").

Further, the district court found that the Asserted Claims here "bear little resemblance to the claims at issue in *Enfish* and *DDR Holdings*." Appx59. In particular, the district court described the *Enfish* claims as directed to "improvements to data structures." Appx59 (citing *Enfish*, 822 F.3d at 1339). It then distinguished the Asserted Claims here as "directed to methods of verifying and optimizing memory tests, not to improving the computer or software components used to carry out those methods." Appx59. But that distinction is not dispositive.

It is correct that the Federal Circuit found the *Enfish* claims were directed "to a specific improvement to the way computers operate, embodied in the self-referential table" and thus were patent eligible. *Enfish*, 822 F.3d at 1336. However, *Enfish* did not hold that all claims directed to a method that improves a technological

[8] In fact, the preambles of the independent Asserted Claims explicitly state that the claims are "[a] method of generating a test for a memory," "[a] method of generating and verifying a test for a memory," or "[a] method of simulating the behavior of a memory device." Appx100 at 9:22-23, 49-50; Appx101 at 11:20-21; Appx110 at 9:24-25.

process (rather than the components used to carry out those methods) are abstract; nor has any other applicable precedent. *McRO* directs the opposite conclusion; there, the Federal Circuit found that the at-issue claims focused on a specific improved method of computer animation and that the claims were, therefore, not abstract. *McRO*, 2016 WL 4896481, at *10. Consequently, the district court erred in finding the Asserted Claims patent ineligible because they are directed to a specific improved method of generating a memory device test rather than directed to improving a component or software component.

**2.** The district court concluded that the patented methods invoke computers "merely as a tool." Appx47 (citing *Enfish*, 822 F.3d at 1336). They do not.

The district court found that "the steps of the asserted claims reflect activity described by the specification as previously having been carried out by humans, and which are capable of being performed mentally or with pencil and paper." Appx60. It is correct that, under the prior art method, a test writer attempted to verify a memory device test mentally based on assumption and guesswork. *See* Appx96 at 2:55-57; Appx99 at 8:31-42. It is also correct that the simulator and the packer are indisputably embodied in computer software that is processed by general-purpose computers and used in the patented method to generate a verified, run-time

optimized test.[9] However, as in *McRO*, the record here does not provide any evidence that "the process previously used by [test writers] is the same as the process required by the [patented methods]." *McRO*, 2016 WL 4896481, at *8 (noting that the defendants failed to provide any such evidence). The district court did not conclude[10]—and could not have concluded[11]—that the conventional process is the same as the patented methods.

The difference between the conventional and patented methods here are similar to the difference between the conventional and patented processes in *McRO*. In *McRO*, similar to the conventional test generation process here, the conventional

---

[9] *See Enfish*, 822 F.3d at 1338 ("[W]e are not persuaded that the invention's ability to run on a general-purpose computer dooms the claims.")

[10] For example, the district court merely described that (1) "human test writers wrote memory tests for early memory devices, and did so in accordance with the constraints of particular memory devices;" (2) human test writers could "compar[e] the operations of a simple memory test to the rules obtained from a simple memory device data sheet;" (3) human test writers could optimize a test mentally or with pencil and paper; (4) "[a]n equivalent function to the error messages recited by the asserted claims . . . can likewise be performed by a human test writer by noting a violation of a rule by the memory test, or noting the solution to such a violation as a result of the mental steps or pencil-and-paper calculations." Appx60-61 (internal quotations, citations omitted).

[11] For example, a human test writer cannot (1) compare a set of time-ordered memory device operations against memory device operating constraints to check for violations; (2) output error messages upon detection of a violation that identify the source of errors and corresponding corrections; or (3) iteratively call a simulator to optimize inter-operational timing of memory device operations. See, e.g., Appx98 at 5:63-66; Appx100 at 9:27, 33, 54, 58-59, 62-63; Appx101 at 11:29-32; Appx110 at 9:31, 39-40, 10:4-5, 7-8.

animator's process "was driven by subjective determinations rather than specific, limited mathematical rules." *McRO*, 2016 WL 4896481, at *8. Additionally, here, as in *McRO*, "[t]he computer . . . is employed to perform a distinct process to automate a task previously performed by humans." *Id.* And "[i]t is the incorporation of the claimed [special-purpose software with specific characteristics and functionality], not the use of the computer, that 'improve[s] the existing technological process' [of test generation] by allowing the automation of [determining whether a test violated a memory device's constraints, suggesting adjustments to resolve detected errors, and reducing the run time of tests by temporally packing operations]." *Id.* (quoting *Alice*, 134 S. Ct. at 2358) (internal alteration omitted). Accordingly, the Asserted Claims do not merely perform a preexisting process on a general-purpose computer to, for example, automate it or make it faster.

Ultimately, then, similar to the patent-eligible methods in *McRO*, the claimed methods here are "unlike *Flook*, *Bilski*, and *Alice*, where the claimed computer-automated process and the prior method were carried out in the same way" and thus were unpatentable. *McRO*, 2016 WL 4896481, at *8 (internal citations and alteration omitted); *see also Flook*, 437 U.S. at 594-95 (finding claims requiring the use of a specific equation unpatentable because they "simply provide[d] a new and presumably better method of calculating alarm limit values"); *Bilski*, 130 S. Ct. at

611-12 (finding claims directed to "hedging risk" unpatentable because "[h]edging is a fundamental economic practice long prevalent in our system of commerce"). Instead, the Asserted Claims are more analogous to the claims found patentable by the Supreme Court in *Diehr* and the Federal Circuit in *McRO*, *BASCOM*, *Enfish*, and *DDR*. *See McRO*, 2016 WL 4896481, at *7 (describing that the Supreme Court in *Diehr* found claims using a "well-known" mathematical equation to be patent eligible because "when looked at as a whole . . . they improved an existing technological process," *i.e.*, a process for curing rubber) (citing *Alice*, 134 S. Ct. at 2358; *Diehr*, 450 U.S. at 178).

**3.** In invalidating the patents, the district court (and Xilinx below) cited to or relied on a number of cases where claims have been invalidated under *Alice*. However, the invalidated claims in those cases cannot be analogized to the Asserted Claims here. Whereas the Asserted Claims here are directed to a distinct process for generating verified, run-time optimized memory device tests using special-purpose software tools with particular characteristics and functionality, the claims in those cases were directed to taking well-known processes or fundamental economic or business practices and performing them on a computer or over the Internet. For example, this Court invalidated such claims in the following case: *Mortgage Grader, Inc. v. First Choice Loan Servs., Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016) ("the collection of information to generate a 'credit grading' and to facilitate

anonymous loan shopping”); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015) (“tailoring content based on viewer’s location”); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362-64 (Fed. Cir. 2015) (offer-based price optimization); *Planet Bingo, LLC v. VKGS, LLC*, 576 Fed. App’x 1005, 1008 (Fed. Cir. 2014) (“managing a game of bingo”); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1354-55 (Fed. Cir. 2014) (“transaction performance guaranty”); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1330-34 (Fed. Cir. 2012) (applying for credit); *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (USA)*, 687 F.3d 1266, 1277 (Fed. Cir. 2012) (administering and tracking life insurance policy values); *CyberSource, Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369, 1376 (Fed. Cir. 2011) (“verifying the validity of credit card transactions”).

The Asserted Claims here do not purport to merely migrate longstanding or fundamental economic practices or human activity over to a new technological environment. *See Enfish*, 822 F.3d at 1339 (“[W]e are not faced with a situation where general-purpose computer components are added post-hoc to a fundamental economic practice or mathematical equation.”). Instead, for all the reasons set forth above, the Asserted Claims “are directed to a specific implementation of a solution to a problem in [conventional processes for generating memory device tests].” *Id.*

### C. The District Court Erroneously Concluded that the Asserted Claims Lack an Inventive Concept Because They Incorporate Allegedly Conventional, Routine Software Components.

In the district court, Xilinx attempted to demonstrate the absence of an inventive concept by arguing that the claimed elements and limitations "were well-understood, routine, and conventional" and performed "activities previously known to the industry." Appx260; *see generally* Appx259-261. Papst argued that, in addition to containing elements that were individually inventive, the ordered combination of the steps of each of the Asserted Claims constituted a sufficiently inventive concept. Appx191; *see generally* Appx189-191. The district court did not explicitly address Papst's "ordered combination" argument. Instead, it repeated its incorrect determination that the claim limitations, "even when viewed as an ordered combination," lack sufficiently detailed implementation instructions. *See* Appx64. It then specifically addressed only whether individual claim elements sufficiently transformed the Asserted Claims. *See* Appx65-66. That conclusion is erroneous for two reasons.

First, the district court had no evidence to support its finding that the limitation requiring the use of a packer was conventional, well-known, or routine. *See supra* part IV. That finding contradicts the patent specification, as well as the PTAB's institution decision. *See id.* Second, the district court's failure to explicitly consider whether the overall combination of elements was inventive contradicts Supreme

Court and Federal Circuit precedent. *See, e.g.*, *Alice*, 134 S. Ct. at 2355; *Diehr*, 450 U.S. at 188; *BASCOM*, 827 F.3d at 1350. Any implicit conclusion that the ordered combination of elements in the Asserted Claims does not constitute an inventive concept is erroneous, for all the reasons set forth in parts III and IV above.

## CONCLUSION

The district court's judgment and order finding that the Asserted Claims of the patents-in-suit recite ineligible subject matter under § 101 should be reversed.

Respectfully submitted

/s/ *Nicole E. Glauser*

ANDREW G. DINOVO
JAY D. ELLWANGER
NICOLE E. GLAUSER
DINOVO PRICE ELLWANGER & HARDY LLP
7000 N. MoPac Expressway, Suite 350
Austin, Texas 78731
Telephone: (512) 539-2626
Facsimile: (512) 539-2627

*Counsel for Plaintiff-Appellant*
*Papst Licensing GmbH & Co. KG*

# ADDENDUM

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PAPST LICENSING GMBH & CO. KG,<br>Plaintiff,<br>v.<br>XILINX INC,<br>Defendant. | Case No. 16-CV-00925-LHK<br>Case No. 16-CV-00926-LHK<br><br>**ORDER GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Re: Dkt. No. 88 (Case No. 16-CV-00925); Dkt. No. 81 (Case No. 16-CV-00926) |
| PAPST LICENSING GMBH & CO. KG,<br>Plaintiff,<br>v.<br>ALTERA CORPORATION,<br>Defendant. | |

Plaintiff Papst Licensing GmbH & Co. KG ("Papst" or "Plaintiff") filed patent infringement suits against Xilinx, Inc. ("Xilinx") and Altera Corporation ("Altera") (collectively, "Defendants"). Plaintiff alleges that Defendants infringe claims of U.S. Patent Nos. 6,574,759 and 6,704,891. On May 11, 2016, Defendants filed identical Motions for Judgment on the Pleadings, contending that the asserted claims of Papst's patents are invalid for failure to claim patent-eligible

subject matter under 35 U.S.C. § 101. On May 25, 2016, Papst filed an opposition. On May 30, 2016, Defendants filed a reply. *See* ECF Nos. 88 ("Motion"), 92 ("Opposition"), 94 ("Reply") (Case No. 16-CV-00925-LHK); ECF Nos. 81, 82, 84 (Case No. 16-CV-00926-LHK).[1]

Having considered the parties' submissions, the record, and the relevant law, the Court GRANTS Defendants' Motion for the reasons set forth below.

# I. BACKGROUND

## A. Factual Background

### 1. The Parties

Plaintiff Papst is a German patent licensing company with its principal place of business in St. Georgen, Germany. No. 16-CV-00925-LHK, ECF No. 1 ¶¶ 1, 6. Papst is the assignee of the two patents at issue in the instant case, which Papst acquired through Papst's predecessor-in-interest, Rambus, Inc. *Id.* ¶¶ 7, 13, 19. Defendant Xilinx is a Delaware corporation that supplies programmable logic devices and software. *Id.* ¶¶ 2, 13–15. Defendant Altera is also a Delaware corporation that supplies programmable logic devices and software. No. 15-CV-00926-LHK, ECF No. 1 ¶¶ 2, 13–15.[2]

### 2. The Asserted Patents

At issue are U.S. Patent Nos. 6,574,759 (the " '759 patent") and 6,704,891 (the " '891 patent") (collectively, the "Papst Patents"). Each of the Papst Patents is entitled "Method for Verifying and Improving Run-Time of a Memory Test."[3] The '891 patent resulted from a continuation of the same patent application that led to the '759 patent, meaning that the two

[1] Because the parties' motions for judgment on the pleadings in the two cases are substantively identical, for simplicity, references to the Motion, Opposition, and Reply are to ECF Nos. 88, 92, and 94, respectively, in Case No. 16-CV-00925-LHK.

[2] Though not relevant for purposes of the Motion, Altera states that it is now a wholly owned subsidiary of third-party counterclaimant Intel Corporation. No. 15-CV-00926-LHK, ECF No. 54 (Answer) ¶ 2. Intel has asserted breach-of-contract counterclaims against Papst stemming from an alleged covenant not to sue Intel and its affiliates concerning the Papst Patents. *Id.* ¶¶ 38–66.

[3] The '759 and '891 patents are attached to the Complaints filed in each case as Exhibits A and B, respectively. *See* No. 16-CV-00925-LHK, ECF Nos. 1-1, 1-2; No. 16-CV-00926-LHK, ECF Nos. 1-1, 1-2.

patents share nearly identical specifications.[4] For simplicity, the Court's citations to the text and figures of the Papst Patents refer to the '759 patent specification.

The Papst Patents relate generally to the field of testing computer memory devices, and more specifically, to methods for creating and verifying sets of instructions or operations used to test memory devices. *See* '759 Patent, at abstract ("A method of generating and verifying a memory test is disclosed."). According to the Papst Patents, improvements in the size and capacity of integrated circuit memory devices have "revolutionized computer systems, telecommunications equipment and consumer electronics." '759 patent, col. 1:11–12. Such memory devices, however, "must be reliable." *Id.*, col. 1:15–16. "Accordingly, memory devices have been tested since their first manufacture. Very early in the history of memory device testing, specialized equipment and automated test routines were developed to improve testing efficiency." *Id.*, col. 1:16–21.

As described by the Papst Patents, "[i]n creating a [memory] test, a test writer must define a sequence of operations which store and retrieve data to/from the memory device in accordance with certain 'operating constraints'" or rules imposed by the capabilities of the particular memory being tested. *Id.*, col. 1:58–61. These operating constraints or rules may be "timing-based," meaning that a minimum amount of time must elapse between certain memory operations, or "state-based," meaning that certain operations must occur in a particular order. *See id.*, col. 1:63–2:1; col. 2:63–3:17.

While early memory devices were "simple and characterized by relatively few constraints," contemporary memory devices have "increased in complexity" and "have an increased number of operating constraints which must be obeyed during a sequence of memory system operations." *Id.*, col. 2:2–6; col. 2:9–11.

The Papst Patents note several disadvantages of the conventional methods for creating

[4] *See Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1337 (Fed. Cir. 2006) ("The patents are continuations or divisionals of a common parent application and therefore necessarily have almost identical specifications."); *see also* Opp. at 2 n.1 (noting that Papst Patents share substantially the same specification).

United States District Court
Northern District of California

memory tests by hand. Specifically, the Papst Patents note that "[m]emory device test writers currently generate test protocols without benefit of a tool which provides feedback as to whether or not a test step or test routine violates one or more memory device constraints." *Id.*, col. 2:23–27. Similarly, "the conventional process for generating a test does not include a mechanism for verifying compliance with actual memory device constraints." *Id.*, col. 3:15–17. As a result, "when a memory device fails a test," it is unclear whether "the memory device is truly broken, or whether the test has been improperly constructed" by failing to comply with all required timing-based and state-based rules governing use of the memory. *Id.*, col. 2:29–31.

According to the Papst Patents, one way in which this problem was addressed in the "conventional process of test generation" was by using a "known-good" memory device "to test the test" in a "trial-and-error" fashion. *Id.*, col. 2:55–57; col. 2:37; *see also id.*, at Fig. 1 (describing prior art process). Identifying an appropriate reference device, however, was sometimes done by running another kind of test to "attempt to identify known-good memory devices." *Id.*, col. 3:26. This could lead to a "chicken and egg" problem, since "known-good memory devices can not be identified until a valid set of tests have been run." *Id.*, col. 3:19–24.

The Papst Patents purport to overcome this problem with a "simulator . . . using a parameter list covering all relevant constraints" to model the memory device to be tested. *Id.*, col. 3:58–60. The simulator "is event-driven and directly models the behavior of one or more memory devices or modules on a communications channel" using a "parameter file . . . that describes the architectural and timing characteristics of the memory device or module being simulated." *Id.*, col. 5:7–12. The "parameter file" of rules is provided by the test writer. *Id.* A "time-ordered sequence" of operations, *i.e.*, the test, "is passed through the simulator to verify that it adheres to the operating constraints" of the memory device for which the test is intended. *Id.*, col. 3:60–63. If the test violates any of the rules required by the memory device specification, "error messages may offer suggested fixes, such as timing adjustments required to place the sequence of operations in compliance with the constraints." *Id.*, col. 3:64–67. In addition, the Papst Patents disclose the use of a "packer" to minimize the length of time a particular test will take to run "in relation to the

given constraints" of the memory device. *Id.*, col. 4:1–4.

Figure 2 of the '759 patent is instructive as to the general sequence of steps taught by the claimed process:




FIG. 2

At step 10, a test writer creates a test for a particular memory device. '759 patent, col. 7:41–49. The test is then passed through the simulator modeling the operational constraints of the memory device at step 12. *Id.*, col. 7:49–55. If the test fails, error messages are generated at step 14, the test writer alters the test accordingly at step 15, and the process is repeated until errors no longer remain. *Id.*, col. 7:56–60. Once the test is verified, it may be run through the packer at step 17, which "may dictate alteration of the test . . . to minimize the run-time of the sequence of operations." *Id.*, col. 7:61–67.

The Papst Patents describe the implementation of the preferred embodiment of the simulator and packer as follows:

> As presently preferred, the simulator is written in a high level language like 'C' on a UNIX based platform. A standard tool set or



United States District Court
Northern District of California

> threads package, such as the CSIM17 software library offered by Mesquite Software™, may be used to write the simulator. The simulator may be written to test memory devices on an individual basis, in groups (such as modules), and/or to test a . . .fully populated channel with memory modules. The packer function is presently implemented as a 'Perl script,' a well known UNIX programming language.

'759 patent, col. 6:55–65; *see also id.*, col. 5:5–34 (describing use of simulator); col. 5:59–6:52 (describing use of packer).

**3. The Asserted Claims**

Plaintiff asserts claims 1, 4, 5 and 14 of the '759 patent and claims 1 and 2 of the '891 patent against both Xilinx and Altera. Mot. at 4–5; Opp. at 4. Plaintiff additionally asserts claims 5 and 6 of the '891 patent against Xilinx alone. *Id.* The Court refers to these claims collectively as the "asserted claims." All of the asserted claims are method claims. With minor differences, the asserted clams of the two patents are similar in nature.[5] The text of the asserted claims of the '759 patent is as follows:

> 1. A method of generating a test for a memory having defined operating constraints, the method comprising:
>
> developing a set of operations defining the test, where the set of operations is ordered in time;
>
> passing the set of operations through a simulator capable of determining whether the set of operations violates any one of the operating constraints; and
>
> upon determining that the set of operations violates any one of the operating constraints, outputting an error message, wherein the error message comprises an adjustment to the set of operations which will resolve the operating constraint violation.
>
> 4. A method of generating a test for a memory having defined operating constraints, the method comprising:
>
> developing a set of operations defining the test, where the set of operations is ordered in time;
>
> passing the set of operations through a simulator capable of determining whether the set of operations violates any one of the operating constraints; and
>
> upon determining that the set of operations violates any one of the operating constraints, outputting an error message, wherein the error message identifies a violated time-based constraint.

[5] As discussed further below, Claim 14 of the '759 patent differs in that it includes a limitation directed to "packer" functionality, which is not present in the remaining claims.

> 5. The method of claim 4, wherein the error message further identifies a timing adjustment to the set of operations which will resolve the time-based constraint violation.
>
> 14. A method of generating and verifying a test for a memory having defined operating constraints, the method comprising:
>
> defining one or more commands, wherein each one of the commands comprises a group of operations;
>
> forming a time ordered sequence of commands defining the test;
>
> verifying the test by passing the time ordered sequence of commands through a simulator capable of determining whether the time order [sic] sequence of commands violates any one of the operating constraints;
>
> passing the verified test through a packer to minimize run time of the test in relation to the operating constraints.

The text of the asserted claims of the '891 patent is as follows:

> 1. A method of simulating the behavior of a memory device, the method comprising:
>
> defining a set of operating constraints based on the characteristics of the memory device;
>
> providing a set of memory device operations, wherein the set of memory device operations is ordered in time;
>
> passing the set of operations through a simulator capable of determining whether the set of memory device operation [sic] violates any one of the operating constraints; and
>
> outputting an error message upon determining that the set of operations violates any one of the operating constraints.
>
> 2. The method of claim 1, wherein the error message comprises an adjustment to the set of operations which will resolve the operation constraint violation.
>
> 5. The method of claim 1, wherein the error message identifies a violated time-based constraint.
>
> 6. The method of claim 5, wherein the error message further identifies a timing adjustment to the set of operations which will resolve the time-based constraint violation.

### B. Procedural History

#### 1. Altera

On October 28, 2014, Altera filed a declaratory judgment action against Papst in this district, and sought a declaration that the Papst Patents were neither valid nor infringed. *Altera Corp. v. Papst Licensing GmbH & Co. KG*, No. 14-CV-04794-LHK, ECF No. 1 (N.D. Cal. Oct. 28, 2014). On February 6, 2015, Papst moved to dismiss Altera's California case for lack of personal jurisdiction, or, in the alternative, to transfer the case to the United States District Court

for the District of Delaware. *See id.*, ECF No. 18. On February 20, 2015, Altera filed an opposition. *Id.*, ECF Nos. 28, 45. On April 22, 2015, Papst filed a reply. *Id.*, ECF No. 51.

Meanwhile, on February 17, 2015, Papst filed an action against Altera in the District of Delaware, alleging that Altera infringed the Papst Patents. *Papst Licensing GmbH & Co. KG v. Altera Corp.*, No. 15-CV-00162-LPS, ECF No. 1 (D. Del. Feb. 17, 2015). On March 31, 2015, Altera filed a motion seeking to transfer the Delaware case to the Northern District of California, or alternatively to dismiss or stay the case under the first-to-file rule in view of the case previously filed by Altera against Papst in California. *Id.*, ECF Nos. 11–12. Papst filed an opposition on April 17, 2015. *Id.*, ECF No. 16. Altera filed a reply on April 27, 2015. *Id.*, ECF No. 18.

**2. Xilinx**

On November 7, 2014, Papst sued Xilinx in the United States District Court for the District of Delaware for alleged infringement of the Papst Patents. *Papst Licensing GmbH & Co. KG v. Xilinx, Inc.*, No. 14-CV-01376-LPS, ECF No. 1 (D. Del. Nov. 7, 2014). On February 2, 2015, Xilinx moved to transfer the Delaware case against Xilinx to the Northern District of California. *Id.*, ECF Nos. 13–14. Papst filed an opposition on February 20, 2015. *Id.*, ECF No. 18. Xilinx filed a reply on March 2, 2015. *Id.*, ECF No. 22.

On November 7, 2014, the same day that Papst sued Xilinx in Delaware, Xilinx filed a declaratory judgment action against Papst in the Northern District of California. *Xilinx, Inc. v. Papst Licensing GmbH & Co. KG*, No. 14-CV-04963-LHK, ECF No. 1 (N.D. Cal. Nov. 7, 2014). In the California case, Xilinx sought a declaration that the Papst Patents were neither valid nor infringed. *See id.* On February 6, 2015, Papst moved to dismiss Xilinx's California case for lack of personal jurisdiction, or, in the alternative, to transfer the case to the District of Delaware. *See id.*, ECF No. 18. Xilinx took discovery on Papst's motion to dismiss the California case, and thereafter filed an opposition on April 15, 2015. *Id.*, ECF No. 52. On April 22, 2015, Papst filed a reply. *Id.*, ECF No. 56.

**3. Rulings on Motions to Dismiss and Transfer**

On February 23, 2015, both California cases were reassigned to the undersigned judge. As

a result, by late February 2015, two cases between Defendants and Papst regarding the Papst Patents were pending before this Court, while two additional cases between Defendants and Papst regarding the Papst Patents were simultaneously pending in the District of Delaware.

On July 9, 2015, this Court granted Papst's motions to dismiss the California cases for lack of personal jurisdiction over Papst, ending the California cases. No. 14-CV-4963-LHK, ECF No. 62; No. 14-CV-4794-LHK, ECF No. 57. Both Altera and Xilinx appealed to the United States Court of Appeals for the Federal Circuit. *See* Appeal Nos. 2015-1914, 2015-1919. On June 9, 2016, the Federal Circuit granted Altera's unopposed motion to dismiss its appeal as moot. *See* No. 14-CV-4794-LHK, ECF No. 69 (Federal Circuit order). Xilinx's appeal remains pending. *See* Appeal No. 15-1919.

On September 1, 2015, a Magistrate Judge in Delaware issued a combined Memorandum Order that granted both Xilinx's and Altera's motions to transfer the Delaware cases to the Northern District of California. No. 14-CV-01376-LPS, ECF No. 49; No. 15-CV-00162-LPS, ECF No. 41. Papst filed objections, which a District Judge orally overruled on February 23, 2016. No. 14-CV-01376-LPS, ECF No. 54; No. 15-CV-00162-LPS, ECF No. 48. On February 24, 2016, the cases were transferred to the Northern District of California and docketed as the instant cases, Nos. 16-CV-00925 and 16-CV-00926.

On March 22, 2016, this Court issued an order relating the two cases transferred from Delaware to the two dismissed California cases involving Defendants and Papst. *See* No. 14-CV-00925, ECF No. 66. The two cases transferred from Delaware were accordingly reassigned to the undersigned judge that same day.

On May 11, 2016, Defendants filed their substantively identical Motions for Judgment on the Pleadings. On May 25, 2016, Plaintiff filed an opposition. On May 30, 2016, Defendants filed a reply. *See* ECF Nos. 88, 92, 94 (Case No. 16-CV-00925); ECF Nos. 81, 82, 84 (Case No. 16-CV-00926).

## II. LEGAL STANDARD

### A. Motion for Judgment on the Pleadings Under Fed. R. Civ. P. 12(c)

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is properly granted when, accepting all factual allegations in the complaint as true, there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (quotation marks and alteration omitted). Like a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a motion under Rule 12(c) challenges the legal sufficiency of the claims asserted in the complaint. *See id*. Indeed, a Rule 12(c) motion is "functionally identical" to a Rule 12(b)(6) motion, and courts apply the "same standard." *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989) (explaining that the "principal difference" between Rule 12(b)(6) and Rule 12(c) "is the tim[ing] of filing"); *see also United States ex rel. Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011).

Judgment on the pleadings should thus be entered when a complaint does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quotation marks omitted). For purposes of ruling on a Rule 12(c) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

The Court, however, need not accept as true allegations contradicted by judicially noticeable facts, *see Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and it "may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(c)

motion into a motion for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). Nor must the Court "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (quotation marks omitted). Mere "conclusory allegations of law and unwarranted inferences are insufficient" to defeat a motion for judgment on the pleadings. *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

**B. Patent Validity Challenges Under 35 U.S.C. § 101**

**1. Availability of Judgment on the Pleadings**

Defendants' Motion asserts that the Papst Patents fail to claim patent-eligible subject matter under 35 U.S.C. § 101 in light of the U.S. Supreme Court's decision in *Alice Corporation Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014). Whether a claim recites patent-eligible subject matter under Section 101 is a question of law. *In re Roslin Inst. (Edinburgh)*, 750 F.3d 1333, 1335 (Fed. Cir. 2014) ("Section 101 patent eligibility is a question of law[.]"); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) (same). Accordingly, a district court may resolve the issue of patent eligibility under Section 101 by way of a motion for judgment on the pleadings. *See, e.g.*, *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1351 (Fed. Cir. 2014) (affirming determination of ineligibility made on motion for judgment on the pleadings); *see also Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1345 (Fed. Cir. 2014) (affirming determination of ineligibility made on 12(b)(6) motion); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 713 (Fed. Cir. 2014) (same).

Although claim construction is often desirable, and may sometimes be necessary, to resolve whether a patent claim is directed to patent-eligible subject matter, the Federal Circuit has explained that "claim construction is not an inviolable prerequisite to a validity determination under § 101." *Bancorp Servs., L.L.C. v Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273–1274 (Fed. Cir. 2013). Where the court has a "full understanding of the basic character of the claimed subject matter," the question of patent eligibility may properly be resolved on the pleadings. *Content Extraction*, 776 F.3d at 1349; *see also Cardpool, Inc. v. Plastic Jungle, Inc.*,

No. 12-CV-04182-WHA, 2013 WL 245026, at *4 (N.D. Cal. Jan. 22, 2013) (same), *aff'd*, 817 F.3d 1316 (Fed. Cir. 2016).

**2. Burden of Proof**

Before proceeding to the merits of Defendants' Motion, the Court addresses Plaintiff's contention concerning the appropriate burden of proof to be applied.

"Under § 282 of the Patent Act of 1952, a patent shall be presumed valid and the burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011) (citing 35 U.S.C. § 282) (quotation marks and alterations omitted).

Plaintiff states without elaboration that Defendants must establish a lack of patent-eligible subject matter by clear and convincing evidence—a heightened evidentiary standard applied in evaluating challenges to patent validity—rather than by a preponderance of the evidence. Opp. at 4:26, 15:18. In that regard, Plaintiff cites to *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1338–39 (Fed. Cir. 2013), for the proposition that the clear and convincing evidence standard applies. Opp. at 4. However, the *Ultramercial* decision relied upon by Plaintiff lacks precedential effect, as the U.S. Supreme Court vacated the judgment in the case "for further consideration in light of *Alice*." *WildTangent, Inc. v. Ultramercial, LLC,* 134 S. Ct. 2870 (2014). On remand, the Federal Circuit reversed its prior decision and held, without mention of the clear and convincing evidence standard, that the claims at issue were not directed to patent-eligible subject matter. *See Ultramercial*, 772 F.3d at 711–12, 714–717.

No post-*Alice* decision of the U.S. Supreme Court or the Federal Circuit appears to directly address whether the clear and convincing evidence standard applies when evaluating a lack of patent-eligible subject matter on the pleadings. There is a split of authority amongst district courts as to the appropriate standard to be applied. Several courts have concluded that a heightened burden of proof makes little sense in the context of a motion to dismiss or motion for judgment on the pleadings, and therefore declined to apply the clear and convincing evidence standard. *See, e.g., TNS Media Res., LLC v. Tivo Res. & Analytics, Inc.*, No. 11-CV-4039-SAS, 2016 WL

United States District Court
Northern District of California

817447, at *10 (S.D.N.Y. Feb. 22, 2016) ("Because no evidence outside the pleadings is considered in deciding a motion to dismiss or a motion for judgment on the pleadings, it makes little sense to apply a clear and convincing evidence standard—a burden of proof—to such motions.") (quotation marks and emphasis omitted); *Protegrity USA, Inc. v. Netskope, Inc.*, No. 15-CV-02515-YGR, 2015 WL 6126599, at *4 (N.D. Cal. Oct. 19, 2015) (same). Other courts have applied the clear and convincing evidence standard to Section 101 challenges either without discussion, or because that standard is applied by the Federal Circuit in the context of other challenges to validity. *See OpenTV, Inc. v. Apple Inc.*, No. 15-CV-02008-EJD, 2016 WL 344845, at *3 (N.D. Cal. Jan. 28, 2016) (noting split of authority and collecting cases); *Affinity Labs of Tex., LLC v. DirecTV, LLC*, 109 F. Supp. 3d 916, 932 & n.6 (W.D. Tex. 2015) (same); *c.f. Bascom Res., LLC v. LinkedIn, Inc.*, 77 F. Supp. 3d 940, 945 (N.D. Cal. 2015) (holding that "an alleged infringer asserting an invalidity defense pursuant to § 101 bears the burden of proving invalidity by clear and convincing evidence" in summary judgment context).

However, the Court need not resolve this dispute in connection with the instant Motion. For the reasons set forth below, regardless of which standard applies, the Court concludes that Defendants have established that the asserted claims of the Papst Patents currently at issue are directed to patent-ineligible subject matter.

**C. Substantive Legal Standards Applicable Under 35 U.S.C. § 101**

Defendants contend that the asserted claims of the Papst Patents are directed to unpatentable abstract ideas, and fail to "recite an inventive concept sufficient to transform the unpatentable abstract idea of using a simulator to verify a memory test into a patentable application of that idea." Mot. at 1. Defendants therefore argue that judgment on the pleadings is appropriate because [t]he asserted claims are . . . invalid under 35 U.S.C. § 101." *Id.* Because of the rapid evolution of the law concerning patent-eligible subject matter under Section 101 in recent years, the Court first discusses the legal framework applicable to Defendants' Motion. The Court then turns to the application of that framework to the Papst Patents.

**1. Patent-Eligible Subject Matter Under 35 U.S.C. § 101**

Section 101 of Title 35 of the United States Code "defines the subject matter that may be patented under the Patent Act." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010). Under Section 101, the scope of patentable subject matter encompasses "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." *Id.* (quoting 35 U.S.C. § 101). These categories are broad, but they are not limitless. Section 101 "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 134 S. Ct. at 2354 (quotation marks omitted). These three exceptions are not patent-eligible because "they are the basic tools of scientific and technological work," which are "free to all men and reserved exclusively to none." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012) (quotation marks omitted). The U.S. Supreme Court has explained that allowing patent claims for such purported inventions would "tend to impede innovation more than it would tend to promote it," thereby thwarting the primary object of the patent laws. *Id.* at 1293. However, the U.S. Supreme Court has also cautioned that "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice*, 134 S. Ct. at 2354 (quotation marks and alterations omitted). Accordingly, courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Id.*

In *Alice*, the leading case on patent-eligible subject matter under Section 101, the U.S. Supreme Court refined the "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts" originally set forth in *Mayo*, 132 S. Ct. at 1296–97. This analysis, generally known as the "*Alice*" framework, proceeds in two steps as follows:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, "[w]hat else is there in the claims before us?" To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. We have described step two of this analysis as a search for an "'inventive concept'"—*i.e.*, an element or combination of elements

> that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."

*Alice*, 134 S. Ct. at 2355. (citations omitted; alterations in original); *see also In re TLI Commc'ns Patent Litig.*, No. 2015-1372 (lead), --- F.3d ----, 2016 WL 2865693, at *2 (Fed. Cir. May 17, 2016) (describing "the now familiar two-part test described by the U.S. Supreme Court in *Alice*"). The Court discusses the contours of analysis under the two steps of the *Alice* framework below.

**2. *Alice* Step One — Identification of Claims Directed to an Abstract Idea**

Neither the U.S. Supreme Court nor the Federal Circuit has set forth a bright line test separating abstract ideas from concepts that are sufficiently concrete so as to require no further inquiry under the first step of the *Alice* framework. *See, e.g.*, *Alice*, 134 S. Ct. at 2357 (noting that "[the U.S. Supreme Court] need not labor to delimit the precise contours of the 'abstract ideas' category in this case"); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) (observing that the U.S. Supreme Court did not "delimit the precise contours of the 'abstract ideas' category in *Alice*") (quotation marks omitted). As a result, in evaluating whether particular claims are directed to patent-ineligible abstract ideas, courts have generally begun by "compar[ing] claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, No. 2015-1244, --- F.3d ----, 2016 WL 2756255, at *4 (Fed. Cir. May 12, 2016).

Two of the U.S. Supreme Court's leading cases concerning the "abstract idea" exception involved claims held to be abstract because they were drawn to longstanding, fundamental economic practices. *See Alice*, 134 S. Ct. at 2356 (claims "drawn to the concept of intermediated settlement, *i.e.*, the use of a third party to mitigate settlement risk" were directed to an unpatentable abstract idea); *Bilski*, 561 U.S. at 611–12 (claims drawn to "the basic concept of hedging, or protecting against risk" were directed to an unpatentable abstract idea because "[h]edging is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class.") (quotation marks omitted). Although courts have thus had little difficultly concluding that claims drawn to the simple automation of fundamental

United States District Court
Northern District of California

economic practices similar to those at issue in *Bilski* and *Alice* are abstract[6], the determination of whether other types of computer-implemented claims are abstract has proven more troublesome. *See, e.g.*, *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1345 (Fed. Cir. 2015) ("[P]recision has been elusive in defining an all-purpose boundary between the abstract and the concrete[.]").

As a result, in addition to comparing claims to prior U.S. Supreme Court and Federal Circuit precedents, courts considering computer-implemented inventions have taken varied approaches to determining whether particular claims are directed to an abstract idea. For example, courts have considered whether the claims purport to "improve the functioning of the computer itself," *Alice*, 134 S. Ct. at 2359, which may suggest that the claims are not abstract, or instead whether "computers are invoked merely as a tool" to carry out an abstract process. *Enfish*, 2016 WL 2756255 at *5; *see also id.* at *4 (noting that "some improvements in computer-related technology when appropriately claimed are undoubtedly not abstract, such as a chip architecture, an LED display, and the like. Nor do we think that claims directed to software, as opposed to hardware, are inherently abstract[.]").

Similarly, the Federal Circuit has considered whether claims are directed to "a problem that does not arise in the 'brick and mortar context'" but rather is "particular to the Internet" as an indicator that a claim is not drawn to a patent-ineligible abstract idea. *DDR Holdings*, 773 F.3d at 1257–58 (holding that claims were not abstract where the "the claims recite an invention that is not merely the routine or conventional use of the Internet" but instead solve a specific problem by departing from "the routine, conventional functioning of Internet hyperlink protocol").

[6] *See, e.g.*, *buySAFE*, 765 F.3d at 1355 (creating a transaction performance guaranty for a commercial transaction on computer networks such as the Internet); *Accenture Global Servs., GmbH v. Guidewire Soft., Inc.*, 728 F.3d 1336, 1338 (Fed. Cir. 2013) (generating rule-based tasks for processing an insurance claim); *Bancorp Servs.*, 687 F.3d at 1278 (managing a stable value protected life insurance policy); *Dealertrack*, 674 F.3d at 1333 (processing loan information through a clearinghouse); *see also Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 991 (Fed. Cir. 2014) (non-prec.) (collecting cases).



United States District Court
Northern District of California

Another helpful tool used by courts in the abstract idea inquiry is consideration of whether the claims are, in essence, directed to a mental process or a process that could be done with pen and paper. *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011) (claim for verifying the validity of a credit card transaction over the Internet was invalid because the "steps can be performed in the human mind, or by a human using a pen and paper"); *see also, e.g.*, *Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016) (claims for computer-implemented system to enable borrowers to anonymously shop for loan packages were abstract where "[t]he series of steps covered by the asserted claims . . . could all be performed by humans without a computer"); *Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371, 383 (D. Del. 2015) ("Another helpful way of assessing whether the claims of the patent are directed to an abstract idea is to consider if all of the steps of the claim could be performed by human beings in a non-computerized 'brick and mortar' context.") (citing *buySafe*, 765 F.3d at 1353).[7]

Regardless of the particular analysis that is best suited to the specific facts at issue in a case, however, the Federal Circuit has emphasized that "a substantial class of claims are *not* directed to a patent-ineligible concept," and thus "the first step of the [*Alice*] inquiry is a meaningful one." *Enfish*, 2016 WL 2756255 at *4 (emphasis in original). The court's task is thus not to determine whether claims merely involve an abstract idea at some level, *see id.*, but rather to examine the claims "in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp.*, 790 F.3d at 1346.

**3. Alice Step Two — Evaluation of Abstract Claims for a Limiting Inventive Concept**

A claim drawn to an abstract idea is not necessarily invalid if the claim's limitations—

[7] One court has noted that, like all tools of analysis, the "pencil and paper" analogy must not be unthinkingly applied. *See California Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 995 (C.D. Cal. 2014) (viewing pencil-and-paper test as a "stand-in for another concern: that humans engaged in the same activity long before the invention of computers," and concluding that test was unhelpful where "error correction codes were not conventional activity that humans engaged in before computers").

considered individually or as an ordered combination—serve to "transform the claims into a patent-eligible application." *Content Extraction*, 776 F.3d at 1348. Thus, the second step of the *Alice* analysis (the search for an "inventive concept") asks whether the claim contains an element or combination of elements that ensures that the patent in practice amounts to significantly more than a patent upon the abstract idea itself. *Alice*, 134 S. Ct. at 2355.

The U.S. Supreme Court has made clear that a transformation of an abstract idea to a patent-eligible application of the idea requires more than simply reciting the idea followed by "apply it." *Id.* at 2357 (quoting *Mayo*, 132 S. Ct. at 1294). In that regard, the Federal Circuit has repeatedly held that "[f]or the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than the performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction*, 776 F.3d at 1347–48 (quoting *Alice*, 134 S. Ct. at 2359) (alterations in original); *see also Mortgage Grader*, 811 F.3d at 1324–25 (holding that "generic computer components such as an 'interface,' 'network,' and 'database' . . . do not satisfy the inventive concept requirement."); *Bancorp Servs*., 687 F.3d at 1278 ("To salvage an otherwise patent-ineligible process, a computer must be integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not."). Similarly, "[i]t is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea" where those components simply perform their "well-understood, routine, conventional" functions. *In re TLI Commc'ns*., 2016 WL 2865693, at *5 (limitations of "telephone unit," "server," "image analysis unit," and "control unit" insufficient to adequately narrow abstract idea of "classifying and storing digital images in an organized manner" under step two of the *Alice* framework) (quotation marks omitted).

In addition, the U.S. Supreme Court explained in *Bilski* that "limiting an abstract idea to one field of use or adding token postsolution components [does] not make the concept patentable." 561 U.S. at 612 (citing *Parker v. Flook*, 437 U.S. 584 (1978)); *see also Alice*, 134 S.Ct. at 2358 (same). The Federal Circuit has similarly stated that attempts "to limit the use of

United States District Court
Northern District of California

the abstract idea to a particular technological environment" are insufficient to render an abstract idea patent eligible. *Ultramercial*, 772 F.3d at 716 (quotation marks omitted); *see also Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015) ("An abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as the Internet.").

Finally, in considering whether a claim contains an inventive element, courts often apply the so-called "machine-or-transformation" test, which asks whether a process is (1) "tied to a particular machine or apparatus," or (2) "transforms a particular article into a different state or thing." *Ultramercial*, 772 F.3d at 716. Although the "machine-or-transformation test is not the sole test governing § 101 analyses, that test can provide a 'useful clue' in the second step of the *Alice* framework." *Id.* at 716 (citations omitted); *Bancorp Servs.*, 867 F.3d at 1279 (discerning "no fault" in district court's consideration of machine-or-transformation test).

## III. DISCUSSION

The question presented by Defendants' Motion is whether the asserted claims fall within the patent-ineligible "abstract ideas" exception to Section 101. To answer this question, the Court turns to the application of the *Alice* framework described above to the asserted claims of the Papst Patents.

### A. *Alice* Step One — Whether the Asserted Claims Are Directed to an Abstract Idea

The Court "must first determine whether the claims at issue are directed to [an abstract idea]." *Alice*, 134 S. Ct. at 2355. Defendants contend that "[t]he Papst Patents are directed to the abstract idea of verifying a test for a memory device." Mot. at 1; *see also id.* at 8 (arguing that "the 'gist' of the Papst Patents is to use a generic 'simulator' to verify whether a memory test will violate any of the operating constraints of the memory device to be tested."). Defendants argue that "two things are critical in assessing whether the Papst Patent claims recite an unpatentable abstract idea": first, that the "functions recited in the asserted claims—all of which are methods—can be performed by a human test writer either mentally or with a pencil and paper"; and second, that the asserted claims "do not recite any specific algorithm or implementation details of the

claimed 'simulator' or 'packer'—and neither does the specification." *Id.* at 8–9.

Plaintiff responds that the claims are not directed to abstract ideas because the specification demonstrates that the claims "are directed to an improvement of an existing computer technology rather than an abstract idea," Opp. at 8–9; because the claimed "simulator" and "packer" are specialized computer programs, Opp. 10–12; because "Defendants' assertion that the functions . . . can be carried out mentally or with a pencil and paper is nonsensical," Opp. 12–13; and because Defendants' characterization of the asserted claims is overly general, Opp. 14–15.

The Court begins by examining each asserted claim in its entirety to understand the idea at the "heart" of the claimed invention. *Ultramercial*, 772 F.3d at 714 ("We first examine the claims because claims are the definition of what a patent is intended to cover"); *Accenture Global Servs.*, 728 F.3d at 1341 ("[T]he court must first identify and define whatever fundamental concept appears wrapped up in the claim.") (quotation marks omitted). In distilling the purpose of a claim, the Court is careful not to express the claim's fundamental concept at an unduly "high level of abstraction . . . untethered from the language of the claims," but rather at a level consonant with the level of generality or abstraction expressed in the claims themselves. *Enfish*, 2016 WL 2756255 at *6; *see also Visual Memory LLC, v. Nvidia Corp*, No. 15-CV-789-RGA, 2016 WL 3041847, at *5 (D. Del. May 27, 2016) ("Put another way, the 'level of abstraction' employed by the court in describing the claims must be consonant with the level of abstraction expressed in the claims themselves.")

Here, the Court agrees with Defendants that each of the asserted claims, at its heart, is directed to the use of a simulator to determine whether a memory test violates a set of rules. With minor variations in phrasing, each of the asserted claims requires (1) writing a memory test (*e.g.*, '759 patent, cl. 1: "developing a set of operations defining the test" wherein the operations are "ordered in time"); (2) using a "simulator" to check if the test violates the rules ("operating constraints") governing use of the memory (*e.g.*, '759 patent, cl. 1: "passing the set of operations through a simulator capable of determining whether the set of operations violates any one of the [memory's] operating constraints"); and (3) notifying the user of any errors found by the simulator

United States District Court
Northern District of California

(*e.g.*, '759 patent, cl. 1: "outputting an error message"). The focus of this process is on the use of a simulator, with additional steps describing the input to the simulator (the memory test and a set of rules) and the output of the simulator (error messages if the test does not comply with the rules).

Moreover, the specification emphasizes the use of the simulator as a basic feature of the claimed invention. *See, e.g.*, '759 patent, at abstract ("A simulator is used to verify that the sequence of time-ordered commands complies with a set of operating constraints for the memory."); *id.*, col. 3:55–63 (emphasizing simulator as "a first general aspect" of the invention). With the exception of Claim 14 of the '759 patent, discussed further below, the remaining asserted claims are directed to variants of the same basic concept as Claim 1 of the '759 patent. These variants consist of minor rephrasing or the addition of minor limitations varying the content of the error message output by the simulator (*e.g.*, '759 patent, cl. 5, and '891 patent, cl. 6, which add "wherein the error message further identifies a timing adjustment to the set of operations which will resolve the time-based constraint violation.").

The Federal Circuit has held that a district court need not expressly address each asserted claim where the court concludes particular claims are representative because all the claims are "substantially similar and linked to the same abstract idea." *Content Extraction*, 776 F.3d at 1348 (quotation marks omitted); *see also Mortgage Grader*, 811 F.3d at 1324 n.6 (court did not err by discussing only one claim where claims did not "differ in any manner that is material to the patent-eligibility inquiry"). Although Claims 1 and 14 of the '759 patent are plainly representative of the remaining asserted claims, the Court has also considered each asserted claim individually, and its analysis herein concerning Claims 1 and 14 is equally applicable to each asserted claim.

Plaintiff contends that Defendants' description of the claims (and, by extension, the abstract idea identified by Defendants) is impermissibly generalized, and fails entirely to account for two categories of claim limitations: limitations related to error messages recited in each claim except Claim 14 of the '759 patent, and the "packer" limitation recited by Claim 14. Opp. at 15.

Plaintiff's contention is unpersuasive with regard to the error message limitations. The error message limitations of the asserted claims are secondary to (and dependent upon) the use of

the simulator itself. *See, e.g.*, '759 patent, col. 5:26–28 ("If the list of operations violates a constraint, the simulator provides an error message."). The use of a simulator is thus the dominant concept to which the claims are directed. Moreover, although determining the concept to which a claim is directed at the first step of the *Alice* framework cannot be "untethered from the language of the claims," *Enfish*, 2016 WL 2756255 at *6, it is equally clear that the Court's formulation of the basic concept reflected by the claim need not expressly recite every limitation of a claim. *See, e.g.*, *Ultramercial*, 772 F.3d at 715 (describing "the concept embodied by the *majority* of the limitations" despite presence of other limitations) (emphasis added); *Content Extraction*, 776 F.3d at 1347 (summarizing concept to which claims were drawn as "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" despite presence of other claim limitations); *Dealertrack*, 674 F.3d at 1333 (reducing multi-step process to "its simplest form [of] three steps" and summarizing concept as "processing information through a clearinghouse" despite presence of additional limitations).

With regard to the "packer" functionality of Claim 14, however, Plaintiff's point is well-taken. Although Claim 14 of the '759 patent is directed to the same basic concept of using a simulator to determine whether a memory test violates a set of rules, *see* '759 patent, cl. 14, it also adds the additional concept of passing the memory test through a "packer" to minimize the time between each test command. Unlike the limitations directed to the content of error messages output by the simulator, the Papst Patents describe the packer as a conceptually separate aspect of the invention used to reduce the amount of time a memory test takes to run. *See, e.g.*, '759 patent, at abstract ("A packer may thereafter be used to optimize run time of the verified test"); col. 4:1–4; col. 5:59–62 (describing packer as "a second general aspect" of the invention that temporally "packs" the operations making up the memory test "as tightly as possible" given a set of rules). While the other asserted claims are directed to the fundamental concept of using a simulator to determine whether a memory test violates a set of rules, Claim 14 is thus more appropriately characterized as being directed to the concepts of (1) using a simulator to determine whether a memory test violates a set of rules; and (2) using a packer to optimize the memory test.

Having thus identified the fundamental concepts to which the asserted claims are directed, the question remains whether those concepts are abstract within the meaning of the exception to patentable subject matter set forth by the U.S. Supreme Court. For the reasons set forth below, the Court concludes that each of the asserted claims is directed to a patent-ineligible abstract idea.

**1. The Asserted Claims of the Papst Patents Are Similar to Claims Previously Held to Be Directed to Abstract Ideas**

As noted above, in considering whether a claim is directed to an abstract idea, both the U.S. Supreme Court and the Federal Circuit have "compare[d the] claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish*, 2016 WL 2756255 at *4. Defendants contend that the Federal Circuit's relatively recent decision in *Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC* is particularly instructive on these facts. 635 F. App'x 914 (Fed. Cir. 2015) (non-prec.), *cert. denied*, No. 15-1201, 2016 WL 1171121 (U.S. May 31, 2016). The Court agrees.

In *Vehicle Intelligence*, the Federal Circuit affirmed a judgment on the pleadings under Federal Rule of Civil Procedure 12(c), holding that asserted claims of U.S. Patent No. 7,394,392 were invalid as covering "only abstract ideas coupled with routine data-gathering steps and conventional computer activity." 635 F. App'x at 915. The claims of the patent at issue related to "methods and systems that screen equipment operators for impairment, selectively test those operators, and control the equipment if an impairment is detected." *Id.* at 916. A representative method claim was directed to a method "to screen an equipment operator for impairment" and recited limitations including "screening an equipment operator by one or more expert systems to detect potential impairment of said equipment operator," "selectively testing said equipment operator when said screening of said equipment operator detects potential impairment of said equipment operator," and "controlling operation of said equipment if said selective testing . . . indicates said impairment . . ., wherein said screening . . . includes a time-sharing allocation of at least one processor executing at least one expert system." *Id.* A representative system claim recited similar concepts in terms of modules, such as "one or more expert system modules" and "a

screening module to screen and selectively test an equipment operator . . . wherein said screening module utilizes one or more expert system modules." *Id.*

As is relevant here, the Federal Circuit held that these claims were directed to patent-ineligible abstract ideas. A particular focus of the court's analysis was the level of generality at which the computerized "expert system" performing the impairment screening and control was claimed, and the equivalent generality with which that expert system was described in the specification. Specifically, the Federal Circuit noted that "critically absent from the entire patent" was an explanation of *how* the expert system or modules actually carried out the claimed functions. *Id.* at 918. Although the patent specified the functions that the expert system would perform (*e.g.*, determining whether or not the equipment operator was impaired), neither the specification nor the claims explained, for example, how "the decision module determines if an operator is impaired . . .; assuming this determination can be made, how the decision module decides which control response to make; and assuming the control response decision can be made, how the 'expert system' effectuates the chosen control response." *Id.* Rather, the patent "[a]t best . . . answer[ed] the question of how to provide faster, more accurate and reliable impairment testing by simply stating 'use an expert system.'" *Id.* As the court concluded, "in the absence of any details about how the 'expert system' works, the claims at issue are drawn to a patent-ineligible abstract idea." *Id.*.

The Federal Circuit's analysis of the claims at issue in *Vehicle Intelligence* is equally applicable to the asserted claims here. The asserted claims of the Papst Patents replace manual evaluation of a memory test with "a simulator capable of determining whether the set of operations violates any one of the operating constraints" of the memory, '759 patent, cl. 1, and manual optimization of a memory test with "a packer to minimize run time of the test in relation to the operating constraints," *id.*, cl. 14. But just as in *Vehicle Intelligence*, neither the specification nor the claims of the Papst Patents provide any meaningful explanation of *how* the claimed simulator determines whether operating constraints are violated. Nor do the specification or claims offer any explanation of how the claimed packer optimizes the memory test. Rather, the

Papst Patents simply describe, in the most general of terms, that the simulator "runs the set of operations against the set of constraints defined by the [memory device] parameter list," '759 patent, col. 5:25–28, and that the packer operates by "iteratively call[ing] the simulator to produce a version of the time-ordered sequence [of memory test commands] which minimizes the time allocated between different operations," *id.* col. 5:62–66; *see also id.* col. 5:7–9 (explaining that "[t]he simulator is event-driven and directly models the behavior of one or more memory devices," but offering no further explanation how modeling occurs).

Similarly, the specification states, again in general terms, that the simulator can be "written in a high level language like 'C' on a UNIX based platform" or with "[a] standard tool set or threads package, such as the CSIM17 software library[.]" *Id.* col. 6:56–59. The packer is similarly described in general terms as being implemented "as a 'Perl script,' a well known UNIX programming language." *Id.* col. 6:64–65. Although the specification thus includes generic descriptions of well-known programming languages that could be used in the abstract to create a simulator or packer, absent from the Papst Patents is any description of any specific algorithm for simulator or packer operation to be implemented with those languages, or other implementation details that might narrow the scope of the abstract idea of creating and using a generic simulator or packer. In essence, the simulator and packer in the asserted claims of the Papst Patents are claimed simply as black boxes defined by a desired function. As in *Vehicle Intelligence*, the Papst Patents thus answer "the question of how to provide faster, more accurate and reliable [verification of memory tests] by simply stating 'use [a simulator or packer].'" 635 F. App'x at 918. Without more, the asserted claims are drawn to a patent-ineligible abstract idea.

Plaintiff argues that the asserted claims are not directed to abstract ideas because the claimed "simulator" and "packer" refer to "specific, defined, special-purpose software components that achieve functionality different from existing and conventional practices." Opp. 9–12.[8] This

---

[8] In connection with this argument, Plaintiff requests without opposition that the Court take judicial notice of several exhibits attached to the Declaration of Andrew G. DiNovo submitted with the Opposition. Opp. at 11 n. 2; *See* No. 16-CV-00925-LHK, ECF No. 93 ("DiNovo Declaration"). The Court takes judicial notice of the dictionary definition submitted as Exhibit A

argument is unpersuasive. First, Plaintiff's contention that the simulator and packer claimed are something other than generically identified software components performing conventional functions is belied by the complete lack of description in the Papst Patents as to *how* those components should be implemented. Indeed, the Papst Patents assume that implementation of a generic simulator or packer is within the abilities of one of ordinary skill in the art, and state without elaboration that the simulator or packer can be written in standard programming languages using standard tools. *See* '759 patent, col. 6:55–65; *cf. Content Extraction*, 776 F.3d at 1348 (holding that "use of a generic scanner and computer to perform well-understood, routine, and conventional activities commonly used in industry" was insufficient to render claims non-abstract). The concept of a software "packer" or a "simulator" for a memory device, specified at the level of generality present in the asserted claims of the Papst Patents, is thus no different than the other types of generic software components, such as a "database," that the Federal Circuit has described as "generic computer elements performing generic computer tasks." *Intellectual Ventures I*, 792 F.3d at 1368; *Mortgage Grader*, 811 F.3d at 1324–25 (rejecting claims reciting "generic computer components" including a "database"); *Accenture Global Servs.*, 728 F.3d at 1344 (rejecting claims requiring "a combination of computer components including an insurance transaction database, a task library database, a client component, and a server component, which include[d] an event processor, a task engine, and a task assistant").

Second, Plaintiff's argument closely parallels an argument rejected by the Federal Circuit in *Vehicle Intelligence*, albeit in the second step of the *Alice* analysis. There, the patentee argued that "its methods are embedded in 'specialized existing equipment modules,' as opposed to

---

to the DiNovo Declaration and the May 6, 2016 Institution Decision of the United States Patent and Trademark Office's Patent Trial and Appeal Board ("PTAB"), submitted as Exhibit D to the DiNovo Declaration, concerning the claims of the '759 patent in *inter partes* review No. IPR2016-00104. However, Exhibits B and C to the DiNovo Declaration appear to be technical materials printed from Defendants' websites. Because Plaintiff does not explain (and it is not otherwise apparent) why such documents may be appropriately judicially noticed, the Court denies Plaintiff's request concerning those documents. *See* ECF No. 93, Ex. B (Altera document); Ex. C (Xilinx document). Regardless, none of the documents supplied with the DiNovo Declaration would alter the Court's conclusions herein.

generic computers, which renders them patent-eligible." 635 F. App'x at 919. As is also the case here, however, the Federal Circuit in *Vehicle Intelligence* noted that "markedly absent from the . . . patent is any explanation of how the methods at issue can be embedded into these existing modules." *Id.* The Federal Circuit further explained that "[m]erely stating that the methods at issue are performed on already existing vehicle equipment"—much as Plaintiff here argues its methods are performed on existing software components—"does not save the disputed claims from abstraction." *Id.*

In addition, Plaintiff relies heavily upon the Federal Circuit's decisions in *Enfish*, 2016 WL 2756255, at *4, and *DDR Holdings*, 773 F.3d at 1248, 1257, to argue that the "[a]sserted [c]laims here are directed to an improvement of an existing computer technology rather than an abstract idea." Opp. at 8; *see also id.* at 6. Plaintiff's argument is not persuasive, however, because unlike the claims at issue in *Enfish* and *DDR Holdings*, the asserted claims of the Papst Patents are not directed to any improvement of the computer or technology itself.

In *Enfish*, the Federal Circuit "clarified that a relevant inquiry at [*Alice*] step one is 'to ask whether the claims are directed to improvement to computer functionality versus being directed to an abstract idea.'" *In re TLI Commc'ns*, 2016 WL 2865693, at *3 (quoting *Enfish*, 2016 WL 2756255, at *4). In *Enfish*, however, the claims at issue were directed "to a specific improvement to the way computers operate," in the form of a data structure that used a "self-referential table." *Enfish*, 2016 WL 2756255, at *5. Rather than simply automating a process using a computer as a tool, the claims involved "a specific type of data structure designed to improve the way a computer stores and retrieves data in memory." *Id.* at *8. The claims were therefore directed to an improvement of the functioning of the computer itself, as opposed to an abstract idea merely performed on a computer. Similarly, the claims at issue in *DDR Holdings* were directed to an improvement of the functionality of network technology itself. The claims there "specif[ied] how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." 773 F.3d at 1258. The claims thereby solved a "particular Internet-centric problem" by means that did

not recite "the routine or conventional use of the Internet" to carry out a process. *Id*. at 1259.

In contrast, the asserted claims here bear little resemblance to the claims at issue in *Enfish* and *DDR Holdings*. Although Plaintiff contends that "the [a]sserted [c]laims improve the functioning of the computer itself," Opp. at 14, that conclusion does not follow from the specification of the Papst Patents or the asserted claims. The Papst Patents are directed to methods of verifying and optimizing memory tests, not to improving the computer or software components used to carry out those methods. Unlike the improvements to data structures claimed by the patents at issue in *Enfish*, the Papst Patents do not purport to improve the underlying technology of memory devices or particular techniques of testing memory devices. For example, the Papst Patents do not purport to improve the design, operation, or functionality of memory devices in any way. Nor do the Papst Patents disclose any improvement to the design or operation of the simulator or packer recited in the asserted claims. Indeed, as noted above, the Papst Patents offer scant detail as to how the simulator and packer should be implemented, let alone details of improvements to those components. The focus of the asserted claims is instead on "a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool"—specifically, using a generically claimed simulator as a tool to determine whether a memory test violates a set of rules, and using a generically claimed packer to optimize the test. *Enfish*, 2016 WL 2756255, at *5.

Plaintiff's argument that abstractness is defeated because the "claimed methods solve the problems [identified in the specification] or improve memory-device testing" in various ways is similarly unavailing. Opp. at 8–9 (citing *Enfish*, 2016 WL 2756255, at *6). In *Enfish*, the Federal Circuit observed that benefits described in the patent's specification bolstered the court's conclusion that the claims were directed to an improvement of existing database technology through the use of a "self-referential table." *Enfish*, 2016 WL 2756255, at *5. In contrast to the asserted claims in the instant case, however, the *Enfish* claims were directed to implementations of the self-referential tables or data structures that provided the purported improvement. *See id*.

Here, the primary improvement cited by Plaintiff—the efficient generation of memory tests

United States District Court
Northern District of California

for modern, complex memory devices, *see* Opp. at 9, 2–3—is not reflected in the limitations of the asserted claims. Nothing in the asserted claims limits the claimed processes to the generation of tests only for modern or complex memory devices, as opposed to simple tests for simple, conventional memory devices. *See* '759 patent, col. 2:1–3 ("The operation of early memory devices was simple and characterized by relatively few constraints."). The specification's description of the benefits of automation of a process using a computer is thus insufficient to save the asserted claims from abstractness. *See Accenture Global Servs.*, 728 F.3d at 1345 (focusing on the language of the claims and stating that the "level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method"). The remaining improvements cited by Plaintiff recite general advantages of using a computer to automate a memory-test verification process previously done manually, not improvements over a prior computerized method for simulating or verifying memory tests. *See* Opp. 8–9. Plaintiff is thus incorrect that the asserted claims are directed to a specific improvement of existing technology, as opposed to unduly preempting an abstract idea.

**2. The Asserted Claims of the Papst Patents Claim Automation of Mental or Pencil-and-Paper Processes**

In addition, Defendants contend that the abstract nature of the asserted claims is confirmed by the fact that "[t]he fundamental concept set out in each of the asserted claims can be—and, at least with early, simply memory devices, often was—carried out by a human test writer either mentally or with the aid of a pencil and paper." Mot. at 10.

Defendants are correct that the steps of the asserted claims reflect activity described by the specification as previously having been carried out by humans, and which are capable of being performed mentally or with pencil and paper. As the Papst Patents describe, human test writers wrote memory tests for early memory devices, and did so in accordance with the constraints of particular memory devices. '759 patent, col. 2:23–34; *see also id.*, col. 1:58–61 ("In creating a test, a test writer must define a sequence of operations which store and retrieve data to/from the memory device in accordance with certain 'operating constraints.'"). Defendants also

United States District Court
Northern District of California

convincingly argue that there is no reason why, at least for simple memory devices, the step of each asserted claim performed by "a simulator capable of determining" whether the memory tests violates any of the constraints of the memory device could not instead be performed mentally or with pencil and paper, simply by comparing the operations of a simple memory test to the rules obtained from a simple memory device data sheet. *See, e.g.*, '759 patent, col. 2:1–3 (noting that "[t]he operation of early memory devices was simple and characterized by relatively few constraints); *id.* col. 3:35–37 (acknowledging that memory devices and memory tests have varying levels of complexity). Similarly, the optimization step performed by the "packer" recited by Claim 14 of the '759 patent reflects a process that could be performed mentally or with pencil and paper. *See* '759 patent, col. 3:39–40 (acknowledging "a test writer is motivated to write efficient tests"); *id.* col. 6:10–13 (acknowledging that test writers previously worked to "minimiz[e] the time allocated between operations in the sequence of operations when the test is being written"). An equivalent function to the error messages recited by the asserted claims (other than Claim 14 of the '759 patent) can likewise be performed by a human test writer by noting a violation of a rule by the memory test, or noting the solution to such a violation as a result of the mental steps or pencil-and-paper calculations described above.

Plaintiff contends that Defendants' argument that the "functions recited in the [a]sserted [c]laims can be carried out mentally or with a pencil and paper is nonsensical" for three basic reasons: (1) because the claims "must be implemented on a computer"; (2) because the "packer" of Claim 14 of the '759 patent operates differently than a human test writer optimizing a test does; and (3) because "an unaided human cannot account for the near-instantaneous speed of memory operations." Opp. at 12–13. None of these reasons is persuasive.

First, Plaintiff's contention that the functions recited by the claims literally require the use of "software and computers" does not undermine Defendants' argument. *See, e.g.*, Opp. at 12 (arguing that "a human being cannot . . . iteratively call a simulator to optimize" a memory test). Although cases have found that claims directed to "computational methods which can be performed *entirely* in the human mind" are abstract, *CyberSource*, 654 F.3d at 1373 (emphasis

added), the Federal Circuit has also held that claims that literally require the use of a computer, but nevertheless reflect routine automation of activities which "could all be performed by humans without a computer" may be abstract. *Mortgage Grader*, 811 F.3d at 1324 (claims directed to patent-ineligible abstract idea where steps "could all be performed by humans without a computer" despite literally requiring "[a] computer-implemented system" including "a database," "a computer system," "a first interface," and "a second interface").

Second, Plaintiff's argument that the packer operates differently than a human test optimizer is unpersuasive. Opp. at 13 (arguing that "just because the packer shares a common goal with a human test writer does not mean that they reach the goal in the same way"). In this regard, Plaintiff essentially argues that human test writers previously attempted to minimize run time of a memory test while writing the test, while the packer operates after the test is written. *Id.* However, Plaintiff identifies no reason why a human could not simply optimize a test after it is written, regardless of whether that human would also attempt to minimize the run time of the test when first writing the test. Moreover, Plaintiff's argument that the operation of the packer should be distinguished from the way humans previously optimized memory tests is particularly unpersuasive given the generality with which the packer element is described, and the absence of any implementation details or claim limitations directed to the specific way in which the claimed packer achieves its goal.

Third, and finally, the Federal Circuit has repeatedly and emphatically rejected arguments similar to Plaintiff's contention that a computerized process is necessary to handle the complexity or speed contemplated by the invention where such complexity is not reflected in the claim limitations. *See, e.g.*, *Intellectual Ventures I*, 792 F.3d at 1367 ("Nor . . . does claiming the improved speed or efficiency inherent with applying the abstract idea on a computer provide a sufficient inventive concept"); *id.* at 1370 ("[O]ur precedent is clear that merely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea."); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) ("[R]elying on a computer to perform routine tasks more quickly or more accurately is

insufficient to render a claim patent eligible.”).

In this respect, Plaintiff's argument is akin to the argument rejected by the Federal Circuit in *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1008 (Fed. Cir. 2014) (non-prec). There, the Federal Circuit held the claimed computerized bingo management system was directed to patent-ineligible subject matter, despite the patentee's argument that "'in real world use, literally thousands, if not millions of preselected Bingo numbers are handled by the claimed computer program,' making it impossible for the invention to be carried out manually." *Id.* The complexity upon which the patentee relied, however, was not reflected in the actual claims at issue, which required at most "two sets of Bingo Numbers," a "player," and "a manager." *Id.* That is equally true in the instant case, where the claims are not limited to complex tests for complex memory devices, or similarly restricted in a manner which somehow might make the "near-instantaneous speed of memory operations" which Plaintiff cites relevant.[9] *See* Opp. at 13. As in *Planet Bingo*, the use of a computer in the Papst Patents might make a tedious verification process faster and more efficient, but it does not change the fundamental fact that the functions recited could also be performed by humans without a computer. *Cf.* '759 patent, col. 3:51–52; col. 6:18–21 (suggesting that invention lifts the "burden" from human test writer by automating manual process previously performed).

As noted above, whether a claim reflects routine automation of steps that could be performed by humans mentally or with a pencil and paper is a useful tool in determining whether the claim as a whole is directed to an abstract idea. *See, e.g.*, *Mortgage Grader*, 811 F.3d at 1324; *cf. CyberSource*, 654 F.3d at 1373. Here, the asserted claims' reflection of generic, and conventional, computerization of processes previously performed by humans without computers confirms the Court's conclusion that the asserted claims are directed to patent-ineligible abstract ideas.

[9] As Defendants also correctly note, Plaintiff's argument concerning the speed of modern memory devices fails for the additional reason that the claims are not directed to memory devices themselves (which Plaintiff states operate at "near-instantaneous speed"), but rather to generating and verifying memory tests—activity which need not occur at such speeds. Reply at 6.

United States District Court
Northern District of California

For the reasons stated above, the Court concludes that each of the asserted claims is directed to a patent-ineligible abstract idea. *See Alice*, 134 S. Ct. at 2355.

**B. *Alice* Step Two — Whether the Asserted Claims Contain an "Inventive Concept" Sufficient to Confer Patent Eligibility**

Having determined that the asserted claims are directed to patent-ineligible abstract ideas, the Court proceeds to the second step of the *Alice* framework to determine whether the claim's limitations—considered individually or as an ordered combination—serve to "transform the claims into a patent-eligible application." *Content Extraction*, 776 F.3d at 1348. Here, the Court concludes that the asserted claims' limitations, considered both individually and as a whole, include no such transformation or inventive concept sufficient to ensure that the claims in practice amount to significantly more than a patent upon the abstract idea itself. *See Alice*, 134 S. Ct. at 2355.

When viewed as an ordered combination, the claim limitations of the asserted claims specify steps at a high level of generality using generic software in order to carry out the abstract idea of (1) using a simulator to determine whether a memory test violates a set of rules and (2) using a packer to optimize that test. The U.S. Supreme Court in *Alice* explained that these types of claim limitations—which consist of little more than reciting the idea followed by "apply it"—are insufficient to salvage a claim directed to an abstract idea. *Alice*, 134 S. Ct. at 2357 (quoting *Mayo*, 132 S. Ct. at 1290); *see also Dealertrack*, 674 F.3d at 1333 (rejecting argument that use of a computer sufficiently limited the claims where the patent "[did] not specify how the computer hardware and database are specially programmed to perform the steps claimed in the patent") (quotation marks omitted).

Plaintiff's arguments to the contrary, which occupy a scant three pages of Plaintiff's Opposition, largely restate the same arguments made by Plaintiff in connection with the first step of the *Alice* framework. Opp. at 16–18. For example, as with Plaintiff's argument that the asserted claims are not directed to an abstract idea, Plaintiff contends that the claims as a whole contain an "inventive concept" at *Alice* step two because they include a simulator, and "the

specialized simulator is not a generic software implementation devoid of any particular details." Opp. 16. However, the Court has already considered, and rejected, that argument in connection with its analysis of the first step of the *Alice* framework. *See supra* Section III.A.1. Plaintiff's contentions that the asserted claims do not seek to patent abstract ideas because the claims recite a "simulator" or "packer" are thus incorrect.[10]

In addition, Plaintiff's arguments that the asserted claims are transformed by individual claim elements are equally unavailing. Plaintiff argues that four limitations of various asserted claims—which Plaintiff identifies as the "simulator," "packer," "outputted error," and "adjustment" elements—are sufficient, when viewed individually, to transform the abstract idea into patent-eligible claims. Opp. at 18. For the reasons previously discussed, however, the first two limitations upon which Plaintiff relies (the "simulator" and "packer" elements), each of which is claimed at a high level of generality, are insufficient to significantly narrow the scope of the claims beyond the abstract idea itself. Moreover, as the Federal Circuit has held, "[i]t is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea" where those components simply perform their "well-understood, routine, conventional" functions. *In re TLI Commc'ns*, 2016 WL 2865693, at *5 (quotation marks omitted). There is no suggestion in the specification of the Papst Patents that these two elements, the implementation of which is left largely unspecified, act unconventionally or do anything other than operate in their expected manner.[11]

---

[10] Plaintiff's suggestion that the claims are sufficiently limited because the simulator is limited to "receiving particular inputs: memory device operations and memory device operating constraints" is essentially an argument that the abstract concept is limited because the asserted claims apply to memory device tests. Opp. at 16. An abstract idea, however, "does not become nonabstract by limiting the invention to a particular field of use or technological environment[.]" *Intellectual Ventures I*, 792 F.3d at 1366.

[11] Papst notes that the PTAB recently denied institution of Xilinx's petition for *inter partes* review in connection with certain claims of the '759 patent containing the "packer" limitation, and argues that the PTAB's ruling is evidence of an inventive concept at *Alice* step two. Opp. at 18. Neither a Section 101 challenge generally nor the more specific question articulated by the U.S. Supreme Court as the second step of the *Alice* framework was before the PTAB, however, which ruled only that the particular prior art cited in Xilinx's petition failed to show a reasonable likelihood that Xilinx would prevail in establishing unpatentability under 35 U.S.C. § 103 (relating to obviousness). *See* DiNovo Decl., Ex. D., at 36; *see also* 35 U.S.C. § 311(b) (*inter partes* review

The second set of elements, to which Plaintiff refers as the "outputted error" and "adjustment" elements, similarly do not sufficiently narrow the claims in a manner sufficient to avoid preemption of the abstract idea itself. The Papst Patents contain no suggestion of any novel or unconventional way in which an error message or proposed adjustment would be created or displayed by the simulator that might impose a meaningful limitation on the claims' scope. Rather, using a computer (in some unspecified way) to output an error message or a suggested adjustment based on a calculation of rules violations (in some unspecified way) is precisely the type of limitation "reciting no more than generic computer elements performing generic computer tasks [that] does not make an abstract idea patent-eligible." *Intellectual Ventures I,* 792 F.3d at 1368. Further, any error message or adjustment is secondary to the use of the simulator, which the Papst Patents describe as the component responsible for comparing the memory test to a set of rules. Merely displaying the results of that calculation using a computer is similar to the type of "post-solution" activity that the U.S. Supreme Court suggested was insufficient to salvage an otherwise abstract claim in *Bilski*. *See* 561 U.S. at 610–11; *see also Flook*, 437 U.S. at 590 (rejecting "[t]he notion that post-solution activity, no matter how conventional or obvious in itself, can transform an unpatentable principle into a patentable process" where patentee argued that "the adjustment of the alarm limit to the figure computed" by the process made claim patent-eligible).

Finally, Plaintiff concludes its argument that the asserted claims contain transformative elements by devoting a single sentence to the machine or transformation test: "Moreover, each of the [a]sserted [c]laims is tied to a particular device—a computerized simulator for a semiconductor device." Opp. at 18. As explained at length above, however, the Papst Patents describe and claim the simulator at a level of generality that makes it a generic computer element, rather than a particular device sufficient to save an otherwise abstract claim. *See Alice*, 134 S. Ct. at 2358 ("[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention.").

---

limited to grounds "that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications"); *id.* § 314(a) (standard for instituting review).

Because the asserted claims are directed to an abstract idea and nothing in the claims adds an inventive concept, the claims are not patent-eligible under § 101.

**C. Claim Construction and Papst's Alternative Request for Denial Without Prejudice**

As a final matter, Plaintiff argues that Defendants' Motion should be denied without prejudice because "there are relevant fact-related disputes and claim construction issues." Opp. at 19. Plaintiff's generalized objection that resolution of the Motion should be delayed pending claim construction is without force. "[C]laim construction is not an inviolable prerequisite to a validity determination under § 101[.]" *Bancorp Servs.*, 687 F.3d at 1273. Moreover, Plaintiff has neither explained how any particular construction would alter the Section 101 analysis nor even proposed any such construction that the Court might view in the light most favorable to Plaintiff. *See, e.g.*, *Open Text S.A. v. Alfresco Software Ltd*, No. 13-CV-04843-JD, 2014 WL 4684429, at *3 (N.D. Cal. Sept. 19, 2014) ("In this case, the parties have not sought construction of any terms . . . and this lack of dispute over the proper construction of the asserted claims confirms that it is unnecessary to engage in claim construction before addressing validity under Section 101.").

At best, Plaintiff's Opposition argues elliptically that a simulator should be construed to include a specific software component for modeling semiconductor devices. Opp. at 10–12. Even if the Court were to interpret Plaintiff's arguments as a proposed construction of the term "simulator" and construe the term to include a software component for modeling semiconductor devices or predicting the behavior of a circuit, that construction would not alter the generic nature of the simulator as claimed in the asserted claims (much as inclusion of a generic "database," which is also a software component with a specific meaning, has been found not to salvage similar claims).

As explained above the Court has a "full understanding of the basic character of the claimed subject matter," *Content Extraction*, 776 F.3d at 1349, and Plaintiff has not identified any material factual dispute that exists or any claim construction issue that might affect the Court's Section 101 analysis. Accordingly, there is no reason why the Court cannot proceed with

United States District Court
Northern District of California

adjudication of the merits of Defendant's Motion at this time.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that each of the asserted claims of the Papst Patents is directed to a patent-ineligible abstract idea, and that the limitations of the asserted claims do not provide an "inventive concept" sufficient to transform these claims into patentable subject matter. Accordingly, the Court GRANTS Defendants' Motion for Judgment on the Pleadings. Claims 1, 4, 5, and 14 of the '759 patent and claims 1, 2, 5, and 6 of the '891 patent are invalid under 35 U.S.C. § 101. Because the asserted claims are directed to patent-ineligible subject matter, a defect which cannot be cured through amendment of a complaint, Plaintiff's claims for infringement are DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED.**

Dated: June 9, 2016

Lucy H. Koh

LUCY H. KOH
United States District Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

PAPST LICENSING GMBH & CO. KG,
Plaintiff,

v.

XILINX INC,
Defendant.

Case No. 16-CV-00925-LHK

**JUDGMENT**

On June 9, 2016, the Court granted defendant Xilinx Inc.'s ("Defendant's") Motion for Judgment on the Pleadings. ECF No. 99. The Court ruled that asserted claims 1, 4, 5, and 14 of U.S. Patent No. 6,574,759 and asserted claims 1, 2, 5, and 6 of U.S. Patent No. 6,704,891 are invalid under 35 U.S.C. § 101. Accordingly, JUDGMENT is hereby entered in favor of Defendant. The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: June 9, 2016

Lucy H. Koh
LUCY H. KOH
United States District Judge

US006574759B1

(12) **United States Patent**
**Woo et al.**

(10) **Patent No.: US 6,574,759 B1**
(45) **Date of Patent: Jun. 3, 2003**

(54) **METHOD FOR VERIFYING AND IMPROVING RUN-TIME OF A MEMORY TEST**

(75) Inventors: **Steven Cameron Woo**, Saratoga, CA (US); **John Philip Privitera**, San Mateo, CA (US); **Mark Alan Horowitz**, Menlo Park, CA (US)

(73) Assignee: **Rambus Inc.**, Los Altos, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/484,431**

(22) Filed: **Jan. 18, 2000**

(51) **Int. Cl.**[7] .............................................. **G11C 29/00**
(52) **U.S. Cl.** ....................................................... **714/718**
(58) **Field of Search** ........................... 714/718; 211/100

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,801,870 A * 1/1989 Eichelberger et al. ...... 714/732
5,740,353 A * 4/1998 Kreulen et al. ............... 714/33
5,974,241 A * 10/1999 Fusco ........................... 716/2
6,080,203 A * 6/2000 Njinda et al. ................. 703/14
6,170,078 B1 * 1/2001 Erle et al. ..................... 714/25
6,212,667 B1 * 4/2001 Geer et al. .................... 714/35
6,295,623 B1 * 9/2001 Lesmeister et al. ......... 714/724
6,311,317 B1 * 10/2001 Khoche et al. ............... 716/18
6,327,686 B1 * 12/2001 Grundmann et al. ........ 714/724
2001/0037497 A1 * 11/2001 Kumon .......................... 717/9
2002/0010909 A1 * 1/2002 Charisius et al. .............. 717/2
2002/0016954 A1 * 2/2002 Charisius et al. .............. 717/2
2002/0029231 A1 * 3/2002 Aptus et al. ................ 707/513
2002/0032900 A1 * 3/2002 Charisius et al. .............. 717/2

* cited by examiner

*Primary Examiner*—Albert Decady
*Assistant Examiner*—Cynthia Britt
(74) *Attorney, Agent, or Firm*—Pennie & Edmonds LLP

(57) **ABSTRACT**

A method of generating and verifying a memory test is disclosed. A simulator is used to verify that the sequence of time-ordered commands complies with a set of operating constraints for the memory. A packer may thereafter be used to optimize run time of the verified test.

**20 Claims, 3 Drawing Sheets**






(Prior Art)
FIG. 1



START
CREATE A TEST
10
CONVERT TEST FORMAT
11
PASS TEST THROUGH SIMULATOR
12
PASS?
13
No
FEEDBACK ERROR MESSAGE(S)
14
ALTER TEST
15
Yes
TIME OPTIMIZED?
16
No
RUN PACKER
17
ALTER TEST
18
Yes
TEST IS GOOD
19
STOP


FIG. 2


START
CREATE TEST USING SIMULATOR FORMAT
20
PASS?
21
No
ALTER TEST USING ERROR MESSAGE FEEDBACK
22
Yes
TIME OPTIMIZED?
23
No
RUN PACKER
24
Yes
TRANSLATE TEST INTO TESTER FORMAT
25
TEST IS GOOD
26
STOP

FIG. 3

# METHOD FOR VERIFYING AND IMPROVING RUN-TIME OF A MEMORY TEST

## BACKGROUND OF THE INVENTION

Memory devices, including Dynamic Random Access Memories (DRAMs), are implemented as integrated circuits (ICs). The decreased size, increased storage capacity, increased operating speed, and expanded capabilities of memory device ICs have revolutionized computer systems, telecommunications equipment and consumer electronics. However, these attributes have also created a number of technical challenges. Testing is one such challenge.

Integrated circuits implementing memory devices must be reliable. Accordingly, memory devices have been tested since their first manufacture. Very early in the history of memory device testing, specialized equipment and automated test routines were developed to improve testing efficiency. As the capacity and capabilities of memory devices increased, a broad range of tests were automated. Different memory device manufacturers prescribed different testing routines. Test equipment is typically custom and memory device testing routines were written specific to the custom test equipment.

Tests for memory devices may be conveniently divided into two categories; "test vectors," and "algorithmic patterns." A test vector typically consists of a linear set of operations to be performed. A test vector is often written in lower level language like assembly code. Test vectors access one or more memory device components and directly test their functionality over a range of common and end cases. For example, a write buffer might be run through a series of read/write sequences to verify correct operation.

An algorithmic pattern typically consists of a program written in a higher level language which better supports looping and branching constructs for the memory device test. In many conventional implementations, algorithmic patterns are written in a language that looks like a cross between microcode and assembly language. Such "languages" provide a richer set of control commands and expressions. Unfortunately, algorithmic patterns tend to generate some quirky side-effects within the test equipment. For example, dedicated hardware registers in the test equipment may become corrupted with invalid data during the generation of complicated test patterns. Such problems not withstanding, algorithmic patterns remain a mainstay of memory device test protocols. This is not surprising given the great number of memory locations which must be tested in contemporary memory devices. The practical implementation of a test which repeatedly writes data patterns to every location in a memory device requires some sort of looping operation. A set of linear test vectors sufficient to test the full storage capacity of contemporary memory deices would be impossibly long.

A "test" consists of one or more test vectors and/or one or more algorithmic patterns. In creating a test, a test writer must define a sequence of operations which store and retrieve data to/from the memory device in accordance with certain "operating constraints." Operating constraints take many forms including state-based and timing-based constraints, as well as other constraints which govern the proper operation of the memory device. (Attempting to CAS a bank of memory before it has been properly RASed in one example of a state-based constraint being violated. Attempting to CAS a memory bank too soon after it was RASed is



an example of a timing constraint being violated). The operation of early memory devices was simple and characterized by relatively few constraints. As memory devices have increased in complexity, a greater number of operating constraints have arisen. These constraints must be observed and accounted for during the definition and creation of a test.

Contemporary memory devices allow multiple transactions to be handled simultaneously. Compared to their predecessors, contemporary memory devices have an increased number of operating constraints which must be obeyed during a sequence of memory system operations. Further, the use of packets to exchange control/address information and data greatly expands the number of constraints which must be obeyed during the definition of a memory device test protocol. Not only does the number of constraints (or rules) increase for each individual transaction defined within the test protocol, but also the number of interactions between the various rules increases as multiple concurrent transactions are performed to fully test the capabilities of the memory device.

All of the foregoing has created quite a mess. Each memory device manufacturer prescribes a set of tests which targets different aspects of their particular design. Memory device test writers currently generate test protocols without benefit of a tool which provides feedback as to whether or not a test step or test routine violates one or more memory device constraints.

Accordingly, when a memory device fails a test, it is not certain whether the memory device is truly broken, or whether the test has been improperly constructed. In such circumstances, the test writer might ask the memory device designers whether the present interpretation of memory device constraints is correct. However, even if the interpretation is correct, the constraints may not be properly expressed in the written test code. Often a memory device "known-to-be-good" is used to test the test. This method presumes that the "known-good" memory device is still good despite its repeated handling in the test facility.

The flowchart of FIG. 1 illustrates a typical conventional process through which a memory device test is generated. Using current interpretations of memory device constraints, a test is created **2**, and run **3** on a memory device. If the memory device passes the test (**4**=yes), the test and the memory device are assumed to be good. As mentioned above, this assumption is often bolstered by the use of a "known-good" memory device during test development.

If the memory device fails the tests (**4**=no), the test writer is left in doubt as to whether the device failed on its own accord or whether the test is bad **6**. Assuming the test has violated some memory device constraint (**7**=yes), the test is changed **9** and the new test is run **3**. If the test writer has confidence in the test (**7**=no), the memory device is replaced **8** and the test is re-run **3**.

The conventional process of test generation thus relies on assumption and "trial-and-error" tactics to arrive at a test presumed to be good. Further, each new test must be verified against a number of different conditions, such as temperature, data state, power level, etc. The process of test design is lengthy and fraught with doubt. In fact, errors may enter the test design process during any one of steps **2**, **5**, **6**, **7** and **9** in the exemplary process shown in FIG. **1**.

For example, a timing constraint, such as the minimum period between RAS-to-CAS (tRCD), might be violated by a test which defines a slightly shorter period than that prescribed by the memory device specification. Using this constraint as an example, one batch of memory devices

might pass the test even though the test violates the specification for the devices. As a result, the test and the batch of memory devices are assumed to be good. (Step **5** above). As it turns out, the test violates the minimum tRCD period for the memory device, but the first batch of memory devices were able to tolerate the shorter than specified period for tRCD. Unfortunately, a subsequent batch of memory devices, while in actuality meeting specification, are not able to tolerate the shorter tRCD period defined by the test. Because the test has been assumed "good," the later batch of memory devices will be considered out-of-specification and may be thrown out. Such an error in the test protocol may not be caught until many good parts have been discarded as bad.

This result arises because the conventional process of generating a test does not include a mechanism for verifying compliance with actual memory device constraints. Only after a number of memory devices have successfully passed a test is the test assumed to be good. The conventional process of test generation thus involves a "chicken and egg" problem. In order to verify a test, "known-good" memory devices are required. However, known-good memory devices can not be identified until a valid set of tests have been run. Currently, this impasse is breached by running a "mother-of-all-vectors" test on memory devices in an attempt to identify known-good memory devices. While such an approach may serve to verify the memory device interface functionality, it can not reasonably test the entire core of the memory device.

In sum, as memory devices (or memory modules comprising a number of memory devices), memory controllers, and the exchange of data between the memory devices and the memory controller become more complex, the process of generating and verifying tests becomes vastly more complex. Beyond a certain level of complexity, effective test generation requires some additional means of verifying the test.

In addition to writing a test which adheres to the increasing multiplicity of memory device constraints, a test writer is motivated to write efficient tests. The time required to perform a test typically rises as memory devices increase in capacity and complexity. Often the goals of writing a complete, constraint compliant test and writing a run-time efficient test are at odds.

The process of generating memory device tests also requires some means for writing and expressing the tests in a higher level language. The current use of low-level commands, such as Direct RDRAM protocol operations, for example, necessitates that test writers be familiar with such cryptic programming means. Such a requirement unduly burdens test writers and inhibits the development of tests.

## SUMMARY OF THE INVENTION

In a first general aspect, the present invention provides a method by which a test writer may determine whether a proposed test violates any operating constraint for the memory device being tested. A simulator for a collection of one or more memory devices is developed using a parameter list covering all relevant constraints. A test is typically defined by a sequence of time-ordered operations. This time-ordered sequence is passed through the simulator to verify that it adheres to the operating constraints.

Constraint violations are indicated by error messages. The error messages may offer suggested fixes, such as timing adjustments required to place the sequence of operations in compliance with the constraints.



In a second general aspect, the present invention provides a "packer" function. A verified test may be passed through the packer to reduce its run-time in relation to the given constraints.

The present invention further provides methods for addressing the issue of programming language translation. Recognizing that the simulator is compatible with one programming language while a custom tester is compatible with another programming language, the present invention allows translation from one programming language to the other. In such cases, a test may be written in a tester compatible language and translated before verification in the simulator, or the test may be written in a simulator compatible language and translated after verification and run-time reduction.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a flowchart illustrating a conventional method for generating a memory device test;

FIG. **2** is a flowchart illustrating a method of generating and verifying a memory device test according to one aspect of the present invention; and

FIG. **3** is a flowchart illustrating a method of generating and verifying a memory device test according to another aspect of the present invention.

## DETAILED DESCRIPTION

At points in the following discussion, the terms "optimize," optimizing," "minimize," "minimizing," and their like are used to describe the effect of the present invention. These are relative terms in the sense that the present invention, at least in one aspect, is capable of significantly reducing the run-time of a test. However, one of ordinary skill in the art will recognize that any run-time reduction realized by the present invention is made in relation to a particular set of system constraints. Change the constraints and the run-time reduction realized may change as well. Thus, the foregoing terms should not be limited to absolute definitions of the minimum, or the optimal solution. Rather, "optimize" should, for example, be read as "further optimize, given the existing set of constraints." For the sake of clarity, however, such wordier characterizations are omitted in favor of the simpler terms noted.

The exemplary embodiments which follow are described in the context of a high-speed memory system which uses packetized control/address and data exchanges between a memory controller and one or more memory devices via a communications channel. That is, the test(s) generated, verified and run-time optimized by the present invention have particular application to at least contemporary memory systems like those designed by Rambus. Inc. of Mountain View, Calif. The Rambus DRAM (RDRAM) and its application in high-speed memory systems are well documented in available technical literature. While the present invention has been developed in relation to the Rambus memory architecture, it has much broader application. In fact, any test directed to a memory having a complex set of constraints will benefit from the dictates and teaching of the present invention.

The expression "memory device test(s)" is used throughout to broadly denote a test which exercises not only the internal functionality and storage capabilities of a memory device or a collection of memory devices (such as a module), but also the ability of the memory device or module to communicate with an external memory controller.

Thus, as expressed herein, "testing" a memory device connotes all aspects of transferring control/address information and data to and from the memory device, as well as storing data and retrieving data from the memory device.

In one aspect of the present invention, the behavior of a memory device or a memory module comprising one or more memory devices is simulated. The simulator is event-driven and directly models the behavior of one or more memory devices or modules on a communications channel.

The test writer provides a parameter file to the simulator that describes the architectural and timing characteristics of the memory device or module being simulated. The parameter file defines the operating constraints specified for the memory device. A time-ordered sequence of memory device operations are also input into the simulator. This set of operations is the test as first generated. It defines one or more vectors and/or algorithmic operations designed to exercise memory device functionality and storage capabilities. The present invention, as described in greater detail below, receives both the parameter file and the set of operations in text format which is easily read and understood. Thus, a familiarity with cryptic assembly languages is not a prerequisite to understanding and contributing to the test generation process facilitated by the present invention.

The simulator runs the set of operations against the set of constraints defined by the parameter file. If the list of operations violates a constraint, the simulator provides an error message. The error message is typically provided on a display screen associated with a computer system running the simulator. Errors are preferably identified in sequence, since the simulator will typically traverse the set of operations in a time-ordered sequence. Sequential error identification allows the test writer to verify early operations which may impact later operations in the test.

However, while presently preferred, error messages need not be sequentially related to a time-ordered set of operations. For example, some set of operations may include "JUMP" or "GOTO" branching operations which are implicated by a number of conditions. When executed, these operations may essentially re-order the set of operations according to the conditions.

Error messages may include a variable level of user feedback depending on the desired sophistication of the simulator. State-based error messages will communicate the state or memory device resource in conflict. State-based error messages may also identify a suggested state adjustment which will overcome the identified violation. Time-based error messages will communicate the timing constraint being violated. Time-based error messages may also identify a suggested timing adjustment which will overcome the identified violation.

The temporal relationship between operations in the set of operations has meaning beyond the ability of the set of operations to conform to the timing constraints expressed in the parameter file. As mentioned above, memory device testing must be as time efficient as possible to minimize testing overhead and associated costs.

Thus, in a second general aspect, the present invention provides a packer, i.e., a function which temporally "packs" the operations as tightly as possible given the current set of constraints. The packer accepts the time-ordered sequence of operations and the parameter file as inputs. The packer then iteratively calls the simulator to produce a version of the time-ordered sequence which minimizes the time allocated between different operations. In one embodiment of the packer, no attempt is made to re-order the sequence of operations. However, in other embodiments, re-ordering may be performed or suggested to the user. Further, write buffer side effects, where present, are maintained between unpacked and packed versions of the operations sequence. For example, if the unpacked sequence of operations calls for a write buffer to be cleared before the next operation, the packed sequence of operations maintains this requirement.

In this manner, operations are packed together as tightly as possible within the limits specified by the parameter file. When the simulator and packer are used together, a test writer need not worry about minimizing the time allocated between operations in the sequence of operations when the test is being written. Rather, when written the sequence of operations may be safely padded with time, and the packer function can thereafter be relied upon to generate a constraint compliant sequence of operations having optimal inter-operation timing with respect to the defined constraints. In effect, the burden of remembering and optimizing inter-operation timing considerations for a particular memory device or collection of one or more memory devices or modules is completely lifted from the test writer.

While the application of packer to a test offers significant benefit to test writers, and while much of this benefit may be derived in the automated output of the packer function, it should be recognized that the expansive breadth of possible tests preclude a trivial "one-size " fits all approach to test verification and optimization. For example, the effective application of the packer to some algorithmic tests comprising complex looping functions is non-trivial. Loop function annotations, i.e., comments written with the code implementing the loop function, might be necessary for packer to determine "pre-optimization" the structure of the loop. In fact, restrictions may necessarily be placed on the structure of loops in a test. Further, the present invention may be used to effectively verify and optimize such algorithmic tests by providing feedback to hand-alter the test, rather than the automated method described above.

In a similar vein, the present invention recognizes that some tests can be very long, and involve so many protocol operations that full simulation is impractical. Fortunately, many of these very long tests incorporate a unique test routine (or test kernel) which is repeated at great length. For such tests, the present invention may be used to verify and optimize the test kernel and extrapolate the resulting feedback to alter the entire test.

Such routine tradeoffs are left to the practitioner. Rather than merely verify the test kernel, the entire very lengthy test may be verified and run-time optimized, provided the test writer is willing to wait during the lengthy period of time such "full testing" may require. Alternatively, extremely powerful test hardware may be used to reduce the test verification and/or run-time optimizing time.

As implemented, the present invention effectively addresses "translation" issues while providing the simulator and packer functions to the test writer. As presently preferred, the simulator is written in a high level language like "C" on a UNIX based platform. A standard tool set or threads package, such as the CSIM**17** software library offered by Mesquite Software™, may be used to write the simulator. The simulator may be written to test memory devices on an individual basis, in groups (such as modules), and/or to test a channel fully populated channel with memory modules. The packer function is presently implemented as a "Perl script," a well known UNIX programming language.

In contrast, most testers require that a test be created and run in an entirely different language. Given existing, sig-

nificant capital investment in testers and the custom nature of tester development, a translation must occur between the tester environment and the simulator/packer environment. Such translation is best accomplished by a piece of code separate from the simulator, since it must be written in relation to the specific tester compatible programing language.

Use of a higher level language to write the simulator allows a related group of primitive memory device operations to be expressed as a single command. When executed during simulator operation, such a command is converted back into the set of primitive operations. The conversion process is transparent to the test user. Commands thus defined within the simulator are akin to conventional software "macros." A command may have timing information embedded within it, or it may be a simple list of primitive operations. Commands lacking timing information are very much like memory controller commands. In fact, the set of memory controller commands may be readily drawn upon to help define efficient simulator commands. For example, the command "Fetch Byte" might consist of a RAS operation, a CAS operation, and a Precharge operation. Conversion of the command might be performed in either a software model, written with reference to the memory controller command definitions, or an application specific integrated circuit (ASIC). However implemented, the conversion interpreter translates the command into a corresponding set of primitive operations.

By allowing the definition of macros, a library of validated high-level commands can be developed which allows a test writer to efficiently express a complex set of primitive operations without sacrificing accuracy. Test users, often different from the test writer, may review the high level code implementing the test to better understand the test's flow and application. User feedback refining subsequent test generations is thus facilitated. Finally, once effective macros are defined, subsequent test writers, perhaps lacking a detailed knowledge of the underlying primitives, may nonetheless write or modify memory device tests in a competent manner.

FIG. **2** is a flowchart illustrating use of the simulator and packer functions of the present invention to generate and verify a memory device test. Once a test is created **10** it may need to be translated from a tester-compatible language into a simulator/packer compatible language **11**. In other words, the test must conform to the simulator's input format. Since the simulator is written in a higher level language, tester compatible language conversion, if necessary, is readily accomplished.

Once the test is compatible with the simulator language, the test is passed through the simulator **12**. If the test does not violate any constraint defined by the parameter list implemented in the simulator (**13**=yes), no error message is generated and the test is ready for run-time optimization in the packer.

If, however, the simulator returns one or more error messages (**13**=no and **14**), the test is altered to correct the noted constraint violations **15**, and the test is run through the simulator again. This process is performed iteratively until the test passes through the simulator without error (**13**=yes).

Once the test complies with all constraints checked by the simulator, it is run through the packer (**16**=no and **17**). Packer may dictate alteration of the test **18** to minimize the run-time of the sequence of operations. Like the simulator, the packer may be run a number of times until the test is fully optimized. Thereafter, the test is accepted as good **19** and may be placed in a suite of memory device tests.

The flowchart shown in FIG. **3** illustrates another method by which the simulator and packer of the present invention may be used to generate and verify a memory device test. In the second illustrated approach, the test is first written in a simulator compatible language **20** without regard to the ultimate language or format used by the tester. This is at odds with the first approach discussed above which assumes an existing test written in tester compatible language.

By writing the test in a format compatible with the simulator, the front end translations required in the first approach are avoided. The test is then passed through the simulator. If one or more error messages are returned (**21**=no) the test is altered according to the noted errors **22** and re-run. The first approach requires that the test be modified when error(s) are found in the tester language. This modification will take place in the tester compatible language. Thus, translation between the two programming languages must take place repeatedly as the test is run iteratively through the simulator. The second approach does not require this repeated programming language translation as part of the iterative test generation and verification process.

Once the test passes through the simulator without error (**21**=yes), it may be time optimized by running the packer (**23**=yes and **24**). Only after being verified against a complete set of memory device constraints and optimized in run time is the test translated from the simulator/packer compatible language to the tester compatible language **25**, if necessary. Finally, the test is accepted as good **26** and is ready to used in actual testing.

By either method specifically illustrated or their equivalents, the present invention solves the problems inherent in the conventional method for generating memory device tests. Operating constraints are observed and automatically checked during the test generation. Resulting tests are known to be "good" in relation to actual constraints specified for the memory device. In contrast, the tests resulting from the conventional process are only known to be good in relation to some set of selected memory devices. When memory devices fail the conventional test, the tester is left to question whether the problem resides with the test or the new set of memory devices.

As memory devices and memory systems become increasingly complex over time, the test writer may write an entirely new suite of tests, re-write selected tests that have become outdated in view of the new memory device(s), or merely add one or more new tests to an existing suite of tests which are specifically directed to the expanded functionality of the new memory device(s). Since tests may be written in a higher level language, test generation is efficient.

Further, tests which conform to all memory device constraints may be optimized in their run-time by the present invention's packer function. Test writers need not struggle to efficiently time a sequence of operations under development. Rather, operations may be spaced with such extra time as is required to allow any combination of operations to run. Subsequently, packer will squeeze the sequence of operations down to its optimal run time.

Conventional test vectors and algorithmic patterns are often written in cryptic assembly code. It is often difficult to tell how much time passes, or even what operation is being performed in the tests written in such languages. The definition and expression of the simulator and packer of the present invention may be had in a higher level language. By using the same text-based programming language to write a test, the test writer may create a program which is very

readable. Once written, verified, and run-time optimized, the test may be translated by a separate piece of code into a tester compatible language.

The input format to the simulator may be readily modeled in accordance with the packet commands used in a memory system incorporating the memory devices to be tested. That is, assuming an existing command format or structure between a memory controller and a memory device, this format may readily serve as the basis for the simulator's input format.

The present invention has been described in relation to several examples. These are, however, merely teaching examples. The examples are drawn to individual memory devices and collections or groups of memory devices susceptible to the benefits of the present invention. However, the present invention may be used to verify and/or run-time optimize a test for any "memory." The physical form or architecture of the memory being tested is not a limiting factor in the application of the present invention, so long as an accurate simulator can be developed for the memory.

What is claimed is:

**1**. A method of generating a test for a memory having defined operating constraints, the method comprising:

developing a set of operations defining the test, where the set of operations is ordered in time;

passing the set of operations through a simulator capable of determining whether the set of operations violates any one of the operating constraints; and

upon determining that the set of operations violates any one of the operating constraints, outputting an error message, wherein the error message comprises an adjustment to the set of operations which will resolve the operating constraint violation.

**2**. A method of generating a test for a memory having defined operating constraints, the method comprising:

developing a set of operations defining the test, where the set of operations is ordered in time;

passing the set of operations through a simulator capable of determining whether the set of operations violates any one of the operating constraints; and

upon determining that the set of operations violates any one of the operating constraints, outputting an error message, wherein the error message identifies a violated state-based constraint.

**3**. The method of claim **2**, wherein the error message further identifies a state adjustment to the set of operations which will resolve the state-based constraint violation.

**4**. A method of generating a test for a memory having defined operating constraints, the method comprising:

developing a set of operations defining the test, where the set of operations is ordered in time;

passing the set of operations through a simulator capable of determining whether the set of operations violates any one of the operating constraints; and

upon determining that the set of operations violates any one of the operating constraints, outputting an error message, wherein the error message identifies a violated time-based constraint.

**5**. The method of claim **4**, wherein the error message further identifies a timing adjustment to the set of operations which will resolve the time-based constraint violation.

**6**. A method of generating a test for a memory having defined operating constraints, the method comprising:

developing a set of operations defining the test, where the set of operations is ordered in time;



passing the set of operations through a simulator capable of determining whether the set of operations violates any one of the operating constraints;

upon determining that the set of operations violates any one of the operating constraints, outputting an error message;

altering the set of operations in response to the error message; and

passing the altered set of operations through the simulator.

**7**. The method of claim **6**, wherein the steps of altering the set of operations in response to the error message, and passing the altered set of operations through the simulator are repeated until an altered set of operations passes through the simulator as a good test without an error message being generated.

**8**. The method of claim **7**, further comprising:

passing the good test through a packer to minimize run time of the good test in relation to the operating constraints.

**9**. A method of assessing a test for a memory having defined operating constraints, the method comprising:

accessing a parameter list expressing the operating constraints;

defining a simulator for the memory in accordance with the parameter list using a first programming language;

developing a set of operations defining the test, wherein the set of operations is developed in a second programming language;

converting the set of operations from the second programming language to the first programming language; and

verifying the test by passing the set of operations through the simulator.

**10**. The method of claim **9**, wherein the step of verifying the test further comprises:

(a) outputting an error message upon determining violation of any one of the operating constraints in the simulator;

(b) altering the set of operations in relation to the error message; and,

(c) repeating (a) and (b) until the set of operations passes through the simulator without outputting an error message.

**11**. A method of assessing a test for a memory having defined operating constraints, the method comprising:

accessing a parameter list expressing the operating constraints;

defining a simulator for the memory in accordance with the parameter list using a first programming language;

developing a set of operations defining the test, wherein the set of operations is developed in a second programming language;

converting the set of operations from the second programming language to the first programming language; and

verifying the test by passing the set of operations through the simulator, by

(a) outputting an error message upon determining violation of any one of the operating constraints in the simulator;

(b) altering the set of operations in relation to the error message

(c) converting the altered set of operations from the second programming language to the first programming language; and,

(d) repeating (a), (b), and (c) until the set of operations passes through the simulator as a good test without outputting an error message.

**12**. The method of claim **11**, further comprising:

passing the good test through a packer to minimize run time of the good test in relation to the operating constraints.

**13**. A method of generating a test for a memory having defined operating constraints, the method comprising:

creating an ordered-set of operations defining the test using a first programming language;

verifying the ordered-set of operations in a simulator capable of checking for violations of the operating constraints, wherein the first programming language is compatible with the simulator;

passing the verified ordered-set of operations through a packer to minimize run time of the test in relation to the operating constraints; and

translating the ordered-set of operations into a second programming language compatible with a tester running the test.

**14**. A method of generating and verifying a test for a memory having defined operating constraints, the method comprising:

defining one or more commands, wherein each one of the commands comprises a group of operations;

forming a time ordered sequence of commands defining the test;

verifying the test by passing the time ordered sequence of commands through a simulator capable of determining whether the time order sequence of commands violates any one of the operating constraints;

passing the verified test through a packer to minimize run time of the test in relation to the operating constraints.

**15**. The method of claim **14** wherein the commands are defined in a first programming language and the simulator is compatible with a second programming language, the method further comprising:

translating the time ordered sequence of commands from the first programming language to the second programming language before verifying the test.

**16**. The method of claim **14**, wherein the commands are defined in a first programming language compatible with the simulator, and wherein the test generated is run on a tester compatible with a second programming language, the method further comprising:

after passing the verified test through the packer, translating the test from the first programming language to the second programming language.

**17**. A method of generating a test for a memory having defined operating constraints, the method comprising:

developing a set of operations defining the test, where the set of operations is ordered in time;

passing the set of operations through a simulator to determine whether the set of operations violates any one of the operating constraints; and

upon determining that the set of operations violates any one of the operating constraints, altering the set of operations into a set of altered operations.

**18**. The method of claim **17**, further comprising passing the set of altered operations through the simulator to determine whether the altered set of operations violates any one of the operating constraints.

**19**. The method of claim **18**, said altering the set of operations and said passing the altered set of operations through the simulator are repeated until said set of altered operations passes through the simulator without violating any one of the operating constraints.

**20**. A method of generating a test for a memory having defined operating constraints, the method comprising:

developing a set of operations defining the test, where the set of operations is ordered in time;

passing the set of operations through a simulator to determine whether the set of operations violates any one of the operating constraints;

upon determining that the set of operations violates any one of the operating constraints, outputting an error message; and

altering the set of operations such that the operating constraint violation is eliminated.

* * * * *

US006704891B2

(12) **United States Patent**
**Woo et al.**

(10) **Patent No.: US 6,704,891 B2**
(45) **Date of Patent: Mar. 9, 2004**

(54) **METHOD FOR VERIFYING AND IMPROVING RUN-TIME OF A MEMORY TEST**

(75) Inventors: **Steven Cameron Woo**, Saratoga, CA (US); **John Philip Privitera**, San Mateo, CA (US); **Mark Alan Horowitz**, Menlo Park, CA (US)

(73) Assignee: **Rambus Inc.**, Los Altos, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/453,368**

(22) Filed: **Jun. 2, 2003**

(65) **Prior Publication Data**

US 2003/0200491 A1 Oct. 23, 2003

**Related U.S. Application Data**

(63) Continuation of application No. 09/484,431, filed on Jan. 18, 2000, now Pat. No. 6,574,759.

(51) **Int. Cl.**[7] .................................................. **G11C 29/00**

(52) **U.S. Cl.** ....................... **714/718**; 714/718; 711/100; 716/2; 716/4

(58) **Field of Search** .......................... 714/718; 711/100; 716/2–4

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,801,870 A * 1/1989 Eichelberger et al. ...... 714/736
5,740,353 A * 4/1998 Kreulen et al. ............... 714/42
5,974,241 A * 10/1999 Fusco ........................... 716/2
6,080,203 A * 6/2000 Njinda et al. .................. 716/4
6,170,078 B1 * 1/2001 Erle et al. ...................... 716/4
6,212,667 B1 * 4/2001 Geer et al. ..................... 716/6
6,295,623 B1 * 9/2001 Lesmeister et al. ......... 714/741
6,311,317 B1 * 10/2001 Khoche et al. ............... 716/18
6,327,686 B1 * 12/2001 Grundmann et al. ........ 714/738
2001/0037497 A1 * 11/2001 Kumon .......................... 717/9
2002/0010909 A1 * 1/2002 Charisius et al. .............. 717/2
2002/0016954 A1 * 2/2002 Charisius et al. .............. 717/2
2002/0029231 A1 * 3/2002 Aptus et al. ................ 707/513
2002/0032900 A1 * 3/2002 Charisius et al. .............. 717/2

* cited by examiner

*Primary Examiner*—Stephen M. Baker
*Assistant Examiner*—Cynthia H Britt
(74) *Attorney, Agent, or Firm*—Pennie & Edmonds LLP

(57) **ABSTRACT**

A method of generating and verifying a memory test is disclosed. A simulator is used to verify that the sequence of time-ordered commands complies with a set of operating constraints for the memory. A packer may thereafter be used to optimize run time of the verified test.

**12 Claims, 3 Drawing Sheets**






(Prior Art)
FIG. 1


START
CREATE A TEST
10
CONVERT TEST FORMAT
11
PASS TEST THROUGH SIMULATOR
12
PASS?
13
No
FEEDBACK ERROR MESSAGE(S)
14
ALTER TEST
15
Yes
TIME OPTIMIZED?
16
No
RUN PACKER
17
ALTER TEST
18
Yes
TEST IS GOOD
19
STOP

FIG. 2


START
CREATE TEST USING SIMULATOR FORMAT
20
PASS?
21
No
ALTER TEST USING ERROR MESSAGE FEEDBACK
22
Yes
24
TIME OPTIMIZED?
23
No
RUN PACKER
Yes
TRANSLATE TEST INTO TESTER FORMAT
25
TEST IS GOOD
26
STOP

FIG. 3

# METHOD FOR VERIFYING AND IMPROVING RUN-TIME OF A MEMORY TEST

This is a continuation of application Ser. No. 09/484,431, filed Jan. 18, 2000 U.S. Pat. No. 6,574,759.

## BACKGROUND OF THE INVENTION

Memory devices, including Dynamic Random Access Memories (DRAMs), are implemented as integrated circuits (ICs). The decreased size, increased storage capacity, increased operating speed, and expanded capabilities of memory device ICs have revolutionized computer systems, telecommunications equipment and consumer electronics. However, these attributes have also created a number of technical challenges. Testing is one such challenge.

Integrated circuits implementing memory devices must be reliable. Accordingly, memory devices have been tested since their first manufacture. Very early in the history of memory device testing, specialized equipment and automated test routines were developed to improve testing efficiency. As the capacity and capabilities of memory devices increased, a broad range of tests were automated. Different memory device manufacturers prescribed different testing routines. Test equipment is typically custom and memory device testing routines were written specific to the custom test equipment.

Tests for memory devices may be conveniently divided into two categories; "test vectors," and "algorithmic patterns." A test vector typically consists of a linear set of operations to be performed. A test vector is often written in lower level language like assembly code. Test vectors access one or more memory device components and directly test their functionality over a range of common and end cases. For example, a write buffer might be run through a series of read/write sequences to verify correct operation.

An algorithmic pattern typically consists of a program written in a higher level language which better supports looping and branching constructs for the memory device test. In many conventional implementations, algorithmic patterns are written in a language that looks like a cross between microcode and assembly language. Such "languages" provide a richer set of control commands and expressions. Unfortunately, algorithmic patterns tend to generate some quirky side-effects within the test equipment. For example, dedicated hardware registers in the test equipment may become corrupted with invalid data during the generation of complicated test patterns. Such problems not withstanding, algorithmic patterns remain a mainstay of memory device test protocols. This is not surprising given the great number of memory locations which must be tested in contemporary memory devices. The practical implementation of a test which repeatedly writes data patterns to every location in a memory device requires some sort of looping operation. A set of linear test vectors sufficient to test the full storage capacity of contemporary memory deices would be impossibly long.

A "test" consists of one or more test vectors and/or one or more algorithmic patterns. In creating a test, a test writer must define a sequence of operations which store and retrieve data to/from the memory device in accordance with certain "operating constraints." Operating constraints take many forms including state-based and timing-based constraints, as well as other constraints which govern the proper operation of the memory device. (Attempting to CAS a bank of memory before it has been properly RASed in one example of a state-based constraint being violated. Attempting to CAS a memory bank too soon after it was RASed is an example of a timing constraint being violated). The operation of early memory devices was simple and characterized by relatively few constraints. As memory devices have increased in complexity, a greater number of operating constraints have arisen. These constraints must be observed and accounted for during the definition and creation of a test.

Contemporary memory devices allow multiple transactions to be handled simultaneously. Compared to their predecessors, contemporary memory devices have an increased number of operating constraints which must be obeyed during a sequence of memory system operations. Further, the use of packets to exchange control/address information and data greatly expands the number of constraints which must be obeyed during the definition of a memory device test protocol. Not only does the number of constraints (or rules) increase for each individual transaction defined within the test protocol, but also the number of interactions between the various rules increases as multiple concurrent transactions are performed to fully test the capabilities of the memory device.

All of the foregoing has created quite a mess. Each memory device manufacturer prescribes a set of tests which targets different aspects of their particular design. Memory device test writers currently generate test protocols without benefit of a tool which provides feedback as to whether or not a test step or test routine violates one or more memory device constraints.

Accordingly, when a memory device fails a test, it is not certain whether the memory device is truly broken, or whether the test has been improperly constructed. In such circumstances, the test writer might ask the memory device designers whether the present interpretation of memory device constraints is correct. However, even if the interpretation is correct, the constraints may not be properly expressed in the written test code. Often a memory device "known-to-be-good" is used to test the test. This method presumes that the "known-good" memory device is still good despite its repeated handling in the test facility.

The flowchart of FIG. **1** illustrates a typical conventional process through which a memory device test is generated. Using current interpretations of memory device constraints, a test is created **2**, and run **3** on a memory device. If the memory device passes the test (**4**=yes), the test and the memory device are assumed to be good. As mentioned above, this assumption is often bolstered by the use of a "known-good" memory device during test development.

If the memory device fails the tests (**4**=no), the test writer is left in doubt as to whether the device failed on its own accord or whether the test is bad **6**. Assuming the test has violated some memory device constraint (**7**=yes), the test is changed **9** and the new test is run **3**. If the test writer has confidence in the test (**7**=no), the memory device is replaced **8** and the test is rerun **3**.

The conventional process of test generation thus relies on assumption and "trial-and-error" tactics to arrive at a test presumed to be good. Further, each new test must be verified against a number of different conditions, such as temperature, data state, power level, etc. The process of test design is lengthy and fraught with doubt. In fact, errors may enter the test design process during any one of steps **2**, **5**, **6**, **7** and **9** in the exemplary process shown in FIG. **1**.

For example, a timing constraint, such as the minimum period between RAS-to-CAS (tRCD), might be violated by a test which defines a slightly shorter period than that

prescribed by the memory device specification. Using this constraint as an example, one batch of memory devices might pass the test even though the test violates the specification for the devices. As a result, the test and the batch of memory devices are assumed to be good. (Step **5** above). As it turns out, the test violates the minimum tRCD period for the memory device, but the first batch of memory devices were able to tolerate the shorter than specified period for tRCD.

Unfortunately, a subsequent batch of memory devices, while in actuality meeting specification, are not able to tolerate the shorter tRCD period defined by the test. Because the test has been assumed "good," the later batch of memory devices will be considered out-of-specification and may be thrown out. Such an error in the test protocol may not be caught until many good parts have been discarded as bad.

This result arises because the conventional process of generating a test does not include a mechanism for verifying compliance with actual memory device constraints. Only after a number of memory devices have successfully passed a test is the test assumed to be good. The conventional process of test generation thus involves a "chicken and egg" problem. In order to verify a test, "known-good" memory devices are required. However, known-good memory devices can not be identified until a valid set of tests have been run. Currently, this impasse is breached by running a "mother-of-all-vectors" test on memory devices in an attempt to identify known-good memory devices. While such an approach may serve to verify the memory device interface functionality, it can not reasonably test the entire core of the memory device.

In sum, as memory devices (or memory modules comprising a number of memory devices), memory controllers, and the exchange of data between the memory devices and the memory controller become more complex, the process of generating and verifying tests becomes vastly more complex. Beyond a certain level of complexity, effective test generation requires some additional means of verifying the test.

In addition to writing a test which adheres to the increasing multiplicity of memory device constraints, a test writer is motivated to write efficient tests. The time required to perform a test typically rises as memory devices increase in capacity and complexity. Often the goals of writing a complete, constraint compliant test and writing a run-time efficient test are at odds.

The process of generating memory device tests also requires some means for writing and expressing the tests in a higher level language. The current use of low-level commands, such as Direct RDRAM protocol operations, for example, necessitates that test writers be familiar with such cryptic programming means. Such a requirement unduly burdens test writers and inhibits the development of tests.

## SUMMARY OF THE INVENTION

In a first general aspect, the present invention provides a method by which a test writer may determine whether a proposed test violates any operating constraint for the memory device being tested. A simulator for a collection of one or more memory devices is developed using a parameter list covering all relevant constraints. A test is typically defined by a sequence of time-ordered operations. This time-ordered sequence is passed through the simulator to verify that it adheres to the operating constraints.

Constraint violations are indicated by error messages. The error messages may offer suggested fixes, such as timing adjustments required to place the sequence of operations in compliance with the constraints.

In a second general aspect, the present invention provides a "packer" function. A verified test may be passed through the packer to reduce its run-time in relation to the given constraints.

The present invention further provides methods for addressing the issue of programming language translation. Recognizing that the simulator is compatible with one programming language while a custom tester is compatible with another programming language, the present invention allows translation from one programming language to the other. In such cases, a test may be written in a tester compatible language and translated before verification in the simulator, or the test may be written in a simulator compatible language and translated after verification and run-time reduction.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a flowchart illustrating a conventional method for generating a memory device test;

FIG. **2** is a flowchart illustrating a method of generating and verifying a memory device test according to one aspect of the present invention; and

FIG. **3** is a flowchart illustrating a method of generating and verifying a memory device test according to another aspect of the present invention.

## DETAILED DESCRIPTION

At points in the following discussion, the terms "optimize," "optimizing," "minimize," "minimizing," and their like are used to describe the effect of the present invention. These are relative terms in the sense that the present invention, at least in one aspect, is capable of significantly reducing the run-time of a test. However, one of ordinary skill in the art will recognize that any run-time reduction realized by the present invention is made in relation to a particular set of system constraints. Change the constraints and the run-time reduction realized may change as well. Thus, the foregoing terms should not be limited to absolute definitions of the minimum, or the optimal solution. Rather, "optimize" should, for example, be read as "further optimize, given the existing set of constraints." For the sake of clarity, however, such wordier characterizations are omitted in favor of the simpler terms noted.

The exemplary embodiments which follow are described in the context of a high-speed memory system which uses packetized control/address and data exchanges between a memory controller and one or more memory devices via a communications channel. That is, the test(s) generated, verified and run-time optimized by the present invention have particular application to at least contemporary memory systems like those designed by Rambus. Inc. of Mountain View, Calif. The Rambus DRAM (RDRAM) and its application in high-speed memory systems are well documented in available technical literature. While the present invention has been developed in relation to the Rambus memory architecture, it has much broader application. In fact, any test directed to a memory having a complex set of constraints will benefit from the dictates and teaching of the present invention.

The expression "memory device test(s)" is used throughout to broadly denote a test which exercises not only the internal functionality and storage capabilities of a memory device or a collection of memory devices (such as a

module), but also the ability of the memory device or module to communicate with an external memory controller. Thus, as expressed herein, "testing" a memory device connotes all aspects of transferring control/address information and data to and from the memory device, as well as storing data and retrieving data from the memory device.

In one aspect of the present invention, the behavior of a memory device or a memory module comprising one or more memory devices is simulated. The simulator is event-driven and directly models the behavior of one or more memory devices or modules on a communications channel.

The test writer provides a parameter file to the simulator that describes the architectural and timing characteristics of the memory device or module being simulated. The parameter file defines the operating constraints specified for the memory device. A time-ordered sequence of memory device operations are also input into the simulator. This set of operations is the test as first generated. It defines one or more vectors and/or algorithmic operations designed to exercise memory device functionality and storage capabilities. The present invention, as described in greater detail below, receives both the parameter file and the set of operations in text format which is easily read and understood. Thus, a familiarity with cryptic assembly languages is not a prerequisite to understanding and contributing to the test generation process facilitated by the present invention.

The simulator runs the set of operations against the set of constraints defined by the parameter file. If the list of operations violates a constraint, the simulator provides an error message. The error message is typically provided on a display screen associated with a computer system running the simulator. Errors are preferably identified in sequence, since the simulator will typically traverse the set of operations in a time-ordered sequence. Sequential error identification allows the test writer to verify early operations which may impact later operations in the test.

However, while presently preferred, error messages need not be sequentially related to a time-ordered set of operations. For example, some set of operations may include "JUMP" or "GOTO" branching operations which are implicated by a number of conditions. When executed, these operations may essentially re-order the set of operations according to the conditions.

Error messages may include a variable level of user feedback depending on the desired sophistication of the simulator. State-based error messages will communicate the state or memory device resource in conflict. State-based error messages may also identify a suggested state adjustment which will overcome the identified violation. Time-based error messages will communicate the timing constraint being violated. Time-based error messages may also identify a suggested timing adjustment which will overcome the identified violation.

The temporal relationship between operations in the set of operations has meaning beyond the ability of the set of operations to conform to the timing constraints expressed in the parameter file. As mentioned above, memory device testing must be as time efficient as possible to minimize testing overhead and associated costs.

Thus, in a second general aspect, the present invention provides a packer, i.e., a function which temporally "packs" the operations as tightly as possible given the current set of constraints. The packer accepts the time-ordered sequence of operations and the parameter file as inputs. The packer then iteratively calls the simulator to produce a version of the time-ordered sequence which minimizes the time allocated between different operations. In one embodiment of the packer, no attempt is made to re-order the sequence of operations. However, in other embodiments, re-ordering may be performed or suggested to the user. Further, write buffer side effects, where present, are maintained between unpacked and packed versions of the operations sequence. For example, if the unpacked sequence of operations calls for a write buffer to be cleared before the next operation, the packed sequence of operations maintains this requirement.

In this manner, operations are packed together as tightly as possible within the limits specified by the parameter file. When the simulator and packer are used together, a test writer need not worry about minimizing the time allocated between operations in the sequence of operations when the test is being written. Rather, when written the sequence of operations may be safely padded with time, and the packer function can thereafter be relied upon to generate a constraint compliant sequence of operations having optimal inter-operation timing with respect to the defined constraints. In effect, the burden of remembering and optimizing inter-operation timing considerations for a particular memory device or collection of one or more memory devices or modules is completely lifted from the test writer.

While the application of packer to a test offers significant benefit to test writers, and while much of this benefit may be derived in the automated output of the packer function, it should be recognized that the expansive breadth of possible tests preclude a trivial "one-size" fits all approach to test verification and optimization. For example, the effective application of the packer to some algorithmic tests comprising complex looping functions is non-trivial. Loop function annotations, i.e., comments written with the code implementing the loop function, might be necessary for packer to determine "pre-optimization" the structure of the loop. In fact, restrictions may necessarily be placed on the structure of loops in a test. Further, the present invention may be used to effectively verify and optimize such algorithmic tests by providing feedback to hand-alter the test, rather than the automated method described above.

In a similar vein, the present invention recognizes that some tests can be very long, and involve so many protocol operations that full simulation is impractical. Fortunately, many of these very long tests incorporate a unique test routine (or test kernel) which is repeated at great length. For such tests, the present invention may be used to verify and optimize the test kernel and extrapolate the resulting feedback to alter the entire test.

Such routine tradeoffs are left to the practitioner. Rather than merely verify the test kernel, the entire very lengthy test may be verified and run-time optimized, provided the test writer is willing to wait during the lengthy period of time such "full testing" may require.

Alternatively, extremely powerful test hardware may be used to reduce the test verification and/or run-time optimizing time.

As implemented, the present invention effectively addresses "translation" issues while providing the simulator and packer functions to the test writer. As presently preferred, the simulator is written in a high level language like "C" on a UNIX based platform. A standard tool set or threads package, such as the CSIM17 software library offered by Mesquite Software™, may be used to write the simulator. The simulator may be written to test memory devices on an individual basis, in groups (such as modules), and/or to test a channel fully populated channel with memory modules. The packer function is presently implemented as a "Perl script," a well known UNIX programming language.

In contrast, most testers require that a test be created and run in an entirely different language. Given existing, significant capital investment in testers and the custom nature of tester development, a translation must occur between the tester environment and the simulator/packer environment. Such translation is best accomplished by a piece of code separate from the simulator, since it must be written in relation to the specific tester compatible programing language.

Use of a higher level language to write the simulator allows a related group of primitive memory device operations to be expressed as a single command. When executed during simulator operation, such a command is converted back into the set of primitive operations. The conversion process is transparent to the test user. Commands thus defined within the simulator are akin to conventional software "macros." A command may have timing information embedded within it, or it may be a simple list of primitive operations. Commands lacking timing information are very much like memory controller commands. In fact, the set of memory controller commands may be readily drawn upon to help define efficient simulator commands. For example, the command "Fetch Byte" might consist of a RAS operation, a CAS operation, and a Precharge operation. Conversion of the command might be performed in either a software model, written with reference to the memory controller command definitions, or an application specific integrated circuit (ASIC). However implemented, the conversion interpreter translates the command into a corresponding set of primitive operations.

By allowing the definition of macros, a library of validated high-level commands can be developed which allows a test writer to efficiently express a complex set of primitive operations without sacrificing accuracy. Test users, often different from the test writer, may review the high level code implementing the test to better understand the test's flow and application. User feedback refining subsequent test generations is thus facilitated. Finally, once effective macros are defined, subsequent test writers, perhaps lacking a detailed knowledge of the underlying primitives, may nonetheless write or modify memory device tests in a competent manner.

FIG. **2** is a flowchart illustrating use of the simulator and packer functions of the present invention to generate and verify a memory device test. Once a test is created **10** it may need to be translated from a tester-compatible language into a simulator/packer compatible language **11**. In other words, the test must conform to the simulator's input format. Since the simulator is written in a higher level language, tester compatible language conversion, if necessary, is readily accomplished.

Once the test is compatible with the simulator language, the test is passed through the simulator **12**. If the test does not violate any constraint defined by the parameter list implemented in the simulator (**13**=yes), no error message is generated and the test is ready for run-time optimization in the packer.

If, however, the simulator returns one or more error messages (**13**=no and **14**), the test is altered to correct the noted constraint violations **15**, and the test is run through the simulator again. This process is performed iteratively until the test passes through the simulator without error (**13**=yes).

Once the test complies with all constraints checked by the simulator, it is run through the packer (**16**=no and **17**). Packer may dictate alteration of the test **18** to minimize the run-time of the sequence of operations. Like the simulator, the packer may be run a number of times until the test is fully optimized. Thereafter, the test is accepted as good **19** and may be placed in a suite of memory device tests.

The flowchart shown in FIG. **3** illustrates another method by which the simulator and packer of the present invention may be used to generate and verify a memory device test. In the second illustrated approach, the test is first written in a simulator compatible language **20** without regard to the ultimate language or format used by the tester. This is at odds with the first approach discussed above which assumes an existing test written in tester compatible language.

By writing the test in a format compatible with the simulator, the front end translations required in the first approach are avoided. The test is then passed through the simulator. If one or more error messages are returned (**21**=no) the test is altered according to the noted errors **22** and re-run. The first approach requires that the test be modified when error(s) are found in the tester language. This modification will take place in the tester compatible language. Thus, translation between the two programming languages must take place repeatedly as the test is run iteratively through the simulator. The second approach does not require this repeated programming language translation as part of the iterative test generation and verification process.

Once the test passes through the simulator without error (**21**=yes), it may be time optimized by running the packer (**23**=yes and **24**). Only after being verified against a complete set of memory device constraints and optimized in run time is the test translated from the simulator/packer compatible language to the tester compatible language **25**, if necessary. Finally, the test is accepted as good **26** and is ready to used in actual testing.

By either method specifically illustrated or their equivalents, the present invention solves the problems inherent in the conventional method for generating memory device tests. Operating constraints are observed and automatically checked during the test generation. Resulting tests are known to be "good" in relation to actual constraints specified for the memory device. In contrast, the tests resulting from the conventional process are only known to be good in relation to some set of selected memory devices. When memory devices fail the conventional test, the tester is left to question whether the problem resides with the test or the new set of memory devices.

As memory devices and memory systems become increasingly complex over time, the test writer may write an entirely new suite of tests, re-write selected tests that have become outdated in view of the new memory device(s), or merely add one or more new tests to an existing suite of tests which are specifically directed to the expanded functionality of the new memory device(s). Since tests may be written in a higher level language, test generation is efficient.

Further, tests which conform to all memory device constraints may be optimized in their run-time by the present invention's packer function. Test writers need not struggle to efficiently time a sequence of operations under development. Rather, operations may be spaced with such extra time as is required to allow any combination of operations to run. Subsequently, packer will squeeze the sequence of operations down to its optimal run time.

Conventional test vectors and algorithmic patterns are often written in cryptic assembly code. It is often difficult to tell how much time passes, or even what operation is being performed in the tests written in such languages. The definition and expression of the simulator and packer of the present invention may be had in a higher level language. By

using the same text-based programming language to write a test, the test writer may create a program which is very readable. Once written, verified, and run-time optimized, the test may be translated by a separate piece of code into a tester compatible language.

The input format to the simulator may be readily modeled in accordance with the packet commands used in a memory system incorporating the memory devices to be tested. That is, assuming an existing command format or structure between a memory controller and a memory device, this format may readily serve as the basis for the simulator's input format.

The present invention has been described in relation to several examples. These are, however, merely teaching examples. The examples are drawn to individual memory devices and collections or groups of memory devices susceptible to the benefits of the present invention. However, the present invention may be used to verify and/or run-time optimize a test for any "memory." The physical form or architecture of the memory being tested is not a limiting factor in the application of the present invention, so long as an accurate simulator can be developed for the memory.

What is claimed is:

**1**. A method of simulating the behavior of a memory device, the method comprising:

defining a set of operating constraints based on the characteristics of the memory device;

providing a set of memory device operations, wherein the set of memory device operations is ordered in time;

passing the set of operations through a simulator capable of determining whether the set of memory device operation violates any one of the operating constraints; and

outputting an error message upon determining that the set of operations violates any one of the operating constraints.

**2**. The method of claim **1**, wherein the error message comprises an adjustment to the set of operations which will resolve the operation constraint violation.

**3**. The method of claim **1**, wherein the error message identifies a violated state-based constraint.

**4**. The method of claim **3**, wherein the error message further identifies a state adjustment to the set of operations which will resolve the state-based constraint violation.

**5**. The method of claim **1**, wherein the error message identifies a violated time-based constraint.

**6**. The method of claim **5**, wherein the error message further identifies a timing adjustment to the set of operations which will resolve the time-based constraint violation.

**7**. A method of simulating the behavior of a memory device, the method comprising:

defining a set of operating constraints based on the characteristics of the memory device;

providing one or more commands, wherein each one of the commands comprises a group of memory device operations;

forming a time ordered sequence of commands;

passing the time ordered sequence of commands through a simulator capable of determining whether the time ordered sequence of commands violates any one of the operating constraints; and

outputting an error message upon determining any one of the commands violates any one of the operating constraints.

**8**. The method of claim **7**, wherein the error message comprises an adjustment to at least one of the one or more commands which will resolve the operation constraint violation.

**9**. The method of claim **7**, wherein the error message identifies a violated state-based constraint.

**10**. The method of claim **9**, wherein the error message further identifies a state adjustment to at least one of the one or more commands which will resolve the state-based constraint violation.

**11**. The method of claim **7**, wherein the error message identifies a violated time-based constraint.

**12**. The method of claim **11**, wherein the error message further identifies a timing adjustment to at least one of the one or more commands which will resolve the time-based constraint violation.

* * * * *

**United States Court of Appeals**
**for the Federal Circuit**
PAPST LICENSING GMBH & CO. KG v. XILINX, INC. 2016-2323

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by DINOVO PRICE ELLWANGER & HARDY LLP, Attorneys for Plaintiff-Appellant to print this document. I am an employee of Counsel Press.

On October 4, 2016, Counsel for Plaintiff-Appellant has authorized me to electronically file the foregoing **Corrected Brief for Plaintiff-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Patrick T. Michael
(Principal Attorney)
Matthew J. Silveira
JONES DAY
555 California Street, 26th Floor
San Francisco, California 94101
(415) 626-3939
pmichael@jonesday.com
msilveira@jonesday.com

David B. Cochran
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-7029
dcochran@jonesday.com

*Counsel for Defendant-Appellee,*
*XILINX, INC.*

Two paper copies of each version will also be sent to lead counsel for the Defendant-Appellees, Patrick T. Michael, via Express Mail to the above address when paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, within the time provided in the Court's rules.

October 4, 2016

/s/ Robyn Cocho
Counsel Press

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATIONS,
TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

1. This brief of Plaintiff-Appellant complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 13,921 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2. The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Civil Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Office Word Version 2007 in 14-point Time New Roman.

Dated: October 4, 2016

DiNovo Price Ellwanger & Hardy LLP
7000 N. MoPac Expressway
Suite 350
Austin, Texas 78702
Tel: 512.539.2626
Fax: 512.539.2627

By: */s/ Nicole E. Glauser*
Nicole E. Glauser
Attorneys for Plaintiff-Appellant